1   John T. Masterson, Bar #007447
    Joseph J. Popolizio, Bar #017434
2   Justin M. Ackerman, Bar #030726
    Ian C. Beck, Bar #035599
3   JONES, SKELTON & HOCHULI, P.L.C.
    40 North Central Avenue, Suite 2700
4   Phoenix, Arizona 85004
    Telephone: (602) 263-1700
5   Fax: (602) 200-7846
    jmasterson@jshfirm.com
6   jpopolizio@jshfirm.com
    jackerman@jshfirm.com
7   ibeck@jshfirm.com

8   Attorneys for Defendants City of Mesa,
    Michael Pezzelle, James Pollard, Hoapili Baker,
9   Jalyn Bellows, William Jones, Brandon Ekren,
    Andrew Walag, and Donald Rudd
10

11                   **UNITED STATES DISTRICT COURT**

12                         **DISTRICT OF ARIZONA**

13  Jennifer Lane, individually and on behalf        NO. 2:19-cv-00852-SMB
    of the statutory beneficiaries of S.L., and in
14  her capacity as the Personal Representative of   **MESA DEFENDANTS' MOTION**
    the Estate of S.L.,                              **FOR SUMMARY JUDGMENT**
15
                                                     (Oral Argument Requested)
16                                      Plaintiffs,

17              v.

18  City of Mesa, a municipality; City of
    Chandler, a municipality; Michael
19  Pezzelle, an individual; James Pollard, an
    individual; Hoapili Baker, an individual;
20  Jalyn Bellows, an individual; William
    Jones, an individual; Brandon Ekren, an
21  individual; Andrew Walag, an individual;
    Donald Rudd, an individual; and Garrett Dever,
22  an individual,

23
                                       Defendants.
24

25

26

27

28

9306276.1

Defendants City of Mesa, Michael Pezzelle, James Pollard, Hoapili Baker, Jalyn Bellows, William Jones, Brandon Ekren, Andrew Walag, and Donald Rudd ("Mesa Defendants") move for summary judgment on all of Plaintiffs' claims.  This case arises out of efforts by members of the Violent Offenders Unit ("VOU") to apprehend a violent and dangerous felon named Brandon Pequeño. On April 20, 2017, Pequeño assaulted and attempted to kidnap his ex-girlfriend. When a bystander attempted to intervene, Pequeño threatened him with a knife. Pequeño, who had already stolen his ex-girlfriend's handgun, then stole her vehicle and fled the scene. He led members of the Chandler Police Department on a chase through the city, but they terminated their pursuit due to his dangerous driving.

The VOU, who had been called in by Pequeño's probation officer to assist in his apprehension, tracked Pequeño down and utilized a vehicle containment tactic to apprehend him before he could inflict further harm on his ex-girlfriend or anyone else. During the vehicle containment, Pequeño failed to comply with officer commands, rammed the officers' vehicles in an attempt to escape, and appeared to be reaching for a handgun to fire at officers. Defendants then used deadly force to prevent serious risk of serious bodily injury or death to themselves or others. S.L., an associate of Pequeño's who was with him at the time of the vehicle containment and shooting, sustained a fatal wound from a bullet fragment.  As set forth below, the Mesa Defendants are entitled to summary judgment on all claims in Plaintiffs' Second Amended Complaint ("SAC").  This Motion is supported by the following Memorandum of Points and Authorities and the accompanying Statement of Facts and Exhibits ("SOF").

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.     RELEVANT FACTUAL BACKGROUND.

#### A.     Brandon Pequeño Was A Known Violent Felon Classified as A Maximum Risk Probationer Given His Violent History and Recent String of Erratic, Concerning Behavior.

Brandon Pequeño had a lengthy criminal history including felony arrests across Arizona and California. [SOF ¶ 1]. During one incarceration, Pequeño violently assaulted a fellow inmate. [SOF ¶ 2]. Pequeño also had documented ties to violent criminal gangs,

1

including the Eastside Colonia street gang in Bakersfield, California, the Sureño prison gang in California, and La Victoria Locos, a Mesa street gang. [SOF ¶ 3].

In October 2016, Pequeño was assigned to Maricopa County Adult Probation Officer Shana Edmundson. [SOF ¶ 4]. After working with him for a few months, Edmundson reclassified Pequeño as a maximum risk probationer, the *highest possible risk* for reoffending by committing a new crime. [SOF ¶ 5]. While under Edmundson's supervision, Pequeño repeatedly violated his probation by using heroin, getting caught with alcohol, and lacking a stable residence. [SOF ¶ 6]. In addition to observing his repeated probation violations, Edmundson learned that Pequeño was mistreating his girlfriend, Frances Gomez.  [SOF ¶ 7]. Gomez contacted Edmundson and reported that Pequeño had twice tried to kill himself in her home. [SOF ¶ 8]. Gomez confirmed that she had purchased a handgun for her own personal safety, but that Pequeño had "broken into her house and stolen the gun." [SOF ¶ 9]. Gomez also reported that Pequeño had "threatened her and said his gang family would harm her." [SOF ¶ 10]. Thus, Gomez requested that she be identified only as a confidential contact because "she feared retaliation" if Pequeño ever learned she had given information to Edmundson. [SOF ¶ 11].[1]  Due to Pequeño's multiple violations and Gomez's reports, Edmundson petitioned to revoke Pequeño's probation. [SOF ¶ 15].

In April 2017, Adult Probation Officer Leah Lara of the Fugitive Apprehension Unit was assigned Pequeño's case. [SOF ¶ 16]. At that time, Pequeño had two outstanding felony probation violation warrants. [SOF ¶ 17]. Upon reviewing Pequeño's file and confirming reports that Pequeño had a stolen handgun, and attempted suicide on multiple occasions, Lara concluded that violence would occur upon Pequeño's arrest. [2] [SOF

---

[1] S.L.'s older sister, Veronica Lane, was romantically involved with Pequeño three weeks prior to the subject incident. [SOF ¶ 12]. During that short time, Pequeño abused Veronica physically and mentally and used heroin and meth. [SOF ¶ 13]. Veronica saw Pequeño in possession of a handgun at least twice and knew he was almost always armed with a knife, which concerned her because "[she] just didn't know what he was capable of." [SOF ¶ 14].

[2] Lara testified that Pequeño's suicide attempts were especially concerning because a suicidal probationer "increases the likelihood of violence" when apprehending that individual "because of the chance that some people that are suicidal would take a chance at a confrontation with officers to commit something called suicide by cop." [SOF ¶ 19].

¶ 18]. From her nearly two decades' experience as an adult probation officer, Lara testified that a probationer's history of violence "always makes it a riskier arrest." [SOF ¶ 20]. In Lara's experience, a felony probationer knows that upon law enforcement contact, he will immediately be taken into custody, so he will choose to either flee or to do "whatever it takes not to be taken into custody." [SOF ¶ 21]. Given that risk, Lara believed that a specialized unit would be needed to apprehend Pequeño "because they have specialized training in apprehending individuals that either pose a threat of violence or in arresting felony subjects." [SOF ¶ 22]. Accordingly, on April 10, 2017, Lara contacted Detective Michael Pezzelle of the VOU to apprehend Pequeño. [SOF ¶ 23].

**B.** **On April 10, 2017, Det. Pezzelle Learned That Pequeño Had Stolen a Firearm and Was A Suspect in an Armed Robbery.**

Det. Pezzelle began his investigation by searching for Pequeño on social media and reviewing his criminal history. [SOF ¶ 24]. In addition to learning about Pequeño's lengthy criminal record and extensive gang ties, Pezzelle also learned of more recent transgressions. [SOF ¶ 25]. Det. Pezzelle received information that on March 27th or 28th, 2017, Pequeño had stolen a Glock 42 handgun from Gomez. [SOF ¶ 26]. Det. Pezzelle also learned that Pequeño was suspected of robbing an Econo Lodge in Mesa, Arizona while armed with a pistol. [SOF ¶ 27].

**C.** **On April 20, 2017, Pequeño Attempted to Violently Kidnap Ms. Gomez, Threatened A Bystander with A Knife, And Stole Ms. Gomez's Car.**

On the afternoon of April 20, 2017, Pequeño and Gomez got into in an argument after he tried to forcibly take her cell phone. [SOF ¶ 28]. That argument became physical when Pequeño slapped Gomez in the face. [SOF ¶ 29]. Gomez fled her apartment and, upon realizing she had left her belongings behind, asked to use a neighbor's cell phone to contact her sister for help. [SOF ¶ 30]. While Gomez waited for her sister, Pequeño took her wallet and keys and drove off in her Toyota Corolla, despite having been told numerous times that he was not allowed to use Gomez's vehicle. [SOF ¶ 31].

Gomez then approached a neighbor, Micah Pals, who was seated in his vehicle, to use his cell phone. [SOF ¶ 32]. Gomez told Pals that Pequeño was stealing her car. [SOF ¶

33]. Pequeño then suddenly returned in Gomez's Corolla and parked it to trap Pals in his parking space. [SOF ¶ 34]. Pequeño approached Pals' driver's side window and held a "very long knife" against the glass. [SOF ¶ 35]. Pequeño threatened Pals with this knife, warning him not to speak to Gomez anymore. [SOF ¶ 36]. Pequeño then grabbed Gomez, threw her over his shoulder, and tried to force the screaming Gomez into the back seat of her own vehicle. [SOF ¶ 37]. Pequeño opened the back door of Gomez's vehicle and tried to force her inside, but Gomez pressed her leg against the back tire and forced herself down toward the ground to prevent her abduction. [SOF ¶ 38]. After Gomez broke free, Pequeño fled the scene in her car.  [SOF ¶ 39].

