1  J. Randall Jue, SBN 014816
Chandler City Attorney's Office
2  P.O. Box 4008, MS602
Chandler, Arizona 85244-4008
3  Telephone (480) 782-4655
Facsimile (480) 782-4652
4  Attorney E-Mail: Randy.Jue@chandleraz.gov
Minute Entries: chandlercityattorney@chandleraz.gov
5  Attorneys for the City of Chandler and Garrett Dever

6              **UNITED STATES DISTRICT COURT**

7                    **DISTRICT OF ARIZONA**

8  Jennifer Lane,                              No. 2:19-cv-00852-SMB

9                          Plaintiff,

   vs.                                         **CHANDLER DEFENDANTS'**
10                                             **MOTION FOR SUMMARY**
   City of Mesa, et al.,                       **JUDGMENT**
11
                           Defendants.         (Assigned to Honorable Susan M.
12                                             Brnovich)

13         Defendants City of Chandler and Garrett Dever ("Chandler Defendants"), through

14  undersigned counsel, hereby move for summary judgment pursuant to Rule 56, Fed. R.Civ. P.

15  This motion is supported by the simultaneously filed Chandler Defendants' Statement of Fact

16  in Support of Motion for Summary Judgment ("DSOF") and the following Memorandum of

17  Points and Authorities.

18              **MEMORANDUM OF POINTS AND AUTHORITIES**

19  **I.     FACTUAL BACKGROUND.**

20         In October of 2016, Maricopa County probation officer Shana Edmundson-Borquez

21  ("Edmundson") began supervising Brandon Pequeno ("Pequeno").   At some point, he

22  admitted to her that he was affiliated with the Surenos, a Latin-based California gang that is

                                    1

part street gang and part prison gang.  In March of 2017, Edmundson learned from Pequeno's girlfriend Frances Gomez ("Gomez") that Pequeno had stolen her Glock .380 pistol ("Glock Pistol").

On April 3, 2017, based on Pequeno's alleged possession of a firearm and other violations of his probation terms, Edmundson submitted a petition to revoke his probation, which was granted by a judge.  As it turns out, Pequeno was not adhering to the terms of his probation for two separate criminal matters.  As a result, two warrants for his arrest were issued.  The job of locating and apprehending Pequeno fell to Leah Lara, a probation officer for Maricopa County who is assigned to the Fugitive Apprehension Unit ("FAU").  Lara uses various law enforcement agencies to assist her in apprehending fugitive probationers, such as Pequeno, including the East Valley Violent Offender Task Force ("Task Force").[1]

Based on Pequeno's affiliations and/or contacts with Mesa gangs, his possible possession of a firearm, and other factors, Lara reached out to Detective Michael Pezzelle ("Pezzelle"), a member of the Task Force, to see if the Task Force would be interested in going after Pequeno.  The Task Force agreed to accept the assignment.

In her deposition, Gomez testified that Pequeno later told her in April that he had sold the Glock Pistol that he had stolen from her.  However, Pezzelle contends that, on April 20, 2017, Gomez told him that Pequeno was still in possession of the pistol.

On April 20, 2017, Gomez got off work at about 2:30 pm and went home to her apartment, which was a unit in an apartment complex located at 1971 North Hartford Street in

---

[1] In this case, the Task Force is also referred to by witnesses as the Violent Offender Unit ("VOU").

Chandler ("Chandler Apartment Complex").   The night before, someone had slashed one of her tires on her white Toyota Corolla ("Toyota Corolla").   Around the time she got off work, Gomez received a phone call from Veronica Lane ("Veronica"), the sister of S.L., who informed Gomez that Veronica was the person who had slashed her tire.   As it turns out, Pequeno had also been romantically involved with Veronica at the same time he was seeing Gomez.

During Gomez's phone call with Veronica, Pequeno came down the stairs of Gomez's Apartment and a physical altercation erupted which resulted in Pequeno slapping Gomez in the face and then grabbing Gomez's belongings, including the car keys to the Toyota Corolla and her phone.   When Gomez attempted to grab her car keys from Pequeno he hurt her hand "really bad."   Pequeno left Gomez's Apartment and got in the Toyota Corolla and drove away a short distance, only to turn around and attempt to physically force Gomez to get into the Toyota Corolla ("Attempted Kidnapping").   Gomez was frightened that Pequeno was "going to hurt me or he was going to crash the car and probably hurt both of us."   Two residents at the Chandler Apartment Complex witnessed the Attempted Kidnapping.   One of the residents, Micah Pals, was threatened by Pequeno with a knife, which Pequeno held up against Pals' driver's side window of his car.

Pequeno fled the scene of the Attempted Kidnapping.   Chandler Officers, who had responded to 911 calls regarding the incident, attempted to execute a traffic stop on the Toyota Corolla, but Pequeno was running red lights and the Chandler Officers terminated the pursuit.

After learning about the Attempted Kidnapping, Pezzelle and Defendant Garrett Dever ("Dever"), another member of the Task Force and a Chandler Police Officer, responded to the Chandler Apartment Complex where they learned about the violent behavior exhibited by Pequeno, including the report that Pequeno was armed with a knife.  Pezzelle testified that Gomez twice told him at the complex that she believed Pequeno still had her Glock Pistol that he had stolen from her.  Dever said he learned at the complex that (1) Pequeno was in possession of a Glock pistol and a knife, (2) high on methamphetamine, and (3) might have a hiding place with a girl on the west side.

After fleeing the Chandler Apartment Complex, Pequeno picked up Damien Sandoval-Rosa ("Sandoval") and S.L. near S.L.'s residence.  After Sandoval and S.L. were picked up, Pequeno and Sandoval smoked heroin and methamphetamine multiple times.  Pequeno drove Sandoval and S.L. to the apartment complex near 51st Avenue and Northern Avenue [5220 W. Northern Avenue] in Glendale ("Glendale Apartment Complex") where Sandoval was living in a unit with his brother.

Pequeno, Sandoval, and S.L. got out of the Corolla and went inside the apartment at the Glendale Apartment Complex.  After some passage of time, the three of them decide to go get groceries and they left the apartment and got in the Toyota Corolla.  Pequeno was in the driver's seat; Sandoval was in the front passenger seat and S.L. was sitting behind Sandoval in the backseat.

At the same time Pequeno, Sandoval, and S.L. were making their way to the Glendale Apartment Complex, the members of the Task Force also began converging at the Glendale Apartment Complex.

Detective Edward Pollard ("Pollard") was the first member of the Task Force to spot the Toyota Corolla in the vicinity of the Glendale Apartment Complex, but subsequently lost sight of it.  Shortly thereafter, Detective Andrew Walag ("Walag"), another member of the Task Force, located the Toyota Corolla in the parking lot of the Glendale Apartment Complex and reported that another male and female [Sandoval and S.L.] were with Pequeno.  The three of them disappeared into the complex and Pollard was unable to determine which apartment unit they were in.

## THE VEHICLE CONTAINMENT

After the members of the Task Force assembled at the Glendale Apartment Complex, the plan was to execute a vehicle containment near the Southeast Side exit (where Dever was positioned in his truck) or near the west side ("West Side") exit of the complex, depending on which way Pequeno decided to exit the complex in the Toyota Corolla.  Sergeant Jalyn Bellows approved the plan to perform a vehicle containment.

When Pequeno started driving to leave the Glendale Apartment Complex, he was forced to stop behind Dever's Truck; Sandoval believed the Truck was waiting to turn left onto Northern Avenue, the road adjacent to the complex.