### D. Pequeño Then Picked Up S.L. And Damien-Sandoval Rosa, Who Both Knew Pequeño Was A Violent, Drug-Abusing Criminal, And Recklessly Drove Through the Streets While Consuming Illegal Drugs.

Later that day, Rosa, who was twenty-five (25) at the time, met with his minor-girlfriend, S.L. [SOF ¶ 40]. Rosa got a call from his friend, Pequeño, who was nearby and offered to give him and S.L. a ride to Rosa's apartment. [SOF ¶ 41]. Rosa was familiar with Pequeño, his character, and his recent conduct.[3] [SOF ¶ 42].   Even armed with that knowledge, Rosa recognized that on April 20, 2017, Pequeño was not acting himself. [SOF ¶ 49]. In fact, Rosa observed that Pequeño was acting even more paranoid than he normally would. [*Id.*]. He also "seemed angry and amped up a little bit more than usual." [SOF ¶ 50].

S.L. and Rosa got in the car with Pequeño and, despite these dire warning signs, traveled with him to the apartment. [SOF ¶ 51]. After about ten minutes of driving, Pequeño stopped his vehicle so that he and Rosa could smoke heroin and meth. [SOF ¶ 52]. Then, after about another five minutes of driving, Pequeño stopped a second time so he and

---

[3] Rosa knew that Pequeño was a "sketchy" person, acted "like a gangster," and was generally a paranoid and angry person. [SOF ¶ 43]. Moreover, Rosa knew that Pequeño was violent and abusive, even to S.L.'s older sister, Veronica. [SOF ¶ 44]. Rosa also knew that Pequeño was possibly armed with a handgun, having stolen it from Ms. Gomez. [SOF ¶ 45]. Additionally, Rosa knew that Pequeño abused illegal drugs. [SOF ¶ 46]. In fact, when Pequeño picked up Rosa and S.L. on April 20, 2017, Rosa assumed he was high on meth and heroin because "he usually was when I was ever with him." [SOF ¶ 47]. Rosa now knows that it was not a good idea to let his minor girlfriend get into Pequeño's vehicle and later testified that S.L. would have been safer if she had been far away from the violent, drug-abusing felon Pequeño. [SOF ¶ 48].

4

Rosa could continue smoking these drugs. [SOF ¶ 53]. When he wasn't making pit stops to smoke illegal drugs with a minor in the back seat, Pequeño was driving dangerously through residential streets. [SOF ¶ 54]. Rosa recalled that Pequeño accelerated quickly from stops, sped down residential streets, and came to abrupt stops. [SOF ¶ 55].

**E.    The VOU Detectives Tracked Pequeño To an Apartment Complex, Where They Attempted to Locate and Apprehend Him on Foot.**

Following Pequeño's failed efforts to violently abduct Gomez and his successful carjacking of her Corolla, Sergeant Jesus Deanda of the Chandler Police Department's gang unit contacted Det. Pezzelle and requested his assistance to investigate the incident. [SOF ¶ 56]. Det. Pezzelle and Det. Garrett Dever reported to the scene. [SOF ¶ 57]. Gomez shared with the detectives her belief that if "[Pequeño] felt like if he was to go, it was going to be by the police." [SOF ¶ 58].

While interviewing Gomez, Det. Pezzelle was informed that Chandler police officers had attempted to pull Pequeño over, but he immediately failed to yield and began running red lights to evade the officers. [SOF ¶ 59]. Pequeño's flight was so dangerous that the officers terminated their pursuit to prevent further risk of danger. [SOF ¶ 60].   Gomez believed Pequeño would flee to a Glendale apartment. [SOF ¶ 61]. Thus, various VOU members stationed across the valley were called and advised to head toward that location. [SOF ¶ 62]. As they prepared to apprehend Pequeño, VOU detectives were informed that he was reportedly armed with a handgun, was driving erratically, and was failing to yield to law enforcement. [SOF ¶ 63].

While in route to Veronica Lane's, Det. Edward Pollard saw Pequeño in Gomez's Corolla. [SOF ¶ 64]. While following Pequeño, Det. Pollard saw him commit a number of civil traffic violations that made discretely following him in rush hour traffic impossible. [SOF ¶ 65]. Ultimately, Det. Pollard lost sight of Pequeño altogether. [SOF ¶ 66].

Det. Walag was the first to arrive at the apartment complex and located the stolen Corolla. [SOF ¶ 67]. Det. Pollard entered the complex shortly after, parked eight or nine spaces away from the Corolla, and began directing the other detectives to park

9306276.1

throughout the area to create a strategic boundary. [SOF ¶ 68].[4] As they arrived, Dets. Pollard and Walag observed Pequeño, Rosa, and S.L. acting paranoid by jumping on dumpsters and checking for police presence. [SOF ¶¶ 69-70] The VOU detectives' initial plan was to identify which apartment Pequeño had entered and apprehend him there. [SOF ¶ 78]. Unfortunately, the detectives were unable to locate Pequeño or confirm which apartment he had gone into. [SOF ¶ 79].

**F.    The VOU Planned to Apprehend Pequeño In the Parking Lot with A Vehicle Containment to Prevent Further Danger to the Community.**

When they were unable to locate Pequeño on foot, the VOU detectives discussed performing a vehicle containment maneuver in the apartment complex parking lot. [SOF ¶ 80]. The detectives determined that Pequeño posed too great a risk to the officers and the public at large to allow him to leave the parking lot, making a vehicle containment necessary. [SOF ¶ 81]. The VOU generally uses a vehicle containment maneuver to apprehend violent suspects who have been known to flee and are potentially armed, criteria which Pequeño met. [SOF ¶ 82]. In Sgt. Bellows' experience, when a suspect is willing or able, or even intends to engage police in gunfire, the vehicle containment maneuver affords officers the best opportunity to disrupt that behavior. [SOF ¶ 83].[5]

---

[4] Det. Jones parked in the northwest corner of the parking lot near the western exit. [SOF ¶ 71]. Det. Ekren was parked facing a cement block wall on the northern end of the parking lot. [SOF ¶ 72]. Det. Dever was parked in the southern portion of the apartment complex. [SOF ¶ 73]. Det. Pezzelle remained outside the parking lot on a side street north of the complex. [SOF ¶ 74]. Sgt. Bellows parked on a side street outside the apartment complex's parking lot. [SOF ¶ 75]. Det. Baker parked in a separate parking area along 53rd Avenue. [SOF ¶ 76]. Lt. Rudd also parked outside the apartment complex, down the street near an adjacent restaurant. [SOF ¶ 77].

[5] The detectives also prioritized the safety of others who may be inside the vehicle at the time of the containment, including Rosa and S.L. [SOF ¶ 84]. The VOU detectives always take minimizing risk of vehicle occupants into account when conducting vehicle containments because of the sanctity of human life and the dangerous work they do. [SOF ¶ 85]. The detectives did not have a specific conversation about passenger safety because that was something that is "always on [their] minds, and it's always something that [they're] taking into consideration." [SOF ¶ 86].

9306276.1

**G.**   **As Pequeño Attempted to Drive Away from the Apartment Complex, the VOU Initiated a Vehicle Containment on His Vehicle and He Immediately Attempted to Ram His Way Free to Escape.**

The detectives observed Pequeño enter the stolen vehicle at the north end of the complex's parking lot along with Rosa and S.L. [SOF ¶ 87].[6] Pequeño backed out of the parking space and began traveling south toward the exit onto Northern Avenue. [SOF ¶ 89]. At that point, Det. Dever began driving slowly toward the same exit. [SOF ¶ 90].

When Pequeño was in position behind him, Det. Dever put his vehicle in reverse, radioed the command for the VOU detectives to move, and backed his vehicle up until he contacted Pequeño's car. [SOF ¶ 91]. Det. Pollard, who was immediately behind Pequeño, moved his vehicle forward until he contacted Pequeño's rear bumper. [SOF ¶ 92]. Det. Ekren's right front bumper contacted Pequeño's driver's side door and prevented it from opening. [SOF ¶ 93]. Det. Walag was on the opposite side of Pequeño's vehicle, with his left front bumper touching the front passenger door. [SOF ¶ 94].

Even as the detectives positioned themselves around the stolen Corolla, Pequeño worked to escape. [SOF ¶ 95]. Det. Dever heard Pequeño's engine rev and felt Pequeño's vehicle pushing against his own. [SOF ¶ 96]. Det. Pollard saw Pequeño immediately accelerate and turn his wheel to the left to try to turn out of the containment. [SOF ¶ 97]. When he was unable to break free driving forward, Pequeño put his vehicle in reverse and pushed Det. Pollard's vehicle backwards to create space to maneuver. [SOF ¶ 98]. Although Det. Pollard kept his foot on the brake pedal, Pequeño was able to push backwards hard enough to create a few inches of clearance. [SOF ¶ 99].[7]

Importantly, Pequeño's ramming posed a significant risk of injury to the detectives who were nearby on foot. [SOF ¶ 104]. Moreover, it represented an opportunity

---

[6] Rosa sat in the front passenger seat and S.L. entered the back seat. [SOF ¶ 88].