As the front block or lead vehicle ("Front Block") of the subject vehicle containment ("Vehicle Containment"), Dever's responsibility was to initiate the Vehicle Containment, which he did by broadcasting the word "move" or something similar over the radio and put the Truck in reverse and stopped when he made contact with the Toyota Corolla.   After    the Truck made contact with the Toyota Corolla, Dever left the Truck in reverse and put his foot on the brake.

Pollard's vehicle was the rear vehicle of the Vehicle Containment.   Defendant Andrew Walag's vehicle was the passenger-side vehicle of the Vehicle Containment.   Defendant Brandon Ekren's vehicle was the driver's-side left block of the Vehicle Containment.

Sandoval testified that it seemed as if the Toyota Corolla had been rear ended.  He did not recall the Truck moving during the Vehicle Containment.

After the completion of the Vehicle Containment, Dever crouched down in his seat and slumped down and made himself as small as possible.  After he slumped down, Dever first heard commands, which possibly included words such as "Show me your hands" and Hands up" and "Police," and then he heard shooting.

## CONFRONTATION WITH PEQUENO

After the completion of the Vehicle Containment, the other members of the Task Force moved in to take custody of Pequeno.  However, the evidence shows that Pequeno refused to comply with the officers' commands.  Walag issued commands to the car occupants to put their hands up and he observed Pequeno revving the engine and ducking towards the center console.  Ekren testified that Pequeno was making the Toyota Corolla rock back and forward. Ekren testified that he gave commands but Pequeno did not appear to be listening to the Task Force commands and was reaching around the whole time.  Defendant Chip Jones ("Jones") issued commands, observed the Toyota Corolla lurch backwards and forward, and shot three rounds from his less lethal shotgun at Pequeno's window.  Through the hole in the window created by the rounds of the shotgun, Jones observed Pequeno turn towards the center console.  Pezzelle yelled multiple commands, including "Police, hands up," at the occupants

of the Toyota Corolla.  Pezzelle could not see Pequeno's hands but observed him leaning over the center console.

Pollard made the decision to start shooting after observing Pequeno reach toward the center console.  Defendant Hoapili Baker moved toward the trapped Toyota Corolla and fired one round after he saw Pequeno reaching down toward the center console and was digging for something and appeared to have an object in his hands.  Pezzelle began shooting (firing five rounds) when Pequeno raised his hand and appeared to be holding a pistol.

Dr. Grant Herndon, who was employed by the Maricopa County Office of the Medical Examiner in 2017, performed the postmortem examination of S.L. and concluded that the cause of death to S.L. was a gunshot wound to the head.  He also examined Pequeno, who had also died, and found that Pequeno had methamphetamine in his system when he died.

## II.      SUMMARY JUDGMENT STANDARD.

A motion for summary judgment challenges whether the opposing party has sufficient admissible evidence to justify a trial.  A motion for summary judgment should be granted if the evidence shows there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Rule 56(a), Fed. R. Civ. P.  A material fact is one that might affect the outcome of the case, and a factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party has the burden of showing the absence of any genuine disputes of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  When the moving party fulfills its obligation to establish an absence of evidence to support the nonmoving party's case,

the burden shifts to the nonmoving party, which must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.  The nonmoving party cannot solely rely on the pleadings and must do more than simply show there is "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986).  In fact, conclusory and speculative testimony, whether contained in affidavits or moving papers, is insufficient to raise genuine issues of fact.  *Thornhill Publ'g Co. v. GTE Corp*., 594 F.2d 730, 738 (9th Cir. 1979); *see also Hernandez v. Spacelabs Med., Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003) (Court pointed out that a motion for summary judgment cannot be defeated with "allegations in the complaint, or with unsupported conjecture or conclusory statements").

## III.   THE APPARENT ASSAULT AND BATTERY CLAIM ASSERTED AGAINST DEFENDANT GARRETT DEVER IN COUNT ONE IS NOT A VIABLE STATE LAW CLAIM AND MUST BE REJECTED  AND DISMISSED.

### A.   DEVER'S EXECUTION OF THE FRONT BLOCK TECHNIQUE CANNOT BE LEGALLY CONSIDERED BECAUSE IT DID NOT CONTRIBUTE TO, OR CAUSE, S.L.'S DEATH.

In Count One of the Complaint, as to the Chandler Defendants, Plaintiff solely lodges a wrongful death claim against Chandler—the municipality.  However, Plaintiff also asserts that Dever committed the intentional tort of assault and battery by "ramming his vehicle into the Toyota Corolla that [S.L.] occupied."  (Second Amended Complaint ¶¶ 208-210.)

The intentional tort of battery requires proof that the alleged perpetrator intended to cause harmful or offensive contact with the plaintiff.  *See Johnson v. Pankratz*, 196 Ariz. 621, 623 ¶ 6, 2 P.3d 1266, 1268 (App. 2000); Restatement (Second) of Torts § 13.  As the name suggests, this tort is committed by a person acting with tortious "intent."  *See Intentional Tort*, Black's Law

Dictionary (10th ed. 2014).  However, acting with "intent" does not refer to the act itself.  *Ryan v. Napier*, 245 Ariz. 54, 59, ¶18, 425 P.3d 230, 235 (2018).  It means that "the actor desires to cause [the] consequences of his act, or that he believes that the consequences are substantially certain to result from it."  Restatement § 8A.  In *Transamerica Ins. V. Meere*, 143 Ariz. 351, 694 P.2d 181 (1984), the Arizona Supreme Court noted that "the mere knowledge and appreciation of a risk, short of substantial certainty, is not the equivalent of intent . . . [and] is not classed as an intentional wrong" (quoting William Lloyd Prosser, *Handbook on the Law of Torts* § 8, at 32 (4th ed. 1971)).

Moreover, under Arizona law, any claims for state law torts of assault, battery, and/or negligence/gross negligence for harm that decedent S.L. suffered do not survive decedent's death and should be terminated pursuant to A.R.S. § 14-3110.

A.R.S. § 14–3110 provides as follows:

> Every cause of action, except a cause of action for damages for breach of promise to marry, seduction, libel, slander, separate maintenance, alimony, loss of consortium or invasion of the right of privacy, shall survive the death of the person entitled thereto or liable therefor, and may be asserted by or against the personal representative of such person, provided that upon the death of the person injured, damages for pain and suffering of such injured person shall not be allowed.

*Cf. Badia v. City of Casa Grande*, 195 Ariz. 349, 988 P.2d 134 (App.1999) (pursuant to § 14–3110, damages for plaintiff's pain and suffering did not survive her death from unrelated injuries).

To the extent that Plaintiff is seeking to recoup damages arising from an intentional tort allegedly committed by Dever when he executed the Front Block technique of the Vehicle Containment, per A.R.S. § 14–3110, this claim cannot survive the death of S.L. because Dever's

performance of the Front Block technique was not a factual or legal cause of S.L.'s death.  It is undisputed that S.L died only from a gunshot wound to her head.  (DSOF ¶ 47.)  Thus, Plaintiff is not entitled to collect any damages arising from Dever's execution of the Front Block technique.

Even in the absence of A.R.S. § 14–3110, the Court should reject any consideration of an intentional tort by Dever because he did not have the requisite intent to cause harmful and offensive contact with S.L. or believe that harmful and offensive contact with S.L. was substantially certain to result from it.  It is undisputed that the purpose of the Vehicle Containment was to trap the Toyota Corolla because Pequeno was inside it.  (DSOF ¶¶ 26, 30-31.)  For this reason also, the Court should reject the assertion that Dever committed an intentional tort against S.L.