[7] Pequeño's ramming was apparent to those in the vicinity of the containment. [SOF ¶¶ 100-103]. As Det. Baker approached the containment on foot, he heard Pequeño's tires squealing and engine revving. [SOF ¶ 100]. Det. Jones heard Pequeño's engine rev and saw the vehicle lurch backwards as if put in reverse. [SOF ¶ 101]. Dets. Ekren and Pezzelle both saw Pequeño try to ram his way out of the containment. [SOF ¶ 102]. Even Rosa, seated in the front passenger seat, heard Pequeño "gun[] it" to try to break free. [SOF ¶ 103].

for the violent felon, Pequeño, to escape arrest. [*Id.*]. The VOU detectives knew from experience that even with a small amount of space, a suspect could "actually get out of containment . . . ." [SOF ¶ 105].

**H.    Pequeño Ignored Officer Commands and Made Furtive, Threatening Movements While in The Vehicle.**

As soon as the containment was initiated, the detectives immediately began shouting verbal commands to the occupants of the Corolla, including to stop moving, to roll the windows down, to raise their hands, and to keep their hands up. [SOF ¶ 106]. Pequeño did not comply with these commands.  [SOF ¶ 107]. At that point, Det. Jones positioned himself alongside Det. Ekren's vehicle on the driver's side of the Corolla. [SOF ¶ 108]. He fired three nonlethal beanbag rounds into the Corolla's driver's side window to disrupt Pequeño's dangerous, non-compliant behavior and to open up the window so that Pequeño could better hear the detectives' commands and comply with them. [SOF ¶ 109].

Rather than complying with the detectives' commands, Pequeño quickly leaned over towards the vehicle's center console. [SOF ¶ 110]. The detectives then observed Pequeño rummaging around for something in the center console area. [SOF ¶ 111].[8]

After digging around for an unknown and unseen object, Pequeño made a sudden move back toward the driver's side. [SOF ¶ 113]. When he abruptly turned towards the officers, it appeared as though Pequeño had something in his hands. [SOF ¶ 114].

**I.    Three Detectives Resorted to Lethal Force *Against Pequeño* As He Refused to Obey Commands and Made Threatening Movements.**

**1.    Det. Baker Fired One Round at Pequeño.**

Det. Baker watched from his position along the driver's side of the vehicle as Pequeño made his furtive movements and reached for some unknown object. [SOF ¶ 115]. Det. Baker believed Pequeño grabbed a handgun. [SOF ¶ 116]. Then, as Pequeño abruptly turned back around, Det. Baker fired a single round aimed solely at Pequeño. [SOF ¶ 117].

---

[8] It bears repeating that as this occurred, the detectives knew Pequeño was a violent felon who was high on meth and heroin, would engage in a gunfight with the officers, and was reportedly armed with a stolen .380 Glock. [SOF ¶ 112].

### 2. Det. Pollard Fired Three Rounds at Pequeño Through the Rear Windshield.

Det. Pollard, who was in the rear block position, also saw Pequeño frantically reach for the center console and then abruptly turn back toward the detectives. [SOF ¶ 118]. At that point, Det. Pollard fired three rounds at Pequeño. [SOF ¶ 119]. Det. Pollard aimed for the upper left portion of the rear windshield, expecting that his rounds would track downward after breaking through the glass of the windshield. [SOF ¶ 120].

### 3. Det. Pezzelle Had A Clear and Unobstructed Sight of Pequeño And Fired Five Rounds at Pequeño.

Det. Pezzelle was leaning up against Det. Walag's vehicle, looking through the rear passenger window of the Corolla. [SOF ¶ 121]. From that vantage point, Det. Pezzelle clearly saw Pequeño's upper torso and head. [SOF ¶ 122]. Det. Pezzelle also saw Pequeño digging around in the center console, which he interpreted as Pequeño trying to grab the pistol he reportedly possessed. [SOF ¶ 123]. Det. Pezzelle then saw Pequeño make a series of abrupt turns, first towards the driver's side, then back to the center console, then back again towards the driver's side. [SOF ¶ 124]. On the final turn, Pequeño's hands started coming up in a motion that appeared as though he was drawing a gun. [SOF ¶ 125]. Seeing Pequeño coming up, Det. Pezzelle fired his weapon five times.  [SOF ¶ 126]. Most importantly, *every single one of those rounds was aimed specifically and solely at Pequeño's chest and upper torso.* [SOF ¶ 127]. As he fired, Det. Pezzelle had an unobstructed view of Pequeño's upper body. [SOF ¶ 128].[9]

## J.    Pequeño Was Struck Three Times and Died from His Wounds.

Pequeño was struck three times: once in the upper right side of his back, once on the left side of his chest, and once in the left lumbar area of his back. [SOF ¶ 134]. Paramedics transported Pequeño to John C. Lincoln Medical Center, where he   was

---

[9] Before Detective Pezzelle fired his first shot, S.L. had turned inward away from the door and disappeared straight down towards the floorboard of the vehicle. [SOF ¶ 129]. Detective Walag saw S.L. turn away from the passenger side of the vehicle and disappear from view. [SOF ¶ 130]. After watching her dive down towards the floorboard, Detective Pezzelle could not see S.L. at all. [SOF ¶ 131]. Having ducked down towards the floorboard, S.L. was completely out of Detective Pezzelle's view. [SOF ¶ 132.] As Detective Pezzelle fired at Pequeño, S.L. remained completely out of sight. [SOF ¶ 133].

pronounced dead shortly after arrival. [SOF ¶ 135]. Dr. Grant Herndon performed an autopsy of Pequeño and determined that his cause of death was gunshot wounds. [SOF ¶ 136].

**K.      A Bullet Fragment from Pezzelle's Gun Entered S.L.'s Head Resulting in Her Death.**

Tragically, S.L. suffered a wound to her head. [SOF ¶ 137]. Paramedics transported her to John C. Lincoln Medical Center, but even after aggressive medical intervention, she was pronounced brain dead the following day. [SOF ¶ 138].

Dr. Herndon performed an autopsy of S.L. and determined that her cause of death was a gunshot wound to the head. [SOF ¶ 139]. Dr. Herndon recovered a "single fragment of copper-colored metal jacketing with adherent gray metal from within the left cerebral hemisphere near the entrance defect." [SOF ¶ 140]. Plaintiffs' forensic analysis and reconstruction expert witness concluded that the projectile that killed S.L. came from *Det. Pezzelle's* firearm. [SOF ¶ 141].

**L.      The VOU Detectives Were Properly Trained and Supervised.**

The Mesa Police Department ("MPD") has various policies governing the use of force, including the use of firearms and less-than-lethal shotgun rounds. [SOF ¶ 142]. The VOU maintained a detailed lesson plan on the vehicle containment technique, which Sgt. Bellows considered to have the force of a policy. [SOF ¶ 143]. All the individual Defendants graduated from a certified police academy and were AZPOST-certified officers. [SOF ¶ 144].

The individual Defendants were up to date on their annual officer training requirements [SOF ¶ 145]. Additionally, the VOU held weekly training sessions. [SOF ¶ 146]. During those sessions, VOU detectives trained on the vehicle containment maneuver. [SOF ¶ 144]. They also trained on shooting into vehicles. [SOF ¶ 147]. The detectives also received additional training from Progressive Force Concepts. [SOF 148].

When joining the VOU, the MPD entered into a Memorandum of Understanding ("MOU") with the United States Marshals Service ("USMS"). [SOF ¶ 150]. Under the MOU, the USMS supervised the VOU. [SOF ¶ 151]. Marshal Patrick Wilhite was

10

9306276.1

the head supervisor of the unit. [SOF ¶ 152]. Sgt. Bellows and Lt. Rudd also supervised the VOU. [SOF ¶ 153]. All three were present at the April 20 shooting and directly supervised the efforts to apprehend Pequeño. [SOF ¶ 154].

Prior to this shooting, none of the individual Defendants had received discipline for any uses of force. [SOF ¶ 155].

## II.  SUMMARY JUDGMENT IS WARRANTED ON PLAINTIFFS' CLAIM FOR AN UNLAWFUL SEIZURE.[10]

Summary judgment is appropriate on Plaintiff's § 1983 Fourth Amendment unlawful seizure claim because the individual Defendants had probable cause to seize the stolen vehicle containing S.L. and, in any event, they are entitled to qualified immunity for that seizure. Plaintiffs' unlawful seizure claim also fails on the basis that the Defendants had no intention of seizing *S.L.*, a requirement for any valid Fourth Amendment unlawful seizure claim. *See Torres v. Madrid*, 592 U.S. ___, No. 19-292 (Mar. 25, 2021) ("[T]he appropriate inquiry is whether the challenged conduct *objectively* manifests an intent to restrain . . . .").

### A.  Plaintiffs' Unlawful Seizure Claim Fails Because the Defendants Had Probable Cause to Utilize A Vehicle Containment Tactic to Stop Pequeño's Violent, Drug-Fueled Crime Spree.

Defendants are entitled to summary judgment on Plaintiffs' unlawful seizure claim because the VOU had probable cause to initiate a vehicle containment maneuver and attempt to arrest Pequeño. Probable cause to arrest or detain is an absolute defense to any § 1983 claim against police officers for wrongful seizure. *Hutchinson v. Grant*, 796 F.2d 288, 290 (9th Cir. 1986); *Cabrera v. City of Huntington Park*, 159 F.3d 374, 380 (9th Cir. 1998); *see also Hart v. Parks*, 450 F.3d 1059, 1065-66 (9th Cir. 2006) ("Probable cause exists when the facts

---

[10] Plaintiffs' SAC brings a single count which alleges violations of S.L.'s Fourth Amendment rights against unlawful seizures and the use of excessive force. [Doc. 8-1 at 22]. Although not pled as a separate count, Plaintiffs' Fourth Amendment excessive force claim, which is analyzed under the *Graham* factors, must be separately analyzed from Plaintiff's Fourth Amendment seizure claim.  *See Velazquez v. City of Long Beach*, 793 F.3d 1010, 1024 (9th Cir. 2015); *Bynum v. City of N. Las Vegas*, 2020 WL 8483837, at *6 (D. Nev. Aug. 31, 2020) (same).  Thus, even in the event the Court finds that the seizure of the vehicle was improper (which it was not), the reasonableness of the force used is independent of whether the seizure itself was proper and should be adjudicated pursuant to the applicable *Graham* standards set forth below.

and circumstances within the officers' knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the plaintiff had committed or was committing an offense.").