Additionally, the Court should reject the assertion of an intentional tort because there is no evidence in the record that Dever caused harmful and offensive contact to S.L.  The Toyota Corolla stopped behind Dever's Truck.  (DSOF ¶ 29.)  Sandoval, the only occupant to survive the subsequent shooting that occurred during the Confrontation with Pequeno, perceived that the Truck was simply a vehicle waiting to make a left turn out of the Glendale Apartment Complex onto Northern Avenue.  (*Id*.)  Sandoval further testified that the Truck did not move during the Vehicle Containment.  (*Id*. ¶ 34.)  Therefore, given the absence of any evidence to support the conjecture that Dever committed an intentional tort when he executed the Front Block technique, the Court must refuse to consider it.

/ / /

## B.    VICARIOUS LIABILITY.

Plaintiff asserts that Chandler is vicariously liable for the conduct of its employee for causing S.L.'s death.  (Complaint ¶ 221.)  "The doctrine of respondeat superior generally holds an employer vicariously liable for the negligent work-related actions of its employees." *Tarron v. Bowen Mach. & Fabricating, Inc.*, 225 Ariz. 147, 150 ¶ 9, 235 P.3d 1030, 1033 (2010). However, as discussed above in Section III(A) and discussed below in Section IV, Dever was not the actual cause or legal cause of the death of S.L.  Therefore, the allegation that Chandler is vicariously liable for the death of S.L. due to the conduct of Dever is without merit and the Court must reject the assertion that Chandler is vicariously liable for Dever's conduct and dismiss the wrongful death claim against Chandler.

## IV.    THE COURT MUST DISMISS ALL NEGLIGENCE AND GROSS NEGLIGENCE CLAIMS AND THE WRONGFUL DEATH CLAIM AGAINST CHANDLER IN COUNT ONE.

The basis for the wrongful death claim against Chandler in Count One is that it was negligent.  Plaintiff claims Chandler breached its duty of care that it owed S.L. by (1) "failing to adequately supervise" Dever in the Task Force (Complaint ¶ 212);  (2) "failing to adequately train" Dever with respect to "the pursuit of suspects, the seizure of suspects, and the risks of using force in making seizures" (Complaint ¶ 213); and (3) "failing to adopt adequate and reasonable policies and training with respect to the pursuit of suspects, high risk stops, Vehicle Assaults, Vehicle Containments, seizure of suspects, seizure of those occupying vehicle with suspects, and the risks of using force"  (Complaint ¶ 214).  Plaintiff's assertion that Chandler's alleged negligence in these three areas is the cause of S.L.'s death is without merit.

Before analyzing whether Chandler has liability for negligence, it is important to note that in Arizona, a plaintiff cannot base a negligence claim on an intentional use of force nor on a law enforcement officer's negligent "'evaluation' of whether to intentionally use force." *Ryan v. Napier*, 245 Ariz. 54, 425 P.3d 230, 236 (2018). Any negligence claim must be based on conduct independent of the intentional use of force. *Id*. at 238. Thus, any negligence on the part of Chandler must stand alone separate and apart from the alleged intentional force used by Dever when he put his Truck in reverse and unnoticeably made contact with the Toyota Corolla.

## A.   NEGLIGENCE.

"To establish a claim for negligence, a plaintiff must prove four elements: (1) a duty requiring the defendant to conform to a certain standard of care; (2) a breach by the defendant of that standard; (3) a causal connection between the defendant's conduct and the resulting injury; and (4) actual damages." *Gipson v. Kasey*, 214 Ariz. 141, 143, ¶ 9, 150 P.3d 228, 230 (2007); *see also Trustmark Ins. Co. v. Bank One*, Ariz., NA, 202 Ariz. 535, 543, ¶ 38, 48 P.3d 485, 493 (App.2002) (stating actual damages are an essential element to a negligence claim).

### 1.   Negligent Training.

To succeed on a negligent training claim, a plaintiff must show a defendant's training or lack thereof was negligent and that such negligent training was the proximate cause of a plaintiff's injuries. *Inmon v. Crane Rental Servs., Inc*., 205 Ariz. 130, 137, ¶ 28, 67 P.3d 726, 733 (App.2003), disapproved of on a different ground, *Tarron v. Bowen Mach. & Fabricating*, 225 Ariz. 147, 235 P.3d 1030 (2010).   For such a claim, it is not enough to establish an employee's incompetence. *Id*. at 137, ¶ 28, 67 P.3d at 733.   The plaintiff must also present evidence showing what training should have been provided, and that the omitted training

proximately caused the plaintiff's injuries. *Id*; *see also Ward v. Mount Calvary Lutheran Church*, 178 Ariz. 350, 357, 873 P.2d 688, 695 (App.1994) (even if inferring negligent supervision, summary judgment is appropriate, given the absence of any facts establishing such negligence.)

Here, it is undisputed that all of the training received by Dever for vehicle containments was through the Task Force. (DSOF ¶ 44.) Lieutenant Melissa Deanda, as member of the Task Force from August of 2013 to October of 2014, confirmed that the training regimen for Dever was consistent with what she experienced during her tenure on the Task Force. (DSOF ¶¶ 48-49.) Plaintiff provides *no evidence* that the arrangement—by which the Task Force provides the training for vehicle containments, instead of Chandler doing so—amounts to negligence by Chandler. Plaintiff's conclusory claim is that Chandler failed in its training. However, Plaintiff introduces no evidence as to what other training *should have been* provided beyond what Dever received from the Task Force, or how the given training was deficient. Scott DeFoe, Plaintiff's police practices expert, generated an 81-page report ("DeFoe Report") that does not offer a single criticism of Dever's execution of the Front Block technique or of Chandler's lack of training on vehicle containments. (*See* Plaintiff's police practices expert report, *generally*, [DSOF ¶ 50].) The Court must dismiss this claim.

### 2. Negligent Supervision.

To prevail on a claim for negligent supervision, the plaintiff must first prove that an employee of the defendant committed a tort. *Kuehn v. Stanley*, 208 Ariz. 124, 130, ¶ 21, 91 P.3d 346, 352 (App.2004). If the theory of the underlying tort fails, the defendant employer is not liable for negligent supervision. *Id*. The plaintiff must further prove that the defendant "had

a reason and an opportunity to act, [ ] failed to adequately discharge [its] duty to supervise, and [ ] thereby contributed to the cause of the [injury]." *Boomer v. Frank*, 196 Ariz. 55, 60, ¶ 21, 993 P.2d 456, 461 (App.1999).

Here, as discussed above in Section III, there is no evidence that Dever committed an intentional tort of assault and battery. For that reason alone, Plaintiff's claim that Chandler is liable for negligent supervision must fail. Moreover, it is undisputed that Dever was primarily supervised by members of the Task Force: Bellows and U.S. Marshal Pat Willhite. (DSOF ¶ 45.) Dever testified that he reported to Pete Rowton at the Chandler Police Department, but rarely did so. (DSOF ¶ 46.) On this claim, Plaintiff offers no evidence that Chandler (1) had a reason and opportunity to act, (2) failed to adequately discharge its duty to supervise, and (3) thereby contributed to the cause of the injury. *See* DeFoe Report; *Boomer*, 196 Ariz. at 60, ¶ 21. This claim is nothing more than unsupported conjecture.

### 3.    Breach of the Duty of Care.

"Duty is defined as an 'obligation, recognized by law, which requires the defendant to conform to a particular standard of conduct in order to protect others against unreasonable risks of harm.'" *Id*. at ¶ 10 (quoting *Markowitz v. Ariz. Parks Bd*., 146 Ariz. 352, 354, 706 P.2d 364, 366 (1985)). "Such an obligation may arise from 'either recognized common law special relationships or relationships created by public policy.'" *Stair*, 245 Ariz. at 361, ¶ 12, 429 P.3d at 1155 (quoting *Quiroz v. ALCOA Inc*., 243 Ariz. 560, 565, ¶ 14, 416 P.3d 824, 829 (2018)). Whether a duty exists "is a matter of law for the court to decide." *Gipson*, 214 Ariz. at 143, ¶ 9, 150 P.3d at 230.