Here, the VOU had probable cause to apprehend and attempt to arrest Pequeño. It was called upon to apprehend a violent felon, Pequeño, with multiple warrants for his arrest for violating the terms of his probation. Pequeño was a known drug user who had spent April 20, 2017, engaged in a string of violent felonies. Pequeño physically assaulted his girlfriend, Gomez, stole her car, and attempted to kidnap her. With a knife, he angrily and aggressively threatened a Good Samaritan who came to Gomez's aid. Pequeño then fled the scene and evaded Chandler police officers. When the officers finally tracked him down, they made the decision to apprehend him, as soon as possible, to prevent any further harm. The VOU had probable cause to arrest Pequeño. The detectives initiated a vehicle containment maneuver to prevent Pequeño from escaping to continue his violent crime spree. Because the Defendants had probable cause to apprehend Pequeño, Plaintiffs' § 1983 unlawful seizure claim fails. *See Whren v. U.S.*, 517 U.S. 806 (1996) (holding that a traffic stop was reasonable even as to the vehicle's passenger because there was probable cause to believe the driver had committed civil traffic violations).

**B.** **The Defendants Are Entitled to Qualified Immunity on Plaintiffs' Unlawful Seizure Claim.**

Even assuming Plaintiffs could somehow bring their unlawful seizure claim despite Arizona's survival statute and somehow prove that there was not probable cause to seize the vehicle Pequeño was operating, Defendants are entitled to qualified immunity because a reasonable officer could find that they acted reasonably under the circumstances. *See Brewster v. Bd. Of Educ. Of Lynnwood Unified Sch. Dist.*, 149 F.3d 971, 977 (9th Cir. 1998) ("if officers of reasonable competence could disagree on the issue whether a chosen course of action is constitutional, immunity should be recognized.") (internal citations omitted).

Qualified immunity "bars civil liability damages insofar as the official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable

12

9306276.1

person would have known." *Butler v. Elle*, 281 F.3d 1014, 1021 (9th Cir. 2002). Qualified immunity is meant "to protect officers from the sometimes hazy border between excessive and acceptable force." *Saucier v. Katz*, 533 U.S. 194, 205 (2001). This is because "holding officials liable for reasonable mistakes might unnecessarily paralyze their ability to make difficult decisions in challenging situations." *Mueller v. Auker*, 576 F.3d 979, 993 (9th Cir. 2009). Thus, "[t]he qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (internal quotations omitted).  A right is "clearly established" when "the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. *Saucier*, 533 U.S. at 202 (citing *Wilson v. Layne*, 526 U.S. 603, 615 (1999)). The issues are evaluated for objective reasonableness based upon the information officers had when the conduct occurred, not upon the subjective intentions of the officers. *Id.* at 207. As a result, the Supreme Court has clarified the importance and burden of a plaintiff opposing a motion for summary judgment on a § 1983 claim to provide the Court with ***specific*** case law that put government agents on notice that their conduct violated clearly established law. *White v. Pauly*, 137 S. Ct. 548, 551-52 (2017).

Here, no applicable authority under these facts would have put the VOU on notice that use of a vehicle containment on the vehicle Pequeño was driving was unlawful given his violent crime spree that day. Indeed, the only case movants could find discussing a vehicle containment tactic was in the context of excessive force, not in the context of an unlawful arrest or detention. *See Nelson v. City of Los Angeles*, 2014 WL 6066053, at *7 (D. Cal. Nov. 13, 2014) ("Given the significant governmental interests at stake and taking all of Plaintiffs' allegations as true, the officers' use of the vehicle-containment technique did not alone constitute an unconstitutionally excessive use of force.").  Accordingly, even assuming this Court found that the Defendants violated S.L.'s Fourth Amendment rights against

13

unlawful seizure for the vehicle containment, all of the individual officers are entitled to qualified immunity.

### III. SUMMARY JUDGMENT IS APPROPRIATE ON PLAINTIFFS' EXCESSIVE FORCE CLAIM FOR THE VEHICLE CONTAINMENT.

#### A. Arizona's Survival Statute Precludes Any Claim for S.L.'s Pre-Death Pain and Suffering.

As a threshold issue, Arizona law precludes Plaintiffs from recovering damages for S.L.'s pre-death pain and suffering. *See* Ariz. Rev. Stat. § 14-3110 ("Every cause of action, except a cause of action for damages for . . . loss of consortium or invasion of the right of privacy, shall survive the death of the person entitled thereto or liable therefor . . . .").  As other Courts have recognized, applying Arizona's survival statute in this fashion does not frustrate the purposes of 42 U.S.C. § 1983 where, as here, the alleged unlawful seizure did not cause the victim's death. *See Robertson v. Wegmann*, 436 U.S. 584, 590-92 (1978); *Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1103-05 (9th Cir. 2014). Insofar as it pertains to the vehicle containment itself, Plaintiffs' excessive force claim seeks recovery for S.L.'s pre-death pain and suffering. Accordingly, that claim fails as a matter of law.  The Court need go no further on this aspect of Plaintiffs' excessive force claim.

#### B. Even if Plaintiffs' Claim was Not Precluded, It Fails Because S.L. Suffered No Damages from the Vehicle Containment.

Plaintiffs' Fourth Amendment claim under 42 U.S.C. § 1983 is, naturally, a species of a tort claim. *See Mendez v. City of Los Angeles*, 897 F.3d 1067, 1074 (9th Cir. 2018) (citing *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 306 (1986)). Accordingly, as with all tort cases, Plaintiffs must establish that the alleged unlawful act or omission "was the but-for *and* proximate cause of [S.L.'s injuries.]" *Id.* (emphasis added).  There is no evidence that S.L. suffered any injuries whatsoever when the VOU initiated the vehicle containment. Certainly, Plaintiffs do not argue that the containment itself was a cause of S.L.'s death. Indeed, Dr. Herndon's conclusion is that the gunshot wound was the *sole* cause of S.L.'s death.

14

9306276.1

Since the vehicle containment was neither the direct nor proximate cause of S.L.'s death, Plaintiffs' Fourth Amendment claim fails insofar as it asserts that the vehicle containment was a use of excessive force.

**C.**     **The Defendants Are Entitled to Qualified Immunity for their Use of the Vehicle Containment.**

Even if Plaintiffs' claim was not precluded and the vehicle containment were found to have caused any injuries, the individual Defendants would be entitled to qualified immunity for their acts. As stated above, to defeat qualified immunity, Plaintiffs must be able to provide this Court with ***specific*** case law that put the individual Defendants on notice that their conduct violated clearly established law. *White v. Pauly*, 137 S. Ct. 548, 551-52 (2017). Plaintiffs cannot provide any such case law.

The only case law on point does not conclude that vehicle containments violate clearly established law; rather, Courts have expressly approved of their use. *See Nelson*, 2014 WL 6066053, at *7 ("Given the significant governmental interests at stake and taking all of Plaintiffs' allegations as true, the ***officers' use of the vehicle-containment technique did not alone constitute an unconstitutionally excessive use of force***.") (emphasis added). As there is no specific case law to notify the individual Defendants that their actions violated clearly established law, they are entitled to qualified immunity for their use of the vehicle containment technique.

**IV.**     **SUMMARY JUDGMENT IS APPROPRIATE ON PLAINTIFFS' EXCESSIVE FORCE CLAIM FOR THE SHOOTING OF S.L.**

**A.**     **Plaintiffs' Claim Should Be Dismissed Against Officers Pollard, Bellows, Baker, Jones, Ekren, Walag, And Rudd Because They Did Not Cause S.L.'s Death.**

As stated above, to prevail on their Fourth Amendment claim, Plaintiffs bear the burden of proving that the alleged unlawful act was the direct *and* proximate cause of S.L.'s injuries. Plaintiffs assert a claim for excessive force against Officers Pollard, Bellows, Baker, Jones, Ekren, Walag, and Rudd while also conceding that none of their actions were the but-for or proximate cause of S.L.'s death. Det. Jones fired three beanbag rounds into the driver's side window of the stolen Corolla. [SOF ¶ 107]. Both Dets. Baker and Pollard used

15

deadly force *against Pequeño*. [SOF ¶ 115 & 117]. Sgt. Bellows and Dets. Ekren, Walag, and Rudd did not use any force, at all.  Plaintiffs do not argue that any of those uses of force were the but-for or proximate cause of S.L.'s death.  Rather, Plaintiffs explicitly argue that it was one of *Detective Pezzelle's* bullets that "struck [S.L.] and caused her death." [Plaintiffs' 33rd MIDP at 63:15-16]. Plaintiffs' own expert agrees "[t]he bullet that struck [S.L.'s] head was fired by Pezzelle." [SOF ¶ 139]. Accordingly, construing Plaintiffs' argument as *they* have asserted it, *In re First Mortg. Co.*, 471 F.3d 977, 999 (9th Cir. 2006), Det. Pezzelle was the *sole cause* of S.L.'s death. Thus, Plaintiffs' excessive force claim against Officers Pollard, Baker, Jones, Ekren, Walag, and Rudd fails to satisfy the basic causation requirements of a § 1983 claim for excessive force and must be dismissed. *See Mendez*, 897 F.3d at 1074.