The Arizona Supreme Court repeatedly has observed that duties of care can arise from the conduct a person has undertaken. *Gipson*, 214 Ariz. 141, ¶ 18, 150 P.3d at 232; *Stanley v. McCarver*, 208 Ariz. 219, ¶ 7, 92 P.3d 849, 851 (2004) (special relationship creating duty "may find its basis in ... undertakings"). The Court previously applied this principle when assessing the scope of a law enforcement agency's duty of care to others. *See Austin v. City of Scottsdale*, 140 Ariz. 579, 581–82 & n. 2, 684 P.2d 151, 153–54 & n. 2 (1984) (even though police owed no duty to protect citizens from "all harms," agency had "duty to [surviving family of crime victim to] act as would a reasonably careful and prudent police department" once they have "opted to provide police protection" by receiving emergency calls). Using this analytical framework, Arizona courts have determined whether law enforcement agencies owed any duty of care to specific plaintiffs. *See McDonald v. City of Prescott*, 197 Ariz. 566, ¶¶ 13–17, 5 P.3d 900, 902–03 (App.2000) (citing *Austin* and holding that—although officers owed no duty "per se " to perform road maintenance—once officers undertook to routinely remove dangerous conditions from road, they owed duty to drivers to do so in a " 'reasonably careful and prudent' " manner), quoting *Austin*, 140 Ariz. at 582, 684 P.2d at 154; *Newman v. Maricopa County*, 167 Ariz. 501, 503, 808 P.2d 1253, 1255 (App.1991) (citing *Austin* and interpreting it to anchor duty of law enforcement agencies to others in the affirmative activities of law enforcement); *see also Noriega v. Town of Miami*, 243 Ariz. 320, 327-28, ¶¶ 29, 32, 407 P.3d 92, 99–100 (App. 2017); *Hogue v. City of Phoenix*, 240 Ariz. 277, 280-81, ¶ 12, 378 P.3d 720, 723(App. 2016).

In the Complaint, Plaintiff claims that Chandler owed of care to the members "with whom they come into contact." (Complaint ¶211.) Nothing in the applicable case law of Arizona suggests such a broad blanket duty of care. In this case, Chandler's decision to assign

Dever to work as a member of the Task Force did not create a duty to all the members of the public who might come into contact with the Task Force to train, supervise, and adopt policies related to vehicle containments.  Thus, given the absence of any duty owed by Chandler to S.L., all claims of negligence against Chandler must fail and the wrongful death claim against Chandler—which is solely based on alleged negligence by Chandler—must be dismissed.

### 4.    Proximate Cause.

The biggest and unsurmountable hurdle for Plaintiff to overcome—with respect to her negligence claim against Chandler—is proximate cause.  A plaintiff suing for negligence must establish a "causal connection" between the alleged defendant's breach and the plaintiff's resulting injuries.  *Quiroz v. ALCOA Inc.*, 243 Ariz. 560, 564 ¶ 7, 416 P.3d 824, 828 (2018). The causal connection actually has two components: actual cause or "causation-in-fact," and proximate or legal cause.  *Ontiveros v. Borak*, 136 Ariz. 500, 505–06, 667 P.2d 200, 205–06 (1983); *Patterson v. Thunder Pass, Inc.*, 214 Ariz. 435, 438–39 ¶¶ 13–14, 153 P.3d 1064, 1067–68; *Barrett v. Harris*, 207 Ariz. 374, 378 ¶ 11, 86 P.3d 954, 958 (App. 2004).  Actual cause is present if the defendant's conduct "helped cause the final result" and the result "would not have happened without the defendant's act."  *Ontiveros*, 136 Ariz. at 505, 667 P.2d at 205. A defendant is liable even if his act contributed "only a little" to the plaintiff's injuries. *Id*. (citation omitted). An act that is the actual cause of injuries will also be the proximate cause unless an intervening event supersedes the defendant's liability for the injuries.  *Id*. at 505–06, 667 P.2d at 205–06; *Patterson*, 214 Ariz. at 438–39 ¶ 14, 153 P.3d at 1067–68.

As for "proximate cause," an event that contributes to the injuries is intervening if it has an independent origin for which the defendant is not responsible.  *Patterson*, 214 Ariz. at 438–

39 ¶ 14, 153 P.3d at 1067–68.   Such an "intervening" event is "superseding" if it "was unforeseeable by a reasonable person in the position of the original actor" and "looking backward, after the event, the intervening act appears extraordinary." *Ontiveros*, 136 Ariz. at 506, 667 P.2d at 206.   When the injuries are "produced by an intervening and superseding cause, even though the original negligence may have been a substantial factor in bringing about the injury," the defendant is not liable "because the necessary proximate causation is lacking." *Patterson*, 214 Ariz. at 439 ¶ 14, 153 P.3d at 1068 (quoting *Herzberg v. White*, 49 Ariz. 313, 321, 66 P.2d 253, 261 (1937)).

Here, even if there were any evidence that Chandler provided negligent training, negligent supervision, or failed to provide adequate policies with regard to vehicle containments, there is nothing in the record to suggest that such negligence was the cause of S.L.'s death.   As discussed above in Section III, the alleged assault and battery by Dever in executing the Front Block technique had nothing to do with the death of S.L.   It is undisputed that S.L. died from a gunshot wound that occurred after the completion of the Vehicle Containment.   Dever's assistance in trapping the Toyota Corolla did not contribute even a little to the death of S.L. *Ontiveros*, 136 Ariz. 505.   When the Vehicle Containment was completed, Dever crouched down in his seat and slumped down and made himself as small as possible. (DSOF ¶ 33.)   From that point forward, Dever had nothing to do with the events which followed during the Confrontation with Pequeno.   Dever was only responsible for assisting in trapping the Toyota Corolla.   He did not contribute to any degree to the Confrontation with Pequeno by the other members of the Task Force and the subsequent shooting.   Chandler was not the actual cause or proximate cause of the death of S.L.

Furthermore, after Dever slump down in his seat, he became essentially just another bystander.  When that happened, then the Confrontation with Pequeno occurred with the other members of the Task Force.  During the Confrontation with Pequeno, Pequeno failed to comply with the commands of the members of the Task Force and made movements that suggested he was reaching for a weapon, which caused shots to be fired by the members of the Task Force.  (DSOF ¶¶ 38-43.)   Chandler was not responsible for Pequeno's conduct during the Confrontation with Pequeno.  The actions by Pequeno were intervening and the superseding cause of the death of S.L., which Chandler could not have predicted would have happened based on the mere fact that Dever had successfully executed the Front Block technique.  It was unforeseeable that Pequeno would be digging around the center console of the Toyota Corolla when the police officers were yelling at him to put his hands up.

Therefore, based on all the reasons stated above, the Court must dismiss the wrongful death claim against Chandler.

**B.    GROSS NEGLIGENCE.**

In Count One, Plaintiff contends that Chandler was grossly negligent.  (Complaint ¶ 222.)  Plaintiff also contends that "[e]mployees of the City of Mesa and City of Chandler shot S.L without justification . . . and their actions . . . amount to . . . gross negligence."  (Complaint ¶ 223.)  The claims against Dever and Chandler for gross negligence are without merit.