   **B.**   **Plaintiffs' Fourth Amendment Excessive Force Claim Against Defendant Pezzelle Fails Because He Did Not *Intentionally* Use Force Against S.L.**

As the Court may recall, at the outset of this case, Defendants sought the early dismissal of Plaintiffs' Fourteenth Amendment Excessive Force claim (Count III in the SAC) because Plaintiffs could not maintain such a claim while simultaneously alleging that one or more of the individual defendants *intentionally* shot S.L.[11] [*See* Docs. 13, 19]. The Court granted Defendants' Motion and dismissed Plaintiffs' improper claim. [*See* Doc. 183]. In that Order, the Court granted Plaintiffs thirty (30) days' leave to amend their SAC to assert a proper claim under the Fourteenth Amendment, if Plaintiffs so desired. *Id*. Plaintiffs never made any attempt to amend their SAC within the thirty (30) days provided by the Court (i.e. by January 9, 2020), or at all, effectively conceding that the *only proper vehicle* for their excessive force claim falls under the Fourth Amendment.

---

[11] Plaintiffs' SAC affirmatively plead that S.L. died as a result of the intentional decision of a police officer to discharge his firearm at the rear passenger window knowing that S.L. was a passenger in a stopped vehicle. [*See* SAC at ¶ 155 ("Defendant Pezzelle *intentionally* aimed his .45 Caliber Sig Sauer at the rear passenger-side window of the Toyota Corolla, where he knew that S.L. was sitting.") (emphasis added)]; [*id.* at ¶ 156 ("Defendant Pezzelle *intentionally* fired five rounds from his .45 Caliber Sig Sauer at the rear passenger-side window of the Toyota Corolla, where he knew that S.L. was sitting.")]; [*id.* at ¶ 157 ("Defendant Pezzelle shot S.L. in the head.") (emphasis added)]; [*see also id.* at ¶¶ 122- 126 (detailing Defendant Jones use of a firearm); ¶¶ 127-132 (detailing Defendant Pollard's use of a firearm); ¶¶ 140-142 (detailing Defendant Baker's use of a firearm)].

Under the Fourth Amendment, the Plaintiffs **_must_** show that the use of force was intentionally directed toward the individual seized. *See Bower v. County of Inyo*, 489 U.S. 593, 596-97 (1989) ("a Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement (the innocent passerby), or even whenever there is a governmentally caused and governmentally desired termination of an individual's freedom of movement (the fleeing felon), but **_only_** when there is a governmental termination of freedom of movement **_through means intentionally applied_**.") (emphasis added); *County of Sacramento v. Lewis*, 523 U.S. 833, 843-44 (1998) (dismissing the Plaintiff's Fourth Amendment § 1983 claim because the officer accidentally – rather than intentionally – drove into the suspect during a high-speed chase); *see also Landol-Rivera v. Cruz Cosme*, 906 F.2d 791, 795 (1st Cir. 1990) ("[i]t is intervention **_directed at a specific individual_** that furnishes the basis for a Fourth Amendment claim.") (emphasis added). Thus, without the intentional use of force **_directed at the specific individual_**, there is no seizure as contemplated by the Fourth Amendment.

Here, Plaintiffs elected to proceed solely under the Fourth Amendment and are now bound by that strategic decision. As more fully stated below, the record is devoid of any evidence that Det. Pezzelle's use of force was intentionally directed toward S.L. As a result, Plaintiffs' Fourth Amendment excessive force claim fails as a matter of law.

    **1.**    **All Evidence in the Record Demonstrates That Detective Pezzelle Intended to Direct his Use of Force _Solely_ at Brandon Pequeño.**

As set forth above, Plaintiffs' Fourth Amendment excessive force claim, by Plaintiffs' own argument, can proceed only against Det. Pezzelle. Accordingly, Plaintiffs must be able to establish that Det. Pezzelle *intentionally* used force against S.L. They cannot do so. The record is utterly devoid of any such evidence.

Det. Pezzelle repeatedly and adamantly testified that all the bullets he fired were aimed only at Brandon Pequeño. From his vantage point, Det. Pezzelle saw Pequeño frantically rummaging around in his center console and then abruptly sitting up, raising both hands in what appeared to be a motion to draw a weapon. Anticipating the imminent threat

9306276.1

of deadly bodily harm directed at him or one of his fellow officers, Det. Pezzelle fired five times *at Pequeño*. He aimed each of those shots for Pequeño's chest and upper torso, which were plainly visible through the window. That one of these bullets somehow struck S.L. in her head does not in any way demonstrate there was an intent to shoot her. Rather, the record is clear that Det. Pezzelle's sole intention was to use force against Pequeño, *not* S.L. Indeed, Det. Pezzelle could not have intended to use force against S.L. because she had completely disappeared from his view when he fired. She remained completely and utterly hidden in the lower part of the vehicle for the entire shooting. [*See* SOF ¶¶ 126-131].

Because liability can *only* attach for a Fourth Amendment excessive force claim when the evidence shows that the officer *intentionally* applied force *to the Plaintiff*, *see Bower*, 489 U.S. at 596-97; *Ct. of Sacramento*, 523 U.S. at 843-44; *Landol-Rivera*, 906 F.2d at 795, and Plaintiffs cannot establish that any of the Defendants, including Det. Pezzelle, intentionally used force against S.L., Plaintiffs' Fourth Amendment excessive force claim fails. For this reason alone, summary judgment is appropriate.

### 2.   Det. Pezzelle's Use of Force Was Objectively Reasonably under *Graham*.

Even assuming, arguendo, that the Plaintiffs' could clear the preliminary hurdle of establishing that Det. Pezzelle somehow intentionally used force against S.L., his actions do not violate S.L.'s Fourth Amendment rights. Fourth Amendment claims of excessive force are analyzed under an objective reasonableness standard. *Scott v. Harris*, 550 U.S. 372, 381 (2007). The Court must balance the extent of the intrusion on the individual's Fourth Amendment rights against the government's interests in determining whether the officer's conduct was objectively reasonable based on the totality of the circumstances. *Espinosa v. City & Cty. of S.F.*, 598 F.3d 528, 537 (9th Cir. 2010) (citing *Graham v. Connor*, 490 U.S. 386, 396-97 (1989)). The Ninth Circuit has set forth a three-step test to determine objective reasonableness:

> First, we must assess the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force inflicted. Next, we must evaluate the government's interests by assessing (1) the severity of the crime;

(2) whether the suspect posted an immediate threat to the officers' or public's safety; and (3) whether the suspect was resisting arrest or attempting to escape. Third, we balance the gravity of the intrusion on the individual against the government's need for that intrusion.

*Id.* Here, all of the "*Graham* factors" weigh in favor of summary judgment for Defendant Pezzelle on Plaintiffs' excessive force claim.

### a.    Det. Pezzelle Used Deadly Force Against Pequeño.

There is no dispute that Det. Pezzelle employed deadly force after Pequeño assaulted Frances Gomez, attempted to kidnap her, threatened a bystander with a knife, stole Gomez's Corolla, fled from law enforcement, consumed meth and heroin, rammed his vehicle into the VOU's vehicles, refused to obey lawful commands, and posed a threat of serious harm or death to the VOU detectives on scene and the entire community at large.

### b.    The Government's Interest Was High Under *Graham*.

The second step requires the Court to consider the government's interest by assessing three factors: (1) the severity of the crime; (2) whether the suspect posed an immediate threat to the officers' or public's safety; and (3) whether the suspect was resisting arrest or attempting to escape. *Glenn v. Wash. Cty.*, 673 F.3d 864, 872 (9th Cir. 2011) (citing *Graham*, 490 U.S. at 396). All three factors weigh in favor of Det. Pezzelle's use of force.

### (1)    Pequeño Committed A Series of Violent Felonies.

The first *Graham* factor considers the severity of the crime at issue, or in this case, the crimes. As noted above, when the VOU finally tracked Pequeño down to his apartment complex, he had already engaged in an hours-long crime spree. He stole Frances Gomez's Corolla, then returned and attempted to violently abduct her. Seeing Micah Pals in a position to assist Gomez, Pequeño threatened him with a knife. Pequeño fled the scene of his attempted abduction and fled from Chandler Police Officers, who attempted to stop him. He then picked up Rosa and S.L. and proceeded to speed through residential neighborhoods, taking regular pit stops to smoke heroin and methamphetamines. After the VOU detectives detained Pequeño using a vehicle containment technique, he rammed his vehicle against

19

9306276.1

theirs to break free in an attempt to escape. Failing that, he began rummaging around for an unseen object in the stolen Corolla, which the Defendants had a good faith belief was a handgun Pequeño had stolen from Gomez. All of these actions, individually, and certainly taken as a whole, constitute attempted or completed felonies which are considered inherently dangerous under Arizona law. *See e.g.* Ariz. Rev. Stat. §§ 13-1202 (threatening or intimidating); 13-1203 (assault); 13-1204 (aggravated assault with a deadly weapon); 13-1201 (endangerment); 13-1304 (kidnapping); 13-1902 (robbery); 13-2623 (child endangerment); 13-2508 (resisting arrest); 13-1105(3) (murder of a police officer); 13-3408 (possession and use of narcotic drugs); 28-622.01 (unlawful flight from law enforcement).