Whether gross negligence exists is generally a fact question for the jury, but it may be resolved on summary judgment if "no evidence is introduced that would lead a reasonable person to find gross negligence."  *Walls v. Arizona Dept. of Public Safety*, 170 Ariz. 591, 595, 826 P.2d 1217, 1221 (App.1991).  The evidence "must be more than slight and may not border

on conjecture." *Walls*, 170 Ariz. at 595, 826 P.2d at 1221.  To establish gross negligence, the claimant essentially must show wanton misconduct that "is flagrant and evinces a lawless and destructive spirit." *Scott v. Scott*, 75 Ariz. 116, 122, 252 P.2d 571, 575 (1953).  *See also Williams v. Thude*, 188 Ariz. 257, 934 P.2d 1349 (1997); *Luchanski v. Congrove*, 193 Ariz. 176, 971 P.2d 636 (App.1998). As the court in *Walls* stated:

> A party is grossly or wantonly negligent if he acts or fails to act when he knows or has reason to know facts which would lead a reasonable person to realize that his conduct not only creates an unreasonable risk of bodily harm to others but also involves a high probability that substantial harm will result.

*Walls*, 170 Ariz. at 595, 826 P.2d at 1221.  *See also Williams*, 180 Ariz. at 539, 885 P.2d at 1104.  Gross negligence "is different from ordinary negligence in quality and not degree." *Kemp v. Pinal County*, 13 Ariz. App. 121, 124, 474 P.2d 840, 843 (1970). It is "action or inaction with reckless indifference to the ... safety of others." *Williams*, 180 Ariz. at 539, 885 P.2d at 1104.

After completion of the Vehicle Containment, Dever slumped down and made himself as small as possible.  He did not draw his weapon, did not point his weapon, and did not shoot at Pequeno.   Nothing he did could be construed as evincing a lawless and destructive spirit.  Thus, Dever cannot be culpable for gross negligence.  As for Chandler, Plaintiff has failed to introduce any evidence to suggest that Chandler did anything with reckless indifference to the safety of other on the issues of whether it properly trained and supervised Dever on vehicle containments and whether it adopted adequate policies governing vehicle containments.  The Court must dismiss the claims of gross negligence against Chandler and Dever.

/ / /

## C.     CHANDLER DEFENDANTS ARE ENTITLED TO THE PRESUMPTIONS AND PROTECTIONS AFFORDED BY A.R.S. §§ 12-711, 12-712, 12-716, 13-404, 13-405, 13-406, 13-409, 13-411, AND 13-413.

Pequeno was under the influence of illicit drugs when Vehicle Containment and Confrontation of Pequeno occurred, which means that he was at least 50 percent at fault for the death of S. L.  *See* A.R.S. § 12-711.  Moreover, the record establishes that Pequeno was fleeing from the scene at the Chandler Apartment Complex where he had committed a number of crimes earlier on April 20, 2017, which means that he was at least 50 percent responsible for the death of S. L.  *See* A.R.S. § 12-712.  Furthermore, Chandler Defendants assert that the record shows that Dever was acting reasonably under the circumstances when he used his vehicle to prevent Pequeno from escaping by executing the Front Block technique.  *See* A.R.S. § 12-716. Therefore, Chandler Defendants request that the Court find, as a matter of law, that Pequeno was 50 percent at fault for the death of S.L. and that Dever was acting reasonably under the circumstances when he executed the Front Block technique.

In addition, as to Dever's execution of the Front Block technique to prevent Pequeno from escaping from the Glendale Apartment Complex, Chandler Defendants assert that the use of the vehicle was justified and legal under Arizona law.  *See* A.R.S. §13-409.   Dever was justified in using his Truck to prevent Pequeno from escaping and Dever had no duty to retreat.  *See* A.R.S. 13-411.  Thus, Chandler Defendants are not subject to civil liability for engaging in appropriate and justified conduct.  *See* A.R.S. § 13-413.  Therefore, Chandler Defendants request that the Court make findings, as a matter of law, pursuant to these Arizona statutes.

Finally, to the extent that the Court finds the Chandler Defendants potentially culpable for the actions by the other members of the Task Force after the completion of the Vehicle Containment—which would include the events that occurred during the Confrontation with Pequeno, such as the shooting and subsequent death of S.L.—Chandler Defendants request the Court find that the Mesa Defendants and Chandler Defendants were acting reasonably pursuant to A.R.S. § 12-716 and their actions were legal and justified pursuant to A.R.S. §§ 13-404, 13-405, 13-406, and 13-409 and they had no duty to retreat pursuant to A.R.S. § 13-411 and are not subject to liability for engaging in appropriate and justified conduct.  A.R.S. § 13-413.

### D.    JOINT AND SEVERAL LIABILITY

Plaintiff asserts the conclusory claim that all the Defendants "who participated in the Task Force acted in concert with each other or pursuant to a common design.  (Complaint ¶ 216.)  Plaintiff further contends that the Defendants "were acting in concert and participating in a joint enterprise for their mutual benefit."  (Complaint ¶ 232.)  Plaintiff also asserts that Defendants Mesa and Chandler are "jointly and severally liable for all claims."  These allegations appear to raise a "joint and several liability" issue as to individual tortfeasors for whom a factual basis for liability has been alleged or proven.  A.R.S. § 12-2506(D)(1).  However, joint and several liability does not operate to impose factual liability on a party who is not otherwise alleged or shown to be negligent or liable.  The acting in concert/joint and several liability is simply a tool that allows Plaintiff to collect an entire judgment against any individually liable tortfeasor (rather than collecting only that tortfeasor's percentage of fault

against it).  The "acting in concert" allegation does not itself support any claim of negligence or gross negligence against the Chandler Defendants.

More importantly, the record does not support a claim for joint and several liability.  The mere fact that Dever participated in the Task Force, along with other officers from neighboring agencies, does not create joint liability.  The statute defines "acting in concert" as requiring at least two people to (1) enter into a conscious agreement to pursue a common plan or design to commit an intentional tort and (2) actively take part in *that* intentional tort.  A.R.S. § 12-2506(F)(1).  In other words, both parties must be intentional tortfeasors of the same tort.  Here, this would require that all of the Defendants (1) agreed to commit an intentional tort on S.L and (2) actively participated in that same intentional tort.  *Mein ex rel. Mein v. Cook*, 219 Ariz. 96, 100, 193 P.3d 790, 794 (App.2008).  In the instant case, the only possible tort committed by Dever was backing his truck into the Toyota Corolla.  He had no involvement in the shooting of S.L.  He ducked down after the completion of the Vehicle Containment and only heard the commands issued to the occupants of the Toyota Corolla and the gunfire during the Confrontation with Pequeno.

**V.   AS TO COUNT TWO, THE TASK FORCE HAD THE LEGAL AUTHORITY TO STOP THE TOYOTA COROLLA AND SEIZE THE OCCUPANTS OF THE VEHICLE BASED ON PEQUENO'S PRESENCE IN THE VEHICLE AND THE OUTSTANDING WARRANTS FOR HIS ARREST.**

A passenger does have standing to claim that a traffic stop was unconstitutional.  *See Brendlin v. California*, 551 U.S. 249, 127 S.Ct. 2400, 2403, 168 L.Ed.2d 132 (2007) ("We hold that a passenger is seized [when a traffic stop occurs] and so may challenge the constitutionality of the stop.").  However, law enforcement officers may stop a vehicle in which they reasonably believe the subject of a warrant is traveling to execute the warrant.  *U.S. v. O'Connor*, 658 F.2d

688 (9th Cir. 1981).  Even if their good faith belief is incorrect, the stop is still valid.  *Hill v. California*, 401 U.S. 797, 803-05, 91 S.Ct. 1106, 1110-1111, 28 L.Ed.2d 484 (1971).  Even for something as mundane as a traffic stop, once a motor vehicle has been lawfully detained, law enforcement officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures.  *Pennsylvania v. Mimms*, 434 U.S. 106, 111, n. 6, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) (per curiam).  The Court in *Mimms* stated that the government's "legitimate and weighty" interest in officer safety outweighs the "*de minimis*" additional intrusion of requiring a driver, already lawfully stopped, to exit the vehicle. *Id*., at 110–111, 98 S.Ct. 330.  In *Maryland v. Wilson*, 519 U.S. 408, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997), the Court held that the *Mimms* rule applied to passengers as well as to drivers and "an officer making a traffic stop may order passengers to get out of the car pending completion of the stop."  519 U.S., at 415, 117 S.Ct. 882.