Given that Pequeño's conduct throughout the day of the incident and his conduct once confronted by the VOU constitute inherently dangerous felonies, this first *Graham* factor strongly runs in favor of Det. Pezzelle's use of force. *Lowry v. City of San Diego*, 818 F.3d 840, 851-53 (9th Cir. 2016).

### (2)     Pequeño posed an immediate threat of harm to the officers and to the general public.

Of all the *Graham* factors, the "most important" is whether the suspect posed an "immediate threat to the safety of the officers or others." *Bryan v. MacPherson*, 630 F.3d 805, 826-28 (9th Cir. 2010) (citing *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005)). For a court to find justification for the use of significant force, "the objective facts" must indicate that the suspect poses an immediate threat. *Id.* at 826.

As stated above, the objective facts of this case certainly demonstrate the immediate threat Pequeño posed to the VOU. The detectives knew that Pequeño may have been armed with a stolen Glock handgun. They knew he was armed with a knife, having threatened a would-be Good Samaritan with it earlier that day during his failed kidnapping attempt. When the vehicle containment occurred, Pequeño's immediate reaction was to "gun" his engine and ram his car against the detective's vehicles in an attempt to escape, putting them at severe risk of serious injury or death. Indeed, considering his earlier actions, had Pequeño escaped, the entire community would have been at risk.

The Ninth Circuit has held that a suspect's dangerous driving alone constitutes an immediate threat to officers. *See Monzon v. City of Murietta*, 2020 WL 4197746, at *5-6 (9th Cir. July 22, 2020). The suspect in *Monzon*, much like Pequeño, had shown a habit of reckless driving and, in a rapidly escalating confrontation, began using his vehicle as a weapon against the defendant officers. *Id.* Moreover, though the Ninth Circuit has previously found the use of deadly force unreasonable when a suspect's vehicle is controlled and slow-moving, that is not the case here. *See Villanueva v. California*, 2021 WL 280756 (9th Cir. Jan. 28, 2021). In *Villanueva*, the suspect executed a cautious, controlled three-point turn at low speeds while located 15 to 20 feet away from the officers. 2021 WL 280756, at *9. Here, Pequeño was mere feet from the VOU detectives and was not executing anything close to a slow-speed, cautious, controlled maneuver. Instead, he was described as gunning his engine, squealing his tires, and "ramming" his vehicle into Det. Dever's and Pollard's vehicles. Clearly, Pequeño's conduct was akin to that of *Monzon*, not *Villanueva*, and was an imminent threat to the VOU.

Finally, Pequeño ignored the detective's lawful commands and began reaching around in the center console for an unknown object that the detectives reasonably believed was the stolen handgun. When he made a furtive gesture towards the officers with an unknown object in his hand, Pequeño certainly posed an imminent threat to all the officers on scene. *See George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013) (holding that a furtive movement or harrowing gesture can justify the use of deadly force against a suspect.).

**(3)     Pequeño was actively, and violently, resisting arrest.**

The final *Graham* factor is whether the suspect resisted arrest or attempted flight. Pequeño had already fled from Chandler police officers hours earlier. When he was contained by the VOU, the detectives observed Pequeño ramming his vehicle back and forth and turning his wheel to the left in an effort to create enough space between the vehicles to escape. These efforts demonstrate that Pequeño was using his vehicle as a battering ram to actively resist arrest and attempt flight from the officers.

9306276.1

c.   **Det. Pezzelle's Use of Deadly Force was Objectively Reasonable.**

Whether Det. Pezzelle's use of deadly force was "objective reasonable" turns on "whether the degree of force used was necessary; in other words, whether the degree of force used was warranted by the governmental interests at stake." *Deorle v. Rutherford*, 272 F.3d 1272, 1282 (9th Cir. 2001) (citing *Liston v. Cty. of Riverside*, 120 F.3d 965, 976 (9th Cir. 1997); *Graham*, 490 U.S. at 396.) A court may decide reasonableness as a matter of law if, "in resolving all factual disputes in favor of the plaintiff, the officer's force was 'objectively reasonable' under the circumstances." *Jackson v. City of Bremerton*, 268 F.3d 646, 651 n.1 (9th Cir. 2001) (citing *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)).

A wealth of precedent from the Ninth Circuit and the District of Arizona points to the conclusion that Det. Pezzelle's use of deadly force against Pequeño was objectively reasonable when considering the indisputable facts of the situation. The District of Arizona has held in recent months that an officer's use of deadly force is reasonable when confronted by a dangerous suspect in a chaotic, dangerous situation. *See, e.g. Refugio v. Unknown Toth*, 2020 WL 5868427, at *3 (D. Ariz. Oct. 2, 2020) (finding it was reasonable for an officer to use deadly force to prevent a dangerous, mentally disturbed suspect from getting a weapon and using it against the officers); *Reyes v. Colclough*, 2020 WL 7192007, at *8 (D. Ariz. Dec. 7, 2020) (finding the officers' use of deadly force was objectively reasonable after stopping a fleeing suspect in his vehicle and believing he was drawing a firearm to use against them). Here, Det. Pezzelle found himself in a chaotic, dangerous situation just as the officers did in *Refugio* and *Reyes*. Confronted with a dangerous felon who appeared to be drawing a weapon to use against the officers, it was objectively reasonable for Det. Pezzelle to use deadly force to avert that threat.

Though Det. Pezzelle did not see the stolen handgun before firing his weapon, the Ninth Circuit does not require that a suspect actually be armed before deadly force is objectively reasonable. *See George*, 736 F.3d at 838 (9th Cir. 2013) ("This is not to say that the Fourth Amendment always requires officers to delay their fire until a suspect turns his

22

9306276.1

weapon on them. If the person is armed – or reasonably suspected of being armed – a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat."). Here, Det. Pezzelle reasonably suspected that Pequeño was armed with a stolen handgun and a knife and, just as in *George*, he made a sudden furtive movement which created an immediate threat.[12] Det. Pezzelle was also informed by Pequeño's ex-girlfriend that Pequeño believed that if he was going to die, it would be in a shooting with police. Presented with that information, and observing Pequeño's furtive movements, any reasonable officer would have perceived the same threat that Det. Pezzelle did. Accordingly, though his use of force was based on a mistake of fact, it remains objectively reasonable.

## C.   The Individual Defendants Are Entitled to Qualified Immunity for Plaintiffs' Excessive Force Claims.

Even if the individual officers could be sued, and they were found to have intentionally used force against S.L., and that force was found to be excessive, they would be entitled to qualified immunity for their individual acts. Again, to defeat qualified immunity, Plaintiffs must provide specific case law with similar facts on point to demonstrate that the officers were on notice that their conduct violated an individual's constitutional rights. *See supra* Section II(B). Moreover, in the Fourth Amendment excessive force context, "specificity is especially important." *Mullenix v. Luna*, 577 U.S. 7, 2015. Thus, "police officers are entitled to qualified immunity unless existing precedent ***squarely*** governs the specific facts at issue." *Kisela v. Hughes*, 138 S.Ct. 1148, 1153 (2018) (emphasis added); *see also Emmons v. City of Escondido*, 921 F.3d 1172, 1174 (9th Cir. 2019); *see also Ventura v. Rutledge*, 2020 WL 6192981, at *2 (9th Cir. Oct. 22, 2020). Here, there was no case law that "squarely" put the VOU detectives on notice that their actions violated clearly established Fourth Amendment rights when they acted to apprehend a violent felon and to control the rapidly escalating, violent,

---

[12] It is inconsequential that it was later determined that Pequeño was not armed with the handgun at the time of the incident. Courts have found the use of deadly force to be objectively reasonable even when it is based on a mistaken belief that the suspect is armed. *See, e.g. Gwynn v. Sherwood*, 2020 WL 60238, at *4 (D. Nev. Jan. 6, 2020). The Ninth Circuit has determined that "[w]here an officer's particular use of force is based on a mistake of fact, we ask whether a reasonable officer would or should have accurately perceived that threat." *Torres v. City of Madera*, 648 F. 3d 1119, 1124 (9th Cir. 2011).

and combative circumstances that Pequeño created by ramming the officers' vehicles, ignoring lawful commands, and by making furtive movements as if to draw a weapon.

### 1. Any objectively reasonable officer could have believed that the Defendants' uses of force were appropriate under the circumstances Pequeño created.

An individual defendant is entitled to qualified immunity whenever a reasonable officer could have believed that the use of force was reasonable under the circumstances. *See Act Up!/Portland v. Bagley*, 988 F.2d 868, 871 (9th Cir. 1993). The record establishes that the actions taken by the individual Defendants, including the use of deadly force by Dets. Baker, Pollard, and Pezzelle, were reasonable given the severity of Pequeño's crimes and the substantial risk of serious injury or death that he posed to the officers and others. Defendants' expert, Police Chief Kenneth Wallentine, concluded that the detectives' uses of force were appropriate given the totality of the circumstances and that any similarly trained and experienced offer would have done the same thing under the circumstances. [SOF ¶ 156]. Accordingly, a reasonable officer could believe that the individual Defendants' use of force was appropriate, thereby entitling them to qualified immunity.

### 2. No applicable authority prohibited the officers' use of force; indeed, Ninth Circuit case law has affirmed qualified immunity under similar circumstances.