Therefore, the execution of the Vehicle Containment, which resulted in the seizure of the Toyota Corolla and all of its occupants was legal and constitutional.

## VI.   THE COURT MUST DISMISS COUNT TWO BECAUSE THERE IS NO EVIDENCE THAT DEVER USED EXCESSIVE FORCE DURING THE INCIDENT.

Assertions of excessive force during an investigatory stop or arrest of a free citizen are examined under the Fourth Amendment's prohibition against unreasonable seizures.  *Graham v. Connor*, 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); *see also Tennessee v. Garner*, 471 U.S. 1, 7, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985).  The "reasonableness inquiry" is an objective inquiry that asks whether an officer's actions were reasonable in light of the circumstances he confronted.  *Graham*, 490 U.S. at 397, 109 S.Ct. 1865.  The determination of

whether a particular use of force was reasonable "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id*. at 396, 109 S.Ct. 1865 (internal quotation marks and citation omitted).   In assessing the government interests, the trial court evaluates a "range of factors" that include "(1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others (3) whether he was actively resisting arrest or attempting to evade arrest by flight, and any other exigent circumstances that existed at the time of the arrest." *Deorle v. Rutherford*, 272 F.3d 1272, 1280 (9th Cir. 2001) (cleaned up and citation omitted); *see also Graham*, 490 U.S. at 396, 109 S.Ct. 1865.

## A.   DEVER'S EXECUTION OF THE FRONT BLOCK TECHNIQUE WAS OBJECTIVELY REASONABLE.

A law enforcement officer's right to make an arrest necessarily includes the right to use some degree of force.   *See Graham*, 490 U.S. at 396, 109 S.Ct. 1865.   The law enforcement tactic of containing or boxing in a suspect's vehicle has been found to be a reasonable use of force.   *See Cunningham v. Gates*, 229 F.3d 1271, 1278 n. 7, 1291 (9th Cir.2000) ( "Cunningham I" ) (the Court found that use of "jamming technique," which referred "to the practice of boxing in a suspect's vehicle with police cars," was "reasonable use of force for the purposes of the Fourth Amendment" when "officers were confronted with armed individuals in the midst of committing a dangerous felony"); *Simpson v. Devore*, No. 2:16-CV-2981 JCM (VCF), 2019 WL 1284101, at *6 (D. Nevada March 20, 2019 ) (district court finds that a reasonable officer could determine that the use of the "jamming method" was justifiable given plaintiff's tendency to flee and the violent nature of the crimes for which defendants were attempting to execute his arrest); *see also Nelson v. City of Los Angeles*, No. CV 11-5407-PSG JPR, 2014 WL 6066053, at *7

24

(C.D. Cal. Nov. 13, 2014) (The district court found that use of the "vehicle-containment technique" did not alone constitute an unconstitutionally excessive use of force).

Here, as to the government's interests at stake, Pequeno was a fugitive with two outstanding warrants out for his arrest. He also was the suspect in an assault and attempted kidnapping incident that occurred earlier in the day at the Chandler Apartment Complex. He further posed an immediate threat to the public based on his prior violent behavior at the Chandler Apartment Complex, his willingness to disregard traffic lights, his possible use of illicit drugs, and his possible possession of a knife and gun. In contrast to the immediate threat to others posed by Pequeno, Dever's use of force was minimal with respect to the execution of the Front Block technique. Dever's execution of the Front Block technique—and the contact the Truck made with the Toyota Corolla—was so subtle that Sandoval, who sitting in the front seat of the Toyota Corolla, did not even realize that the Truck was part of the Vehicle Containment and only thought they had been rear ended. (DSOF ¶ 34.)

## B. DEVER WAS NOT AN INTEGRAL PARTICIPANT IN THE CONFRONTATION WITH PEQUENO AND SUBSEQUENT SHOOTING THAT OCCURRED AND LEAD TO THE DEATH OF S.L.

"A person subjects another to the deprivation of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made." *Preschooler II v. Clark County Sch. Bd. of Trs*., 479 F.3d 1175, 1183 (9th Cir.2007) (quoting *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir.1978)) (internal quotations omitted). But a police officer who is merely a bystander to his colleagues' conduct cannot be found to have caused any injury. *Hopkins v. Bonvicino*, 573 F.3d 752, 770 (9th Cir.2009); *see*

*also Chuman v. Wright*, 76 F.3d 292, 295 (9th Cir.1996) (rejecting a jury instruction that allowed the jury to "lump all the defendants together, rather than require it to base each individual's liability on his own conduct"). A plaintiff must "establish the 'integral participation' of the officers in the alleged constitutional violation." *Jones v. Williams*, 297 F.3d 930, 935 (9th Cir.2002); *see also Torres v. City of Los Angeles*, 548 F.3d 1197, 1206 (9th Cir.2008).

Law enforcement officers who are "integral participants" in a constitutional violation may be liable under § 1983, even if they did not directly engage in the unconstitutional conduct themselves. *Boyd v. Benton County*, 374 F.3d 773, 781 (9th Cir.2004). However, this requires "some fundamental involvement in the conduct that allegedly caused the violation." *Blankenhorn v. City of Orange*, 485 F.3d 463, 481 n. 12 (9th Cir.2007) (*citing Boyd*, 374 F.3d at 780) (finding liable for excessive force every officer who provided armed backup for the officer who gained entry to a suspect's home by unconstitutionally deploying a flash-bang device because "every officer participated in some meaningful way" in the arrest and "every officer was aware of the decision to use the flash-bang, did not object to it, and participated in the search operation knowing the flashbang was to be deployed")). Officers are not integral participants solely based on being present at the scene of an alleged unlawful act. *Jones*, 297 F.3d at 936 (rejecting a jury instruction that would have allowed the jury to find all the officers liable merely for being present at the scene of an alleged unlawful search). Rather, integral participation requires some fundamental involvement in the conduct that allegedly caused the violation. *See id*.

For example, in *Rutherford v. City of Berkeley*, 780 F.2d 1444, (9th Cir.1986), the plaintiff alleged that while he was standing outside a Berkeley residence hotel three police officers threw him to the ground and punched, kicked, and handcuffed him. *Id*. at 1445. The defendants denied assaulting Rutherford but admitted they handcuffed him and placed him under arrest. *Id*. Although Rutherford was not certain which of the three officers actually punched or kicked him while he was on the ground, the Court held that the district court erred when it granted a directed verdict for defendants because there was sufficient evidence for the jury to reasonably infer that the three officers participated in the beating of Rutherford. *Id*. at 1445, 1448.