Plaintiffs cannot cite any Ninth Circuit or Supreme Court precedent at the time of the April 20, 2017, shooting that would have put the detectives on notice that their uses of force in defense of themselves and others violated clearly established law that was "beyond all debate." *See Brewster v. Bd. Of Educ. Of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 977 (9th Cir. 1998). Certainly, Plaintiffs are unable to identify a case that addresses this issue in the "particularized" sense that the strict quality immunity analysis demands. *Id.*; *see generally Mullenix v. Luna*, 136 S.Ct. 305 (2015).

Again, no case published prior to the shooting of Pequeño would have put the VOU detectives on notice that their conduct was prohibited. Rather, applicable legal authority is legion that deadly force is justified under the circumstances Pequeño created. *See Tennessee v. Garner,* 471 U.S. 1, 11 (1985) ("Where the officer has probable cause to believe

24

that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force."); *see also Brosseau v. Haugen,* 543 U.S. 194, 200 (2004) (holding that an officer's decision to "shoot a disturbed felon, set on avoiding capture through vehicular flight, when persons in the immediate area are at risk from that flight" fell under the protection of qualified immunity); *Wilkinson v. Torres,* 610 F.3d 546, 551 (9th Cir. 2010) (deadly force protected by qualified immunity when driver of a moving vehicle, ignoring police commands, attempted to accelerate within close quarters of two officers on foot); *Smith v. City of Hemet,* 394 F.3d 689, 704 (9th Cir. 2005) (recognizing that "where a suspect threatens an officer with a weapon such as a gun or a knife, the officer is justified in using deadly force"); *Weber v. Reif,* 2021 WL 1087203 (D. Ariz. Mar. 22, 2021) (affording the officer qualified immunity after he deployed lethal force in response to a suspect's furtive movements while armed with a handgun.).

Moreover, other Courts have found qualified immunity even if an officer mistakenly believed that a suspect had a deadly weapon. *See Lamont v. New Jersey,* 637 F.3d 177, 183 (3rd Cir. 2011) ("[A]n officer who uses deadly force in the mistaken belief that a suspect is armed will be forgiven so long as the mistake is reasonable."). Even more specifically, the District of Arizona has afforded qualified immunity when a suspect turned his vehicle against the officers as a weapon and put them at serious risk of being run over, leaving the officers in a compromised position with no time to ponder their course of action. *See Adame v. City of Surprise,* 2020 WL 4333444 (D. Ariz. July 28, 2020).

Thus, because there was no precedent which would have placed the Defendants on notice that their specific actions violated a constitutional right, they are entitled to qualified immunity for those actions.

## V.   SUMMARY JUDGMENT IS APPROPRIATE ON PLAINTIFFS' FAMILIAL ASSOCIATION CLAIM BECAUSE THE DEFENDANT OFFICERS DID NOT ACT WITH A PURPOSE TO HARM.

To prevail on a familial-relationship claim, Plaintiffs must "prove that the officers' use of force shocked the conscience." *Gonzalez v. City of Anaheim,* 747 F.3d 789, 797 (9th Cir. 2014). When officers do not have time to deliberate over their actions, as here, "a

25

use of force shocks the conscious *only* if the officers had a 'purpose to harm' the decedent for reasons unrelated to legitimate law enforcement objectives." *Id.; see also Hayes v. Cty. Of San Diego*, 736 F.3d 1223, 1230 (9th Cir. 2013); *Ochoa v. City of Mesa*, 2020 WL 2097785, at *5 (D. Ariz. May 1, 2020); *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008).  Finally, to survive summary judgment, Plaintiffs must have more than mere speculation as to any alleged improper motive. *Gonzalez*, 747 F.3d at 798 (internal citation omitted).

Here, it is undisputed that the detectives were forced to make a series of split-second decisions in response to the chaotic and rapidly unfolding situation before them. They had been tasked to apprehend a violent, gang-affiliated felon who had committed a series of violent crimes just hours before. They had information that Pequeño was high on illegal drugs, was armed with a knife and a stolen handgun, and was a risk for attempting to commit suicide by police. After he was confronted by the detectives' vehicle containment maneuver, Pequeño tried to ram his way free and flee from arrest, failed to comply with the officers' lawful commands, and made a sudden, furtive movement that appeared as though he was drawing a weapon. In that rapidly-escalating, split-second violent confrontation, the detectives had no time to deliberate. Therefore, the Plaintiffs must show that they acted with a purpose to harm S.L. unrelated to legitimate law enforcement objectives.

Here, as in *Ochoa*, the Plaintiffs have "put forth no evidence showing Defendants acted with anything less than legitimate law enforcement objective (sic) in carrying out their actions." *Ochoa v. City of Mesa*, 2020 WL 2097785, at *6 (D. Ariz. May 1, 2020). The record is clear that all of the detectives were seeking to achieve the legitimate law enforcement objective of apprehending Pequeño before he could inflict any more harm on anyone else.  Moreover, Plaintiffs do not allege, and the record fails to demonstrate, that any of the detectives previously knew S.L. and acted to "get even" with her for some alleged prior wrong. *See Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010). For this reason, Plaintiffs' familial association claim fails.

## VI.   SUMMARY JUDGMENT IS APPROPRIATE ON THE PLAINTIFFS' *MONELL* CLAIM.

### A.   Plaintiffs' *Monell* Claim Fails Because There is No Constitutional Violation, As Set Forth Above.

Under 42 U.S.C. § 1983, if there is no underlying constitutional violation, the municipality cannot be held liable as a matter of law. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (if the officer inflicted no constitutional injury, "it is inconceivable" that the municipality could be held liable."); *see also Monell v. Dep't of Soc. Servs.*, 4326 U.S. 658, 691 (1978) (municipalities may not be held liable under § 1983 "unless action pursuant to official municipal policy of some nature caused a constitutional tort."). As explained *supra*, because the Plaintiffs suffered no constitutional deprivation by any of the individual Defendants (or the Defendants are entitled to qualified immunity), summary judgment is appropriate on Plaintiffs' *Monell* claim. *See Daily v. City of Phoenix*, 2017 WL 6527298, at *9 (D. Ariz. Aug. 8, 2017) affirmed in part, reversed in part on other grounds, 765 Fed.Appx. 325 (9th Cir. 2019).

### B.   Plaintiffs' *Monell* Claim for Failure to Train Fails on the Merits.

Plaintiffs allege that the City of Mesa was deliberately indifferent to the proper training of its officers regarding the appropriate use of force, specifically regarding the use of the vehicle containment technique. To establish a "policy" of inadequate training, Plaintiffs must offer "proof of facts evidencing the local government's awareness of a high probability of harm if the government failed to act." *Redman v. Cty. Of San Diego*, 942 F.2d 1435, 1453 (9th Cir. 1991). "A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train[.]" *Flores v. Cty. of L.A.*, 758 F.3d 1154, 1159 (9th Cir. 2014). After all, "[w]ithout notice that a course of training is deficient in a particular respect, decision makers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Connick v. Thompson*, 563 U.S. 51, 62 (2011). In addition, Plaintiffs must identify the specific deficiency in the City's training or supervision and establish that the deficiency directly caused the constitutional deprivation. *See City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *Atwood v. Town of Ellington*, 427 F. Supp. 2d 136, 145 (2006). Plaintiffs must also show the City made a

27

"conscious" or "deliberate" policy decision knowing this incident would likely result. *City of Canton*, 489 U.S. at 389. Thus, municipal liability "is at its most tenuous where a claim turns on a failure to train." *Connick*, 131 S. Ct. at 1359. Simply put, the City cannot be held liable absent sufficient evidence of a "program-wide inadequacy in training." *Blankenhorn v. City of Orange*, 485 F.3d 463, 484–85 (9th Cir. 2007).

Here, Plaintiffs' *Monell* training claim fails because they cannot refute that the individual detectives completed all training requirements for AZPOST certification. *See Mendez v. Cnty. of San Bernardino*, 540 F.3d 1109, 1123 (9th Cir. 2008), *overruled on other grounds*, *Arizona v. ASARCO LLC*, 773 F.3d 1050 (9th Cir. 2014) (affirming dismissal where plaintiff failed to controvert evidence that officer's training met state POST requirements); *Hillbloom v. Cnty. Of Fresno*, 2010 WL 4481770, at *11, 34 (E.D. Cal. Nov. 1, 2010); *see also Ward v. Still*, 2012 WL 37518, *13-14 (E.D. Tenn. 2012) ("If ... police officers were certified by the POST Commission, then the issue of the adequacy *vel non* of their training is resolved."). Moreover, the record lacks any evidence that a pattern of deficient training existed which would put the City on notice that its training and policies regarding police procedures, vehicle containments, or use of force were deficient. *Flores*, 758 F.3d at 1159. Defendants' expert, Kenneth Wallentine, concluded that all the VOU members involved in this incident were properly trained in the tactical operation and performance of the vehicle containment technique.

Accordingly, there was no formal or informal policy, practice or custom by the City that was the moving force behind S.L.'s death and Plaintiffs' alleged damages. Further, there was no formal or informal policy, practice, custom, or procedure that constituted deliberate indifference toward Plaintiffs' rights. Thus, to the extent Plaintiff asserts *Monell* liability on the ground that the City failed to adequately train its officers, that argument fails. *See City of Canton*, 489 U.S. at 390-91.

**B.    Failure to Supervise.**

"Usually, a failure to supervise gives rise to section 1983 liability only in situations in which there is a history of widespread abuse." *Bowen v. Watkins*, 669 F.2d 979, 988 (5th Cir.1982) (emphasis added); *Santos ex rel. Santos v. City of Culver City*, 228 Fed.Appx.