Here, the record shows that there is a clear demarcation between the Vehicle Containment episode and the Confrontation with Pequeno. The Vehicle Containment involved only the movement of four vehicles: suspect car (Toyota Corolla), front block vehicle (Dever), passenger-side vehicle (Walag), and driver's-side vehicle (Ekren). (DSOF ¶¶ 30, 38-40.) After the Vehicle Containment was completed, Dever's involvement ended. He slumped down and made himself as small as possible. (DSOF ¶ 33.) At that point, he was functionally no different than any other nearby bystander—such as any of the apartment dwellers in the Glendale Apartment Complex who could hear the police shouting commands and hear the sound of gunshots erupting.

Integral participation requires fundamental involvement for an officer to qualify as an integral participant. Thus, in *Blankenhorn*, the Court found potential liability for even those officers who were present and provided armed back up. 485 F.3d at 481 n. 12. Here, Dever was curled into a ball making himself as small as possible. He could hear what was happening, but

he was not poised to do anything or assist in any manner during the Confrontation with Pequeno, which occurred after the completion of the Vehicle Containment.  He had no fundamental involvement.  He was a de facto bystander.  Therefore, to the extent that the Court finds any of the other defendants liable for excessive force after the completion of the Vehicle Containment, it must find that Dever was not an integral participant liable for the death of S.L.

**C.     THE OFFICERS WHO PARTICIPATED IN THE CONFRONTATION WITH PEQUENO DID NOT USE EXCESSIVE FORCE WHEN THEY FIRED THEIR WEAPONS AT PEQUENO.**

Even if the Court determines that Dever was an integral participant in the Confrontation with Pequeno and subsequent shooting that led to the death of S.L., Chandler Defendants contend that the other members of the Task Force did not use excessive force when they fired their weapons at Pequeno because their actions were objectively reasonable.  In the Complaint, Plaintiff simply states that Jones, Pollard, Baker and Pezzelle "began firing shotgun and handgun rounds into the Toyota Corolla" (Complaint ¶ 240) but fails to contextualize the decision to shoot to any degree based on the facts and circumstances present at that moment.  As it turns out, the undisputed facts and circumstances establish that these officers' decision to shoot was objectively reasonable.

In *Graham*, the Court held that the question whether an officer has used excessive force "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." 490 U.S. at 396, 109 S.Ct. 1865.  "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20

vision of hindsight." *Ibid.*  And "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.*, at 396–397, 109 S.Ct. 1865.

Here, these officers were forced to make split-second judgments after Pequeno failed to comply with the commands that were directed at the occupants of the Toyota Corolla.  (DSOF ¶¶ 37-43.)   The only person who survived the encounter with the Task Force during the Confrontation with Pequeno was the one person who followed the commands of the Task Force—Sandoval.  Pequeno, on the other hand, made several attempts to manipulate the Toyota Corolla in an attempt to escape the Vehicle Containment.  (DSOF ¶¶ 36, 39-41.)  In addition, instead of putting his hands up in the air as directed by certain members of the Task Force, Pequeno appeared to move around continuously, including making furtive movements near the center console of the Toyota Corolla, which caused multiple members of the Task Force to conclude that he was reaching for a weapon or posed an imminent threat.  (DSOF ¶¶ 38-43.)  It is clear that the officers who fired their weapons used the reasonable amount of force that seemed objectively necessary at a tense, uncertain, and rapidly evolving moment in time.  The use of force was reasonable.

Moreover, the officers' intent was to shoot Pequeno—not S.L.  The officers were not trying to shoot S.L.  Based on Pequeno's suspicious movements, the officers' use of force was objectively reasonable.  The Court must dismiss Count Two in its entirety.

/ / /

1

2

## VII.  DEVER DID NOT VIOLATE PLAINTIFF'S 14TH AMENDMENT RIGHT TO FAMILIAL SOCIETY AND COMPANIONSHIP.

3

In Count Four, Plaintiff asserts that she has been deprived of a familial relationship with

4

S.L. in violation of her Fourteenth Amendment right to substantive due process.  For this claim

5

to succeed, a plaintiff has to prove that an officers' use of force "shock[ed] the conscience."

6

*Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir.2008).  Based on the record, a reasonable jury

7

could not possibly find that Dever's unnoticeable execution of the Front Block technique

"shocked the conscience."

8

To the extent that Dever is determined to be culpable—as an integral participant—for the

9

actions of the other members of the Task Force during the Confrontation with Pequeno and

10

subsequent shooting of S.L., the officers use of force of shooting at Pequeno also does not rise

11

to the level of shocking the conscience.  In *Gonzalez v. City of Anaheim*, 747 F.3d 789 (9th

12

Cir.2014), the Court held that where the officers do not have time to deliberate, a use of force

13

shocks the conscience only if the officers had a purpose to harm the decedent for reasons

14

unrelated to legitimate law enforcement objectives.  *Id*. at 797.

15

Here, there is no evidence that the officers had a reason for harming S.L. that was

16

unrelated to legitimate enforcement objectives.  The purpose of shooting at Pequeno was to

17

achieve the legitimate law enforcement objective of removing a legitimate threat to the safety of

18

others.  The fact that that S.L. was killed an unintended consequence.  None of those officers

19

wanted S.L. to be harmed.  The decision to use deadly force against Pequeno clearly qualifies as

20

a split-second decision during a tense moment.  Therefore, the Court must dismiss Dever from

21

Count Four.

22

**VIII.   NO EVIDENCE TO SUPPORT A *MONELL* CLAIM AGAINST CHANDLER.**

A municipality is a local government unit that may be sued under § 1983 for violating a person's constitutional rights.  *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978).  However, a government entity is only liable under § 1983 for its "own illegal acts"; it cannot be vicariously liable for its employees' actions.  *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986)); *see L.A. Cnty., Cal. v. Humphries*, 562 U.S. 29, 36 (2010) (the government entity cannot be liable "solely for the acts of others, e.g., 'solely because it employs a tortfeasor'") (internal quotation omitted).  To establish § 1983 liability under *Monell*, a plaintiff must show that his or her constitutional injury was caused by employees acting pursuant to the government entity's policy or custom.  *Monell*, 436 U.S. at 690–94; *Villegas v. Gilroy Garlic Festival Ass'n*, 541 F.3d 950, 964 (9th Cir. 2008). This requires the plaintiff to show (1) a constitutional deprivation; (2) that the entity had a policy or custom; (3) that the policy or custom amounted to deliberate indifference to the plaintiff's constitutional right; and (4) that the policy or custom was the moving force behind the constitutional violation.  *Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs*., 237 F.3d 1101, 1110–11 (9th Cir. 2001).  The critical question in the *Monell* analysis is whether the entity's policy or custom inflicted the harm or injury, or if the harm resulted from the independent acts of a subordinate.  *See Humphries*, 562 U.S. at 36.

**A.        CONSTITUTIONAL DEPRIVATION.**

As previously discussed, Chandler Defendants contend that Dever did not violate S.L.'s constitutional right to be free from unlawful seizures and excessive force and did not violate Plaintiff's 14th Amendment right to familial society and companionship.