655, 659 (9th Cir. 2007) (affirming the district court's grant of summary judgment on a *Monell* claim under the "moving force" prong because there was no evidence of a causal link between city's policies and the officer's actions); *D.T. ex rel. M.T. & K.T. v. Indep. Sch. Dist. No. 16*, 894 F.2d 1176, 1180, 1192–93 (10th Cir. 1990) (holding that a school district's policy of supervising its employees was not the "moving force" behind a teacher's alleged molestation of students because there was insufficient evidence of a direct causal link between only sporadic supervision and subsequent molestations).   Here, the record demonstrates that the VOU was adequately supervised by the USMS and had direct, on-sight supervision by Sgt. Bellows and Lt. Rudd during the efforts to apprehend Pequeño. Moreover, no evidence shows the City should have provided additional supervision to these Officers because neither had any prior discipline for use of force. Defendants are also unaware of any authority requiring officers to be constantly operating under an acting supervisor while on duty. Moreover, even if such supervision were required, such purported failure amounts to a single incident of officer misbehavior, which cannot establish *Monell* liability as a matter of law. *McDade v. West*, 223 F.3d 1135, 1141 (9th Cir. 2000).

**C.     Ratification.**

To prove ratification, Plaintiff must show the authorized policymaker approved both a subordinate's decision and the basis for it. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). This requires a showing that the decision triggering § 1983 liability "was the product of a conscious, affirmative choice to ratify the [unconstitutional] conduct in question." *Haugen v. Brosseau*, 351 F.3d 372, 393 (9th Cir. 2003) (internal quotation marks omitted), *rev'd on other grds*, *Brosseau v. Haugen*, 543 U.S. 194 (2004). In addition, the Ninth Circuit has held that merely failing to discipline individual officers accused of unconstitutional conduct does not amount to ratification. *Haugen*, 351 F.3d at 393. Rather, Plaintiff must show the City made a deliberate choice to endorse the officers' actions and the bases for them as its own policy. *Gillette v. Delmore*, 979 F.2d 1342, 1348 (9th Cir. 1992). Here, there was no unconstitutional decision the City could ratify.  The individual officers did not use excessive force or otherwise violate Plaintiffs' constitutional rights.  There is also no

29

evidence that the City had a policy that tolerated or ratified Defendants' conduct. In fact, the City enacted policies to ensure discipline for out-of-policy conduct. Thus, the City did not ratify any conduct at issue in this action.

## VII. SUMMARY JUDGMENT IS APPROPRIATE ON THE PLAINTIFF'S STATE LAW WRONGFUL DEATH CLAIM.

Plaintiffs' wrongful death claim fails for the same reasons the excessive force claim fails: the Defendants' use of force was objectively reasonable under the circumstances. *See Marquez v. City of Phoenix*, 693 F.3d 1167, 1176 (9th Cir. 2013) (holding that because officers acted reasonably in using force, the plaintiffs' wrongful death claim could not succeed under Arizona law); *Miller v. Clark Cnty.*, 340 F.3d 959, 968 n.14 (9th Cir. 2003) (affirming the district court's judgment for the defendants on plaintiffs' state tort claims because they fell "along with [plaintiff]'s rejected federal Fourth Amendment claim.").

Moreover, Arizona's justification statutes also preclude civil liability for "engaging in conduct otherwise justified" under Arizona law. *See* A.R.S. § 13-413. Under Arizona law, officers are immunized for using deadly force during an arrest or detention. *See* A.R.S. § 13-410(C); *Marquez*, 693 F.3d at 1176; *Smith v. City of Chandler*, 2014 WL 1493004, at *5 (D. Ariz. April 16, 2014) (characterizing Arizona statutes as providing "immunity" for law enforcement officers charged with negligence).

Finally, officers are statutorily protected in using deadly force against another to protect themselves or a third person. *See* A.R.S. § 13-406; *see also* A.R.S. § 13-410(C)(1), (C)(2)(a), (b). As repeatedly stated above, Dets. Baker, Pollard, and Pezzelle all knew that Pequeño was reportedly armed with a stolen handgun and used deadly force only after observing him digging around in the vehicle's center console for an unknown, unseen object. Accordingly, the detectives reasonably believed their use of force was necessary to protect their fellow officers from Pequeño's imminent use of deadly force. Thus, the detectives are statutorily immune from Plaintiffs' wrongful death claims. *See Marquez*, 693 F.3d at 1177.

9306276.1

**A.**     **The City of Mesa is entitled to summary judgment on any claims for negligent supervision and training.**

Plaintiffs argue that the City of Mesa ("the City") negligently supervised and trained the individual Defendants. Since Plaintiffs' liability theories against the individual Defendants fail, there can be no liability on the City. *See Kuehn v. Stanley*, 208 Ariz. 124, 130 (App. 2004); *Mulhern v. Scottsdale*, 165 Ariz. 395, 398 (App. 1990). In any event, as argued above, the record is devoid of any evidence that the City was negligent in its supervision or training of the individual Defendants.

**1.     There was no negligent supervision by the City.**

Under Arizona law, a claim for negligent supervision fails if the employee's act was not foreseeable. *See Pruitt v. Pavelin*, 141 Ariz. 192, 202 (App. 1984). Here, the individual Defendants had **never been previously disciplined** for a use of force prior to this incident. [SOF ¶ 151]. Therefore, any allegedly improper act by the individual Defendants was not foreseeable by the City as a matter of law and undisputed facts. Thus, Plaintiffs' negligent supervision claim fails.

**2.     There was no negligent training by the City.**

To prevail on a negligent training claim in Arizona, a plaintiff must show a defendant's training or lack thereof was negligent and that such negligent training was the proximate cause of a plaintiff's injuries. *Inmon v. Crane Rental Servs., Inc.*, 205 Ariz. 130, 137, ¶ 28 (App. 2003), *disapproved of on a different ground*, *Tarron v. Bowen Mach. & Fabricating*, 225 Ariz. 147 (2010). A showing of an employee's incompetence is not enough; the plaintiff must also present evidence showing what training should have been provided, and that its omission proximately caused the plaintiff's injuries. *Id.; see also Guerra v. State, 234 Ariz. 482, 490 (App. 2014)*, vacated on other grounds, 348 P.3d 423 (Ariz. 2015) (summary judgment appropriate where Plaintiff failed to make a showing that training given to DPS Officers or omitted from their training, was negligent).

Once more, the record is devoid of any evidence that the individual Defendants were negligently trained. Indeed, the record shows that the individual Defendants

31

9306276.1

in fact received regular training over and beyond that of a standard officer. [*See* SOF ¶¶ 143-146]. Moreover, Plaintiffs provide no evidence on what training could have been provided and how its omission proximately caused S.L.'s death. Thus, Plaintiffs' negligent training claim fails as a matter of law and undisputed facts.

## VIII.   PLAINTIFFS' CLAIM FOR PUNITIVE DAMAGES ALSO FAILS.

Plaintiffs are not permitted to recover punitive damages from the individual Defendants under federal law because Plaintiffs' 42 U.S.C. § 1983 claims fail, as explained *supra*. Moreover, the Plaintiffs have not established that punitive damages are warranted given the facts of this case because the record is devoid of any evidence that the individual Defendants' conduct was "motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983).  Finally, Plaintiffs are similarly unable to recover punitive damages from the individual Defendants under state law because they were acting within the scope of their employment. *See* A.R.S. § 12-820.04.

## IX.   CONCLUSION.

Based on the foregoing, summary judgment is appropriate in the Mesa Defendants' favor on all of Plaintiffs' claims in this action.

DATED this 9th  day of April 2021.

JONES, SKELTON & HOCHULI, P.L.C.


By /s/ Ian C. Beck
    John T. Masterson
    Joseph J. Popolizio
    Justin M. Ackerman
    Ian C. Beck
    40 North Central Avenue, Suite 2700
    Phoenix, Arizona 85004
    Attorneys for Defendants City of Mesa,
    Michael Pezzelle, James Pollard, Hoapili
    Baker, Jalyn Bellows, William Jones, Brandon
    Ekren, Andrew Walag, and Donald Rudd

9306276.1

1

**CERTIFICATE OF SERVICE**

2   I hereby certify that on this 9th day of April 2021, I caused the foregoing

3   document to be filed electronically with the Clerk of Court through the CM/ECF System

4   for filing; and served on counsel of record via the Court's CM/ECF system.

5   I further certify that on 9th day of April 2021, I have mailed and emailed the

6   forgoing documents to the following:

7

8   Joel B. Robbins
    Jesse M. Showalter
9   Lauren E. Channell
    Robbins & Curtin, P.L.L.C.
10  301 East Bethany Home Rd., Suite B-100
    Phoenix, Arizona 85012
11  joel@robbinsandcurtin.com
    jesse@robbinsandcurtin.com
12  lauren@robbinsandcurtin.com
    Attorneys for Plaintiffs
13

14  John P. Torgenson
    Torgenson Law
15  333 W. Roosevelt St.
    Phoenix, Arizona 85003
16  jtorgenson@torgensonlaw.com
    Attorney for Plaintiffs
17

18

19  J. Randall Jue
    Chandler City Attorney's Office
20  P.O. Box 4008, MS602
    Chandler, Arizona 85244-4008
21  Randy.Jue@chandleraz.gov
    Attorney for City of Chandler
22  and Garrett Dever

23

24  /s/ Lisa Drapeau

25

26

27

28

33

9306276.1