## B.   EXISTENCE OF A POLICY OR CUSTOM.

A policy is "a deliberate choice to follow a course of action" made by the officials or entity "responsible for establishing final policy with respect to the subject matter in question." *Oviatt v. Pearce*, 954 F.2d 1470, 1477 (9th Cir. 1992).   A policy can be one of action or inaction.  *Long v. Cnty. of L.A.*, 442 F.3d 1178, 1185 (9th Cir. 2006).  A "custom" for purposes of municipal liability is a "widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well-settled as to constitute a custom or usage with the force of law."  *St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988).  A plaintiff must show that the challenged action is the "standard operating procedure" of the municipality.  *Price v. Sery*, 513 F.3d 962, 966 (9th Cir. 2008) (internal quotation omitted).  "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996). While one or two incidents are insufficient to establish a custom or practice, the Ninth Circuit has not established what number of similar incidents would be sufficient to constitute a custom or policy.  *See Oyenik v. Corizon Health Inc.*, No. 15-16850, 2017 WL 2628901, at *2 (9th Cir. June 19, 2017) (a reasonable jury could conclude that at least a dozen instances of defendant Corizon denying or delaying consultations and radiation treatment for cancer patient over a year amounts to a custom or practice of deliberate indifference) (citing *Oviatt By & Through Waugh v. Pearce*, 954 F.2d 1470, 1478 (9th Cir. 1992)).  But "[t]here is no case law indicating that a custom cannot be inferred from a pattern of behavior toward a single individual."  *Id.*

Here, the undisputed facts show that the policies and customs of the Task Force were handled by the Task Force and it had been done that way for several years.  (DSOF ¶¶ 44-46, 48-49.)  Plaintiff fails explain how this arrangement—where the Task Force handled the customs and policies for apprehending fugitives and not Chandler—detrimentally impacted S.L. and Plaintiff.  Plaintiff fails to identify a deficiency in the Task Force's policies and practice and customs and explain how a Chandler policy would have rectified that deficiency.  Plaintiff's conclusory claim is that Chandler "failed to develop written policies regarding Vehicle Assault tactics."  (Complaint ¶ 272.)  This assertion is insufficient and merely unsubstantiated speculation.

### C.      POLICY OR CUSTOM AMOUNTING TO DELIBERATE INDIFFERENCE.

Again, Plaintiff fails to identify how the customs and policies of the Task Force, which governed Dever's actions on the Task Force, was deficient.  Plaintiff does not provide any explanation or evidence on how a Chandler policy would have been an improvement over what policies and customs the Task Force follows.  Without any evidence of that, a reasonable jury could not find that Chandler's failure to have a policy on vehicle containments detrimentally impact S.L. and Plaintiff.  Therefore, there is not a triable issue of fact on whether Chandler's omission of a policy amounted to deliberate indifference.

### D.      MOVING FORCE BEHIND THE VIOLATION.

A policy or custom is the moving force behind a constitutional violation when it is "closely related to the ultimate injury" and when the plaintiff can "establish that the injury would have been avoided had proper policies been implemented." *Long*, 442 F.3d at 1190 (9th Cir. 2006) (internal quotation marks omitted).  In view of the discussion above, there is

insufficient sufficient probative evidence in the record to create a triable issue as to whether Chandler is liable under § 1983 for a violation of S.L.'s and Plaintiff's constitutional rights. Plaintiff has never introduced any evidence to show that any of her alleged injuries in this case would have been avoided if Chandler had implemented a proper policy.  (*See* DeFoe Report.)

## IX.   DEVER IS ENTITLED TO QUALIFIED IMMUNITY IN COUNTS TWO AND FOUR.

Government officials enjoy qualified immunity from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  There are two prongs in the qualified-immunity inquiry: "(1) whether 'the facts alleged show the official's conduct violated a constitutional right; and (2) if so, whether the right was clearly established' as of the date of the involved events 'in light of the specific context of the case.'" *Tarabochia v. Adkins*, 766 F.3d 1115, 1121 (9th Cir. 2014) (internal quotation omitted.)  In its analysis, the district court must view the facts "in the light most favorable to the injured party."  *Chappell v. Mandeville*, 706 F.3d 1052, 1058 (9th Cir. 2013) (citation omitted).

A trial court has the discretion to skip the first step in certain circumstances, as when the officer is plainly entitled to prevail at the second step. *See Pearson v. Callahan*, 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009)  If so, the question to be answered is whether the right was clearly established at the time of the officer's actions, such that any reasonably well-trained officer would have known that his conduct was unlawful.  *District of Columbia v. Wesby*, —— U.S. ——, 138 S. Ct. 577, 589, 199 L.Ed.2d 453 (2018).  In determining whether a constitutional right was clearly established at the time of the alleged violation, "a case directly on point" is not required, "but existing precedent must have placed the statutory or constitutional

question beyond debate." *Mullenix v. Luna*, 136 S.Ct. 305, 308 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)); *see also Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) ("[P]olice officers are entitled to qualified immunity unless existing precedent 'squarely govern' the specific facts at issue").

First, it is important to identify the contours of the conduct that is at stake.  It is undisputed that the seizure of the Toyota Corolla was legally justified.  If the Court deems otherwise, then Dever asserts that he is entitled to qualified immunity on that claim in Count Two.  Dever also asserts qualified immunity for the assertion in Count Two that his execution of the Front Block technique amounted to excessive force.  On the question of whether Dever is liable for the alleged excessive force of shooting S.L. during the Confrontation with Pequeno as an integral participant in Count Two, Dever asserts that he is entitled to qualified immunity on that claim.  Finally, as to Count Four, Dever asserts he is entitled to qualified immunity for both his conduct in executing the Front Block technique and as an alleged integral participant with respect to the shooting of S.L. and the claim that he violated Plaintiff's 14th Amendment right to familial society and companionship.

## X.    PUNITIVE DAMAGES.

### A.    STATE LAW CLAIMS.

Pursuant to A.R.S. § 12-820.04, neither a public entity nor a public employee acting within the scope of his employment is liable for punitive or exemplary damages.  Therefore, the Court must dismiss the claim that Plaintiff is entitled to punitive damages for any state law claims asserted against Dever or Chandler.

**B.      SECTION 1983 CLAIMS.**

Whether punitive damages are warranted is an issue reserved for the jury.  *See Smith v. Wade,* 461 U.S. 30, 48, 54, 56 (1983) ("punitive damages are awarded in the jury's discretion"). And a jury may assess punitive damages in a § 1983 action when the defendant's conduct "is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."  *Id*. at 56.  Here, a reasonable jury could not conclude that Dever exhibited reckless or callous indifference to S.L.'s right to be free from seizures and excessive force and Plaintiff's 14th Amended right to familial society and companionship.  The claim for punitive damages must be dismissed.

## XI.   CONCLUSION

Based on the foregoing arguments, the Chandler Defendants request that the Court grant their Motion for Summary Judgment and dismiss with prejudice from the above-captioned matter.

RESPECTFULLY SUBMITTED this 9th day of April, 2021.

CHANDLER CITY ATTORNEY'S OFFICE

/s/ J. Randall Jue
J. RANDALL JUE
Assistant City Attorney for Defendants
City of Chandler and Garrett Dever

/ / /

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of April 2021, I caused the foregoing document

to be filed electronically with the Clerk of Court through the CM/ECF System for filing;

and served on counsel of record via the Court's CM/ECF system.

I further certify that on the 9th day of April 2021, I have emailed the foregoing

document to the following:

Joel B. Robbins
Jesse M. Showalter
Robbins & Curtin, P.L.L.C.
301 East Bethany Home Rd., Suite B-100
Phoenix, AZ 85012
joel@robbinsandcurtin.com
jesse@robbinsandcurtin.com
lauren@robbinsandcurtin.com
Attorneys for Plaintiff
John P. Torgenson
Torgenson Law
333 W. Roosevelt St.
Phoenix, AZ 85003
jtorgenson@torgensonlaw.com
Attorney for Plaintiff

Joseph J. Popolizio
John T. Masterson
Justin M. Ackerman
Jones, Skelton & Hochuli, P.L.C.
40 North Central Ave., Suite 2700
Phoenix, AZ 85004
jmasterson@jshfirm.com
jpopolizio@jshfirm.com
jackerman@jshfirm.com
Attorneys for Defendant City of Mesa

/s/ Kellie Evans