Joel B. Robbins, Esq. (011065)
Anne E. Findling, Esq. (010871)
Jesse M. Showalter, Esq. (026628)
Lauren E. Channell, Esq. (033484)
**ROBBINS & CURTIN, p.l.l.c.**
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Tel: (602) 285-0100
Fax: (602) 265-0267
joel@robbinsandcurtin.com
anne@robbinsandcurtin.com
jesse@robbinsandcurtin.com
lauren@robbinsandcurtin.com
*Attorneys for Plaintiff*

**ROBBINS & CURTIN, P.L.L.C.**
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Jennifer Lane, *et al.*, | No. 2:19-cv-00852-SMB |
| Plaintiffs, | **PLAINTIFF'S RESPONSE TO MESA DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. 306)** |
| vs. | |
| City of Mesa, *et al.*, | **(Oral Argument Requested)** |
| Defendants. | |

# TABLE OF CONTENTS

I.     Introduction ...................................................................................................1

II.    The material facts surrounding the killing of S.L. are disputed. ...........................4

       A.     Defendants' knowledge of Pequeño before April 20, 2017. ........................4

       B.     Brandon Pequeño assaults his girlfriend, and Pezzelle learns that
              Pequeño does not have a gun. ..................................................................4

       C.     Gomez repeatedly tells Pezzelle that Pequeño does not have a gun. ...........5

       D.     Mesa Officers track Pequeño to West Phoenix. ...........................................5

       E.     The Mesa Officers were unaware of any immediate danger that
              Pequeño posed but claim they believed that arresting Pequeño would
              result in a "shootout." ..............................................................................6

       F.     The vehicle containment tactic. ..................................................................7

       G.     The Defendants knowingly and intentionally trap S.L. in a car for a
              shootout. ...................................................................................................8

       H.     Defendants' "ramming" story is controverted by Damien's testimony
              and the testimony of individual Defendants. ..............................................9

       I.     Police began shooting into the car even though Pequeño put his hands
              in the air. ..................................................................................................9

       J.     The bullet holes show that Pezzelle intentionally targeted S.L. when
              he fired his gun into the Corolla's passenger window, where he knew
              she was sitting. .......................................................................................11

       K.     The Mesa Defendants' assertion that a "bullet fragment" killed S.L. is
              baseless. ................................................................................................13

       L.     The City of Mesa's defective policies, customs, and practices were
              deliberately indifferent and caused S.L.'s death. .....................................14

III.   The Mesa Defendants are not entitled to summary judgment or qualified
       immunity on Plaintiff's federal claims. ...............................................................16

# TABLE OF CONTENTS

A.     Defendant Pezzelle is not entitled to qualified immunity or summary judgment on Plaintiff's claim that his use of deadly force violated the Fourth Amendment ..................................................................................... 16

    1.     S.L.'s right to be free from excessive force as a passenger in a vehicle that posed no risk to police was clearly established long before April 20, 2017. ................................................................... 16

    2.     Factual disputes about the shooting and the events before the shooting preclude qualified immunity or summary judgment for Pezzelle. ................................................................................... 20

B.     Mesa Defendants Pollard, Bellows, Baker, Jones, Ekren, Walag, and Rudd were integral participants in the violation of S.L.'s right to be free from deadly force and they are not entitled to summary judgment or qualified immunity on that claim. ......................................................... 23

C.     Plaintiff's unreasonable seizure claim is governed by the Fourth Amendment's reasonableness standard, regardless of whether there was probable cause to arrest Pequeño. ...................................................... 24

D.     Arizona's survival statute does not preclude the Estate of S.L.'s Fourth Amendment claim or the ability to recover damages for the violation of her constitutional rights. .......................................................... 26

E.     Defendants may be held liable for violating the Fourth Amendment even if the vehicle containment itself did not cause a significant physical injury. .......................................................................................... 26

F.     The Officer Defendants are not entitled to qualified immunity for their use of the vehicle containment technique. .................................................. 27

    1.     A reasonable jury could find that the use of the vehicle containment was objectively unreasonable and violated S.L.'s Fourth Amendment rights. ............................................................. 27

    2.     S.L.'s right to be free from an unlawful vehicle containment was clearly established before April 20, 2017. .............................. 29

# TABLE OF CONTENTS

G.     The Mesa Defendants are not entitled to summary judgment on Plaintiff's Fourteenth Amendment familial association claim because they acted with deliberate indifference when they executed the vehicle containment knowing that S.L. would be trapped in the Corolla for the anticipated "shootout." ................................................................................. 30

H.     The City of Mesa is not entitled to summary judgment on Plaintiff's *Monell* claim. .............................................................................................. 32

      1.     The City of Mesa was deliberately indifferent in its training of Officers on the Task Force. ............................................................. 32

      2.     The City of Mesa was deliberately indifferent in its supervision of Officers on the Task Force. ........................................................ 35

      3.     The City of Mesa ratified the Officer Defendants' use of excessive force when it failed to complete a Use of Force Board Review of this incident in violation of its own policies. ...... 36

I.     The Officer Defendants are not entitled to summary judgment of Plaintiff's claim for punitive damages. ....................................................... 36

IV.     The City of Mesa is not entitled to summary judgment on Plaintiff's wrongful death claim. .................................................................................................. 38

A.     The City of Mesa is liable for the negligence and gross negligence of its employees who trapped S.L. in the car for a shootout and for Pezzelle's claim that he unintentionally shot S.L. .................................... 38

B.     A reasonable jury could find that the City of Mesa is vicariously liable for the assault and battery that its Officers committed when they trapped S.L. in the car and shot and killed her. .......................................... 39

C.     A reasonable jury can find that the City was negligent in its training, supervision and adoption of policies. ....................................................... 39

V.     Conclusion ........................................................................................................ 41

## TABLE OF AUTHORITIES

### <u>Cases</u>

*Acosta v. City & County of San Francisco*,
    83 F.3d 1143 (9th Cir. 1996)....................................................................18-19, 25

*Blankenhorn v. City of Orange*, 485 F.3d 463 (9th Cir. 2007) ..................................... 30

*Board of County Commissioners of Bryan County, Oklahoma v. Brown*,
    520 U.S. 397 (1997) ........................................................................................... 32

*Boyd v. Benton County*, 374 F.3d 773 (9th Cir. 2004) ..................................... 23, 24, 27

*Brendlin v. California,* 551 U.S. 249 (2007) ....................................... 3, 17, 18

*Brower v. Cnty. of Inyo*, 489 U.S. 593 (1989) ......................................... 17, 18

*Castro v. County of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016) .......................... 32, 33

*Chaudhry v. City of Los Angeles*, 751 F.3d 1096 (9th Cir. 2014) ................................ 26

*City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989) ) .......................................33, 34-35

*Clement v. Gomez*, 298 F.3d 898 (9th Cir. 2002) ......................................... 27

*Connick v. Thompson*, 563 U.S. 51 (2011) ............................................ 33, 35

*Cortesluna v. Leon*, 979 F.3d 645 (9th Cir. 2020) ) .................................26-27

*Cunningham v. Gates*, 229 F.3d 1271 (9th Cir. 2000),
    *as amended* (Oct. 31, 2000) ............................................................27-28, 29, 30

*Dang v. Cross*, 422 F.3d 800 (9th Cir. 2005) ................................................. 37

*Davenport v. Borough of Homestead*, 870 F.3d 273 (3d Cir. 2017) ............................ 18

*Dawkins v. Graham,* 50 F.3d 532 (8th Cir.1995) ......................................... 29

*Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) .................................. 35

*Dorger v. City of Napa,* 2012 WL 3791447 (N.D.Cal. Aug. 31, 2012) ........................ 36

## TABLE OF AUTHORITIES

*Duenez v. City of Manteca*, 2013 WL 6816375 (E.D. Cal. Dec. 23, 2013) ................. 29

*Farmer v. Brennan*, 511 U.S. 825 (1994) ....................................................... 31

*Felarca v. Birgeneau*, 891 F.3d 809 (9th Cir. 2018) ............................... 26-27

*Floyd v. City of Detroit*, 518 F.3d 398 (6th Cir. 2008) .................................. 29

*Gibson v. County of Washoe,* 290 F.3d 1175 (9th Cir. 2002),
    *cert. denied,* 537 U.S. 1106 (2003) ....................................... 32

*Glenn v. Washington County*, 673 F.3d 864 (9th Cir. 2011) ........................................ 27

*Gonzalez v. City of Anaheim*, 747 F.3d 789 (9th Cir. 2014) ......................................... 30

*Graham v. Connor,* 490 U.S. 386 (1989) .............................................. 20, 24, 25, 27, 28

*Guerra v. State*, 234 Ariz. 482,  323 P.3d 765 (App. 2014),
    *vacated on other grounds,* 237 Ariz. 183, 348 P.3d 423 (2015) ....................... 40

*Guyton v. Phillips*, 532 F. Supp. 1154 (N.D. Cal. 1981) ............................... 26

*Heien v. North Carolina*, 574 U.S. 54 (2014) ............................................. 18

*Hope v. Pelzer*, 536 U.S. 730 (2002) ............................................................... 30

*James v. Sadler,* 909 F.2d 834 (5th Cir.1990) ............................................... 23

*Jensen v. City of Oxnard,* 145 F.3d 1078 (9th Cir. 1998) ...................................... 22, 29

*Johnson v. Shasta County*, 83 F. Supp. 3d 918 (E.D. Cal. 2015) ................. 32-33, 34, 36

*Kuehn v. Stanley,* 208 Ariz. 124, 91 P.3d 346 (App. 2004) ......................................... 40

*Long v. County of Los Angeles*, 442 F.3d 1178 (9th Cir. 2006) ................................... 32

*Longoria v. Pinal County*, 873 F.3d 699 (9th Cir. 2017) ............................................. 19

*Martin for C.M. v. Hermiston Sch. Dist. 8R,*
    2020 WL 6547638 (D. Or. Nov. 4, 2020) ......................................... 35

## TABLE OF AUTHORITIES

*McCoy v. Alamu*, 141 S. Ct. 1364, 209 L. Ed. 2d 114 (2021) ...................................... 30

*McKinley v. Trattles*, 732 F.2d 1320 (7th Cir. 1984) ................................... 37

*Merritt v. Cnty. of L.A.,* 875 F.2d 765 (9th Cir. 1989) ................................... 32

*Monell v. Dep't of Soc. Services of City of New York*,
    436 U.S. 658 (1978) ........................................................................... 4, 14, 32, 39

*Mullenix v. Luna*, 577 U.S. 7 (2015) ............................................................. 19

*Orn v. City of Tacoma*, 949 F.3d 1167 (9th Cir. 2020) .......................................... 19, 20

*Peraza v. Delameter*, 722 F.2d 1455 (9th Cir. 1984) ................................... 26

*Plumhoff v. Rickard*, 572 U.S. 765 (2014) ................................................... 24

*Porter v. Osborn,* 546 F.3d 1131 (9th Cir. 2008) .......................................... 30

*Ryan v. Napier*, 245 Ariz. 54, 425 P.3d 230 (2018) ................................... 39

*Stoddard-Nunez v. City of Hayward*, 817 Fed. Appx. 375 (9th Cir. 2020) .................. 18

*Taylor v. Riojas*, 141 S. Ct. 52, 208 L. Ed. 2d 164 (2020) ...................................... 29-30

*Tennessee v. Garner*, 471 U.S. 1 (1985) ................................................... 20, 25

*Torres v. City of Madera*, 648 F.3d 1119 (9th Cir. 2011) ................................. 22, 28-29

*United States v. Mendenhall*, 446 U.S. 544 (1980) ....................................... 17

*Vaughan v. Cox*, 343 F.3d 1323 (11th Cir. 2003) ....................................... 18

*Villanueva v. California*,
    986 F.3d 1158 (9th Cir. 2021) ............................................ 3, 16-17, 19-20, 21, 25

*Wall v. County of Orange*, 364 F.3d 1107 (9th Cir. 2004) ........................................... 30

*Wilkinson v. Torres*, 610 F.3d 546 (9th Cir. 2010) ................................... 30-31

*Wilks v. Reyes*, 5 F.3d 412 (9th Cir. 1993) ................................................... 26

# TABLE OF AUTHORITIES

## **Constitutional Provisions**

Fourth Amendment,
    U.S. Constitution ......................... 16, 18, 19, 20, 23, 24, 25, 26, 27, 29, 30, 32, 37

Fourteenth Amendment, U.S. Constitution ............................................. 30, 32

## **Federal Statutes**

42 U.S.C. § 1983 ................................................................... 32, 37

## **State Statutes**

A.R.S. § 12-711 ....................................................................... 39

A.R.S. § 12-712 ....................................................................... 39

A.R.S. § 12-716 ....................................................................... 39

A.R.S. § 13-404 ....................................................................... 39

A.R.S. § 13-405 ....................................................................... 39

A.R.S. § 13-406 ....................................................................... 39

A.R.S. § 13-409 ....................................................................... 39

A.R.S. § 13-411 ....................................................................... 39

A.R.S. § 13-413 ....................................................................... 39

## **Rules**

Federal Rules of Civil Procedure, Rule 11 .................................................. 13

Federal Rules of Civil Procedure, Rule 30(b)(6) .......................................... 36

**ROBBINS & CURTIN, P.L.L.C.**
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

# I.     Introduction.

On April 20, 2017, Mesa Police Detective Michael Pezzelle shot and killed S.L., a seventeen-year-old girl. It was not a fragment or a ricochet. He knew the girl was sitting in the rear passenger seat of the Corolla. Pezzelle and other Mesa officers had intentionally trapped her there. Pezzelle intentionally fired five shots from close range into the car window where he knew she sat. He was just 12 feet away. It was daylight. He was an "expert marksman."

The Mesa Defendants' motion for summary judgment ignores significant material facts and factual disputes about the shooting itself and the events leading up to it. The Mesa Defendants want the Court to view the killing of a seventeen-year-old girl in the light most favorable to them. That is not the proper standard on summary judgment.

The bullet holes in the car window have preserved Pezzelle's actual intent. They will allow a reasonable jury to conclude that Pezzelle intentionally targeted S.L.:



The bullet holes contradict Pezzelle's claim that he did not "intend" to shoot S.L. According to Defendants' own expert, Lucien Haag, Pezzelle killed S.L. with his first shot, which is bullet hole "H," on the far left in the photo. A reasonable jury can conclude from bullet hole "H" that Pezzelle intentionally targeted and shot S.L. A reasonable jury can also conclude that when Pezzelle intentionally fired five bullets into the window where he knew S.L. was sitting that he objectively manifested his intent to seize and kill S.L.

Defendants' expert Haag has debunked many of the claims that Defendants advance in their motion. He testified that Mesa's assertion that S.L. was killed by a "bullet fragment" is baseless. He also testified that Pezzelle's claim that S.L. had ducked out of sight is impossible: she could not have been ducking at the time she was shot. The physical evidence shows this as well. There was no room for S.L. to hide. She was trapped in the cramped interior of the Corolla.

The Mesa Defendants' claimed justification for the shooting is contradicted by the physical evidence and the testimony of multiple witnesses, including the Defendants themselves. Damien Sandoval Rosa, a passenger in the car, testified that there was no "ramming," and that Brandon Pequeño never reached for anything. According to Damien, at the time of the shooting, Pequeño had placed the car in park and put his hands in the air. Defendant Pezzelle admitted in his deposition that Pequeño did raise his hands and that they did not contain a weapon. Defendants Baker and Jones also testified consistent with Damien: they never saw the vehicle ramming back and forth. Nor is there physical evidence to support the ramming claim. Multiple officers testified that the vehicle containment was successful, and that the car had been immobilized.

Pezzelle's claim that he reasonably believed Pequeño was armed is also disputed. Before the shooting, Frances Gomez is captured on video telling Chandler police that Pequeño had sold her gun. She testified that she repeatedly told Pezzelle before the shooting that Pequeño had sold the gun and that he did not have a gun. None of the Defendants ever claim to have seen a gun, and there was no gun in the car.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

The Mesa Defendants do not just ignore the relevant facts; they also ignore the clearly established Supreme Court and Ninth Circuit precedents that govern this case. When Pezzelle, Pollard, and Baker intentionally fired into the vehicle, they seized its occupants, including the girl in the back seat. *Villanueva v. California*, 986 F.3d 1158, 1168–69 (9th Cir. 2021) (citing *Brendlin v. California,* 551 U.S. 249, 251 (2007). "[S.L.'s] freedom of movement was terminated when the Officers intentionally shot at the [Toyota] in which [s]he was a passenger to stop its movement and [S.L.] was seized within the meaning of the Fourth Amendment. It matters not whether the Officers intended to shoot [S.L.] or whether they even knew [she] was present as a passenger. Under clearly established precedent at the time, [S.L.] was seized." *Villanueva*, 986 F.3d at 1168–69.

Pezzelle is not entitled to summary judgment or qualified immunity for the killing of S.L. Nor are the other officers. All of the individual Mesa Defendants were integral participants. They admit that they intentionally agreed to trap a seventeen-year-old girl in the back of a car for a shootout they claim to have anticipated. They had time to deliberate. They had other options. They ignored their own training, disregarded the obvious risks to S.L., and carried out their reckless and deadly plan.

Mesa is not entitled to summary judgment on Plaintiff's *Monell* claim. Before Pezzelle killed S.L., Mesa ignored his four prior shootings. Mesa ignored repeated "early warning alerts" stating that based on his number of use of force incidents, Pezzelle's "performance may need to be reviewed." No action was ever taken in response to those alerts.

Mesa is not entitled to summary judgment on Plaintiff's wrongful death claim. In her Second Amended Complaint ("SAC"), Plaintiff alleged that Mesa was vicariously liable for the negligence and gross negligence of its officers, and for the battery they committed on S.L. A reasonable jury can find that they were negligent or grossly negligent when they made the decision to trap S.L. in the back of a car during a shootout in order to try to capture Pequeño. A jury can also conclude that Mesa is liable for Pezzelle's negligence or gross negligence if it believes that he did not intend to shoot S.L. when he fired five shots into the

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

window where he knew she sat. Given the disputed facts, a reasonable jury can also find that Mesa is vicariously liable for Defendants' intentional battery of S.L.

Plaintiff's SAC also alleges that Mesa is liable for its own negligence in failing to train and supervise its officers and it failing to adopt reasonable policies. The same facts relevant to Plaintiff's *Monell* claim permit Plaintiff to reach the jury on this claim.

For all these reasons, as set forth below, the Mesa Defendants' motion for summary judgment should be denied.

## II.    The material facts surrounding the killing of S.L. are disputed.

### A.    Defendants' knowledge of Pequeño before April 20, 2017.

On April 10, 2017, Michael Pezzelle received an email and phone call from Brandon Pequeño's probation officer, Leah Lara. Lara told Pezzelle that there were two probation warrants out for Pequeño's arrest and asked if Pezzelle would assist in the apprehension. She sent Pezzelle an email providing details about Pequeño's criminal history. *See* Dkt. 304, Plaintiff's Separate Statement of Facts in Support of Motion for Partial Summary Judgment ("PSOF"), ¶¶ 1, 4. The email documents that Pequeño had previous arrests and incarcerations, as well as gang ties. *See id.* at ¶ 4. In the ten days that followed the call from Lara, there is no documentary evidence that Pezzelle did anything to locate or apprehend Pequeño.

### B.    Brandon Pequeño assaults his girlfriend, and Pezzelle learns that Pequeño does not have a gun.

At approximately 3:30 p.m. on April 20, 2017, Brandon Pequeño assaulted his girlfriend, Frances Gomez. The Chandler police report refers to this incident as a "domestic dispute." Brandon was seen carrying Frances against her will and trying to push her into a white Toyota Corolla at an apartment complex parking lot at 1970 N. Hartford St. in Chandler Arizona. When Frances refused to get in the car, Brandon drove away. Frances asked to use a bystander's phone to call her sister and Brandon returned and threatened the bystander with a knife—not a gun. The bystander called 9-1-1 and Chandler police were

dispatched to the scene at approximately 3:35 p.m. *See* Plaintiff's Response to Mesa Defendants' Statement of Facts ("PRSOF"), ¶ 157.

Mesa's claim that Brandon Pequeño led police on a chase through the City is an exaggeration. When Brandon fled the scene in Frances' Corolla, a Chandler police officer briefly followed him and attempted to stop him. Brandon did not yield. The officer requested permission from his supervisor to engage in a pursuit. The supervisor denied that permission and the Chandler officer broke off the pursuit and lost sight of Brandon. Detective Baker referred to this as a "semi pursuit." PRSOF, ¶ 158.

After Pequeño left the area, Pezzelle was contacted by a Chandler police officer and informed that Pequeño had assaulted and attempted to kidnap his girlfriend, Frances Gomez, threatened a bystander with a knife, and then fled the scene in Frances' 2017 Toyota Corolla. *See* Dkt. 304, PSOF, ¶ 5. Defendants Bellows, Dever, and Pezzelle responded to the scene in Chandler.

Pezzelle and Chandler Detective Garrett Dever went to Frances Gomez's house to interview her after the assault and attempted kidnapping. Frances Gomez testified that she repeatedly told Pezzelle that Pequeño did not have a gun. She testified that she repeatedly told Pezzelle that Pequeño had sold the gun. In fact, Gomez is captured on video telling a Chandler officer that Pequeño had sold the gun. *See* PRSOF, ¶¶ 160-162.

Nobody will testify that they ever saw Pequeño with a gun on April 20, 2017.

**C.    Gomez repeatedly tells Pezzelle that Pequeño does not have a gun.**

Consistent with Gomez's version, she contacted Chandler P.D. prior to the shooting and informed them that the gun had been sold. Also consistent with her story, the gun at issue was later recovered in Phoenix. Also consistent with Gomez's version, nobody ever reported seeing Pequeño in possession of a firearm on April 20, 2017. *See id.*, ¶¶ 162, 185. Dever testified that he has no memory of Gomez saying that Pequeño had a gun. *Id.*, ¶ 163.

**D.    Mesa Officers track Pequeño to West Phoenix.**

After leaving Frances Gomez's residence in the Corolla, Pequeño drove to Phoenix. He picked up 17-year-old S.L. and a friend, Damien Sandoval Rosa, and drove them to an

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

apartment complex at 5220 West Northern Avenue where Damien was living with his brother. The Officer Defendants tracked Pequeño to Phoenix and the parking lot of the complex using cell phone tracking. Dkt. 304, PSOF, ¶¶ 10-11.

According to Lieutenant Rudd, the officers began arriving at the apartment complex at approximately 6:15 p.m.—more than two hours after the events in Chandler. PRSOF, ¶ 164. Defendant Walag observed Pequeño, S.L., and Damien get out of the Corolla. He radioed to the other Officers that Pequeño was with an "orange haired" female and another Hispanic male and that Pequeño had jumped onto a wall in the parking lot to allegedly look for police. In reality, S.L. had dark hair, not "orange hair," and it was Damien who had climbed onto the wall just to mess around. *Id.*, ¶ 164; Dkt. 304, PSOF, ¶ 13.

### E.    The Mesa Officers were unaware of any immediate danger that Pequeño posed but claim they believed that arresting Pequeño would result in a "shootout."

Pequeño, S.L., and Damien walked into the complex and entered Damien's apartment unit. While they were inside, the Officer Defendants discussed arresting Pequeño. PRSOF, ¶ 165.

Pezzelle allegedly told officers over the radio that Pequeño still had Gomez's stolen gun and would engage in a "shootout" with the Officers if they tried to apprehend him. *Id.*, ¶ 63. There is no preserved radio or CAD log that documents what was actually said. The only evidence for this assertion is the Defendants' statements after the shooting. Given that Frances Gomez denies ever saying that Pequeño had a gun or would engage in a shootout, a reasonable jury could conclude that the Officers made up that story after the shooting of S.L.

The Officers were not aware of any exigent circumstances. The events in Chandler had occurred more than two hours before. Defendants have not articulated any facts showing that Pequeño posed an immediate danger to anyone at the apartment complex. There was no reason for the Officers to seize a person they expected would "shoot it out with police" in an apartment complex parking lot during the evening rush hour. The Officers were already

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

tracking his cell phone and could have followed him to a different location to arrest him when S.L. and Damien were not with him. *Id.*, ¶ 165. They had time.

But the Officer Defendants agreed to use a "vehicle containment" to seize the Corolla and all its occupants and prevent them from leaving the parking lot. Mesa Defendants Sergeant Bellows and Lieutenant Rudd, who were supervisors for the Task Force, approved the use of the vehicle containment technique. *Id.*, ¶¶ 165, 175.

### F.     The vehicle containment tactic.

The City of Mesa does not have a written policy regarding the use of vehicle containments. The City of Mesa does have a written policy that requires that vehicle containments be reported on a vehicle containment form. According to the officers, this seldom occurs. *Id.*, ¶ 170. According to the City of Mesa's written policies regarding vehicle containments, the Vehicle Operations Review Board is required to review vehicle containments. Mesa's designee testified that this did not occur. *Id.*, ¶ 171.

The Mesa Officers testified that they conduct vehicle containments anywhere from twice a week to once every two weeks. They claim that they trained in this tactic regularly, but that the logs of that training have been "lost." According to the City of Mesa's training logs, the Mesa Defendants had not trained in the vehicle containment policy for about three and a half years prior to April 20, 2017. *Id.*, ¶ 172.

The AZPOST vehicle containment lesson plan, which Mesa allegedly followed, required the Officers to conduct a briefing before each containment to discuss, among other things, ways to minimize risks to passengers, each officers' responsibilities, the use of force after the containment, and which officers would give verbal commands. No such briefing was done before this containment. *Id.*, ¶¶ 168, 176.

When Pequeño, S.L., and Damien returned to the Corolla, the Officer Defendants were in position to execute the containment. *See id.*, ¶¶ 177-178.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

### G. The Defendants knowingly and intentionally trap S.L. in a car for a shootout.

The Defendants knew that S.L. was in the rear passenger side seat of the Toyota Corolla. The Defendants knew that conducting a vehicle containment with S.L. in the car would trap her in the car. The Defendants agreed to perform the vehicle containment knowing that S.L. would be trapped in the car for the anticipated "shootout" with Pequeño. *See id.*, ¶¶ 179, 173.

The Defendants also knew S.L. had not committed any crime, had not resisted arrest, and did not pose a threat to anyone. They had no reason to believe she was armed. No one in the Corolla had a gun. *See id.*, ¶¶ 180-185.

Dever had volunteered to perform the front block if Pequeño used the exit onto Northern. As the front block, Dever was responsible for initiating the containment. He also had the ability to call it off. Dever pulled his unmarked Dodge Ram into position at the exit, blocking the Corolla from leaving. He then shifted the Dodge Ram into reverse, shouted the command "move" over the radio, and rammed the front of the Corolla with the back of his truck. *See id.*, ¶ 186.

The Mesa officers performing the rear and side blocks rapidly moved into place. First, Detective James Pollard rammed his unmarked SUV into the rear of the Corolla. *Id.*, ¶ 187.

Pequeño, S.L., and Damien were shocked and alarmed by the vehicle containment. Damien initially thought that someone had unintentionally rear-ended the Corolla, and he opened the front passenger door to try to see what had happened. He realized that they were being surrounded by unmarked vehicles with their police lights activated. An officer yelled at him to get back in the vehicle and put his hands up, and Damien sat back down and closed the door. *Id.*, ¶ 188.

Mesa Detectives Brandon Ekren and Andrew Walag pulled their unmarked vehicles into position along the left and right sides of the Corolla, respectively, impacting or blocking the Corolla's doors so they could not be opened. The containment was complete, and the

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

Corolla was completely immobilized. The Corolla was not capable of moving and did not pose a risk to the Officer Defendants. Its occupants were trapped inside. *Id.*, ¶¶ 189-191.

### H.  Defendants' "ramming" story is controverted by Damien's testimony and the testimony of individual Defendants.

Defendants' claim that Pequeño tried to ram his way out of the containment is contradicted by testimony from Defendants Baker and Jones, and Damien, as well as by the physical evidence. *See id.*, ¶¶ 191-194.

Damien testified that after the containment began Pequeño revved the Corolla's engine a single time, realized the Corolla was immobilized, and shifted it into park. *Id.*, ¶ 192. Detectives Baker and Jones, both of whom ran up to the side of the car and ultimately fired into it, testified that they never saw any ramming. *Id.*, ¶ 193.

Pezzelle has claimed that ramming occurred. But at his deposition, he admitted that the vehicle was not moving at the time of the shooting. *Id.*, ¶ 210.

Expert Michael Knox has opined that there is no physical evidence to support the ramming story. There is a dent in the left side of the car caused by a containment vehicle. If the vehicle moved after contact, it would have scraped or scratched the Corolla if it moved in either direction. There is no physical evidence of movement. *Id.*, ¶ 194.

Moreover, the Defendants admitted in their testimony that the containment was successful and that the Corolla, pinned in all four sides by large trucks was immobilized and unable to escape the containment. *See id.*, ¶ 191.

### I.  Police began shooting into the car even though Pequeño put his hands in the air.

Sgt. Bellows testified that after the vehicle containment, he heard commands and shots simultaneously. *Id.*, ¶ 196. The Officer Defendants surrounding the car began shouting commands over each other, including "Police" and "Put your hands up!" Officers began firing their guns almost immediately. *Id.*, ¶ 195. There is no evidence that any of the officers gave a warning before using deadly force.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

Damien, the only person in the Corolla to survive, testified that Pequeño was following the Officers' commands. His testimony controverts the Defendants' claims that Pequeño was noncompliant or making furtive gestures:

> So after -- after just a rev of the engine, vroom, then he throws the car in park and he realizes we're not going anywhere.
>
> And then at that moment is when shots begin to come through the vehicle, like it kind of like initial like pop of my eardrums kind of make like a little bit of a ringing, because of the air pressure in the vehicle, I'm assuming.
>
> * * * *
>
> **And I turned to my left, and I saw Brandon was kind of like freaking out. And he was like looking back towards the police. And he was like putting his hands up in the air. And he was like our fucking hands are up, our fucking hands are up.**
>
> **And then that's when some more shots came through the windows.**

*Id.*, ¶ 206.

Mesa Detective William "Chip" Jones fired "less lethal" beanbag rounds through the driver's side window where Pequeño was sitting. Jones testified that he began shooting for two reasons: (a) to "gain compliance"; and (b) to "open up" the car so that the occupants could hear police commands. *Id.*, ¶ 197. Pezzelle, Pollard, and Baker began firing lethal rounds into the Corolla simultaneously or nearly simultaneously. *Id.*, ¶ 198.

Pollard fired three rounds through the back window of the car. He testified that he intentionally aimed them into the upper left corner to avoid striking S.L. who he could see. *See id.*, ¶ 120. Pollard's bullets did not strike anyone, although one grazed Pequeño's back and caused a minor superficial injury. *Id.*, ¶ 199.

Pezzelle fired five rounds directly into the rear passenger side window where he and everyone else knew S.L. was sitting. *Id.*, ¶¶ 204-211.

Pezzelle's first shot struck S.L. in the head. Homicide detectives and reconstructionists were able to determine that it was the first shot based on the star pattern it created in the window. *See id.*, ¶ 213.

Two of Pezzelle's remaining bullets struck Pequeño. Two others missed and were recovered from the vehicle. *See id.*, ¶ 214.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

After all the other officers had ceased firing, Baker fired a single round through the driver side window, striking Pequeño. *Id.*, ¶ 200.

**J.    The bullet holes show that Pezzelle intentionally targeted S.L. when he fired his gun into the Corolla's passenger window, where he knew she was sitting.**

The photo on page 2, above, shows the bullet holes from the five shots that Pezzelle fired as they were marked by detectives at the Glendale Police crime lab. Both sides' experts agree that the bullet hole marked "H" was Pezzelle's first shot and is the shot that killed S.L. *Id.*, ¶ 213; *see* photo at p. 2, above.

The bullet holes in the window directly contradict Pezzelle's claim that he did not intentionally target S.L. The bullet holes show that Pezzelle knowingly and intentionally shot directly at S.L. Pezzelle knew that S.L. was sitting behind that window. He was just twelve feet away. Pezzelle fired five shots into that window.

Pezzelle has claimed that S.L. "ducked" down out of sight or "disappeared" at the time he fired the shot that killed her. Defendants' expert and Plaintiff's expert have both opined that this is impossible. PRSOF, ¶¶ 129, 203. The physical bullet holes shows that this is a lie. For Pezzelle to shoot and kill S.L. with a direct shot, he had to be able to see her. The physical evidence shows that there was no place in the cramped compartment of the car for her to "duck" to that would be "out of sight." Defendants' own expert, Lucien Haag, unintentionally debunked Pezzelle's ducking claim. *See id.*, ¶ 203. As the figure below shows, there was nowhere for S.L. to go. The car was too small, and Damien's seat was reclined too far back. She was trapped.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

1
2
3
4
5
6
7
8



9    After Pezzelle shot and killed S.L., he fired four shots toward Pequeño. To do that,

10   he had to move his gun to the right.

11
12
13
14
15
16
17
18
19



20
21   PRSOF, ¶ 122.

22   The physical evidence refutes Pezzelle's claims that Brandon was reaching for a gun.

23   As the scene reconstructions show, Pezzelle's claims that he had a "clear view" of Pequeño

24   are impossible. His view was blocked by Damien, by Damien's seat, by the metal doors of

25   the vehicle and by the B pillar. The evidence contradicts Pezzelle's claims that he was able

26   to clearly see what Pequeño was doing.

27   At his deposition, Pezzelle admitted that he never saw a gun or any other object in

28   Pequeño's hands. *Id.*, ¶ 209. Nobody did. There was no gun in the car and so no gun to reach

for. Pezzelle claims he could see Pequeño's silhouette and saw that Pequeño was raising his hands. Pezzelle claims he assumed that Pequeño was going to be holding a gun. But Pezzelle testified that he could see Pequeño was not holding a gun, weapon, or any other object in his hands.

Damien's testimony further disputes Defendants' claim that Pequeño was "rummaging" for the nonexistent gun in the center console. According to Damien, Pequeño had his hands raised and began leaning to the right only after he appeared to be shot:

> And, and he -- Brandon was hit like right here, say, behind the shoulder, or right through his shoulder, it looked, from like I saw a blood spot on his shirt right there, is when he like leaned over into my lap and was like -- he tried to say something to me or something, and he was looking up at me, and then went back and was leaning more like over the center console like right over my lap.

> And then I was still trying to put my hands up against the windowsill. I was still trying to yell S.L.'s name.

*Id.*, ¶ 208.

### K. The Mesa Defendants' assertion that a "bullet fragment" killed S.L. is baseless.

Pezzelle killed S.L. with a direct shot. The entire bullet hit her head, penetrating her scalp. All qualified witnesses, including Defendants' own expert, Lucien Haag, agree.

When the bullet struck S.L.'s skull, the bullet broke apart, with fragments traveling through her brain. Trauma surgeons surgically removed a fragment of the bullet while S.L. was still alive, and the medical examiner recovered another during autopsy. *Id.*, ¶ 224. There is no evidence whatsoever that S.L. was struck by a ricochet or by fragments other than the actual bullet. Pezzelle's false fragment story is evidence of his consciousness of guilt.

Despite Lucien Haag's report and testimony, the Mesa Defendants continue to maintain their false fragment story. Pursuant to Rule 11, Fed.R.Civ.P., Plaintiff served on Defendants a motion for sanctions. Defendants did not withdraw their motion or otherwise correct their false statements to the Court, and Plaintiff filed her Rule 11 motion on May 20, 2021. *See* Dkt. 324.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

**L.    The City of Mesa's defective policies, customs, and practices were deliberately indifferent and caused S.L.'s death.**

Plaintiff's police practices expert, Scott DeFoe, has opined that the use of lethal force by Defendants Pezzelle, Pollard, and Baker was inappropriate and inconsistent with standard police practices, which require an officer using lethal force in self-defense to have a reasonable belief of an imminent threat of death or serious bodily injury. PRSOF, ¶ 231. With respect to the vehicle containment, Mr. DeFoe has opined that the Officer Defendants' use of the technique was not reasonable because of S.L.'s and Damien's presence in the vehicle with Pequeño. Mr. DeFoe also concluded that Sergeant Bellows and Lieutenant Rudd acted unreasonably as the Task Force supervisors by failing to implement an alternative plan (such as a K9 or Special Weapons Unit) for apprehending Pequeño in lieu of utilizing the vehicle containment and for failing to implement a tactical plan before the containment. *Id.*, ¶ 232.

Mr. DeFoe has also expressed opinions supporting Plaintiff's *Monell* claim against the City of Mesa based on its failure to train and supervise the Task Force. Mr. DeFoe identified several widespread customs and practices within the City of Mesa and Mesa Police Department that endorsed and perpetuated inadequate training, noncompliance with written policies and established standards, and turned a blind eye to excessive use of force incidents.

VOU officers were supposed to complete Containment Report Forms after each vehicle containment, which was about once every two weeks. *Id.*, ¶ 233. But this did not happen. Mesa's reporting policies also required the Officer Defendants to complete a Use of Force Report for each vehicle containment conducted in the field. This did not happen either. *Id.* Mesa policies required that its Vehicle Operation Review Board (VORB) conduct an evaluative review of vehicle containments. *Id.* That also did not happen.

Mesa did not give its officers scenario-based training that involved contingencies and tactics for when a vehicle containment was utilized against a subject vehicle that contained individuals who were not suspected of committing a crime. The Officer Defendants claim they trained on vehicle containments every few weeks, but they only offered vague

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

descriptions of this training, and there are no records showing that any training actually occurred. According to Mr. DeFoe, the training described by the Officer Defendants was inadequate because training should, as closely as possible, replicate scenarios that officers will expect to encounter in the field. This is especially critical with respect to vehicle containments that may involve innocent parties inside of a vehicle. *Id.*, ¶ 234.

Mesa violated its own written policies by failing to convene a Use of Force Board for all officer-involved shooting incidents or use of force incidents that resulted in serious physical injury or death that involved Mesa Police Department detectives and supervisors assigned to the Task Force. *Id.*, ¶ 236. A Use of Force Board should have been conducted for the April 20, 2017 shooting of S.L., but that never happened. *Id.*, ¶ 241.

Mesa also violated its own written policies by failing to respond to IAPro early warning alerts for Detective Pezzelle between January 30, 2014 through May 5, 2015, by not providing Internal Affairs with written notice as to how the alert was handled. The City's IAPro software generated thirteen (13) alerts for Pezzelle during that period, meaning that he had exceeded the threshold number of uses of force incidents, complaints, or vehicle accidents; however, it does not appear that the City of Mesa or Mesa Police Department took any action in response to the alerts.[1] *Id.*, ¶¶ 242-245.

Defoe opines that Mesa failed to review and investigate Pezzelle's IAPro alerts even though he had considerably more alerts than other members of the Mesa Police Department and other members of the Task Force. *Id.*, ¶ 245. Mr. DeFoe described one particularly relevant 2011 use of force incident in which Pezzelle also fired his gun at the unarmed occupants of a vehicle:

[1]     At the time of the subject incident, Mesa Police Department used IAPro/Blue Team, an early warning software system, which would trigger an alert to the professional standards lieutenant if an officer received a certain number of complaints or was involved in a certain number of use of force incidents or vehicle accidents (or any combination thereof) within the prior twelve (12) month period. The professional standards lieutenant would then send the alert to the officer's commander. However, the executive staff of the Mesa Police Department set the threshold number of incidents that were required to trigger an alert.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

> [I]f the Mesa Police Department would have reviewed alerts as well as conducted a thorough use of force investigation and a properly convened Use of Force Board, they would have determined that Detective Michael Pezzelle used lethal force prior to seeing the subject in possession of a firearm on at least one other occasion such as in *Espinoza v. City of Mesa, et al.*, USDC (Arizona) Case No. CV2013-092842/Incident/Investigation Report, OCA 2011-3050363. In the *Espinoza* matter, Detective Michael Pezzelle fired two volleys from his .223 caliber service rifle through the windshield of a police vehicle at Mr. Espinoza and the two other occupants that were inside of the vehicle prior to ever seeing a weapon in possession of any of the three occupants.

*Id.*, ¶ 246. Mesa did not take any corrective action, including retraining or imposing discipline, against Pezzelle in response to the November 1, 2011 shooting incident in the *Espinoza* matter. *Id.*, ¶ 247.

In Mr. DeFoe's opinion, had Mesa monitored Pezzelle's IAPro alerts and properly trained Pezzelle and other VOU members to ensure that lethal force was used only when there is an immediate defense of life, the shooting death of S.L. could have been prevented. *Id.*, ¶ 247.

**III.   The Mesa Defendants are not entitled to summary judgment or qualified immunity on Plaintiff's federal claims.**

**A.   Defendant Pezzelle is not entitled to qualified immunity or summary judgment on Plaintiff's claim that his use of deadly force violated the 4th Amendment.**

**1.   S.L.'s right to be free from excessive force as a passenger in a vehicle that posed no risk to police was clearly established long before April 20, 2017.**

Defendants' motion ignores controlling Ninth Circuit case law in an attempt to make Pezzelle's self-serving claim that he did not intend to shoot S.L. dispositive. But Pezzelle's claimed intent is not dispositive. It was clearly established before April 20, 2017 that a vehicle passenger has a right to be free from excessive force directed at the driver of the car. *Villanueva v. California*, 986 F.3d 1158, 1166 (9th Cir. 2021).

In *Villanueva* the Ninth Circuit held that a passenger who was not intentionally targeted by police officers had a cognizable Fourth Amendment interest as a result of being injured when the officers shot at the vehicle's driver. In July 2016, police officers in

unmarked vehicles attempted a traffic stop on a truck engaging in illegal street racing. *Id.* at 1162. The truck's driver, Villanueva, fled from the unmarked vehicles. A passenger, Orozco, was in the truck with him. *See id.* The police chased the truck down a dead-end street. *Id.* at 1163. As Villanueva slowly made a three-point turn, the officers got out of their vehicles and drew their firearms. *Id.* Villanueva completed the three-point turn so that the front of his truck was generally facing the officers, who were about 15 to 20 feet away. *Id.* The officers then opened fire on the vehicle, killing Villanueva and injuring Orozco. *Id.* Orozco sued. The district court determined that Orozco had Fourth Amendment standing to bring a claim against the officers and denied the officers' motion for summary judgment on qualified immunity. *Id.* at 1164.

In affirming the district court's ruling that the passenger had Fourth Amendment standing, the Ninth Circuit emphasized that a person is "seized" under the Fourth Amendment when there is a governmental termination of the person's freedom of movement "through means intentionally applied." *Id.* at 1166 (9th Cir. 2021) (quoting *Brower v. Cnty. of Inyo*, 489 U.S. 593, 597 (1989)). "Freedom of movement is terminated when, 'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *Id.* (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). Because a traffic stop requires intentional action by police to stop a vehicle, "during a traffic stop an officer seizes everyone in the vehicle, not just the driver." *Id.* (quoting *Brendlin v. California*, 551 U.S. 249, 255 (2007)).

The defendants argued that they did not seize the passenger because they did not intend to shoot him and did not know he was a passenger. *Id.* The court found these arguments unpersuasive. Because the detention of Orozco was made "through means intentionally applied" to stop the truck, the passenger was seized, and the officers' subjective intent was irrelevant. *Id.* at 1166-68 (quoting *Brendlin*, 551 U.S. at 254).

> [U]nder *Brendlin*'s logic, it is irrelevant whether they knew any passengers were in the car, because they stopped the car and all its possible occupants when they shot at it. Here, Orozco was subject to the Officers' "intentional action to stop the car"—and with it the "objectively manifested" restraint on

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

his movement—whether the Officers knew he was a passenger when they fired or not. The Third Circuit agrees that *Brendlin* "ma[kes] clear that an officer's knowledge of a passenger's presence in the vehicle is not dispositive" to the question of seizure "so long as the detention is willful and not merely the consequence of an unknowing act."

*Id.* at 1167 (quoting *Davenport v. Borough of Homestead*, 870 F.3d 273, 279 (3d Cir. 2017) (internal citation omitted). Thus, the Ninth Circuit held that Orozco was seized under clearly established Fourth Amendment precedent when the officers terminated his freedom of movement by intentionally shooting at the truck in which he was a passenger. *Id.* at 1169. *See also Heien v. North Carolina*, 574 U.S. 54, 60 (2014) ("A traffic stop for a suspected violation of law is a 'seizure' of the occupants of the vehicle and therefore must be conducted in accordance with the Fourth Amendment."); *Brower*, 489 U.S. at 598 (1989) (holding that officers seized driver when he slammed into a roadblock the officers had purposefully erected); *Vaughan v. Cox*, 343 F.3d 1323, 1328 (11th Cir. 2003) ("[B]ecause he did not intend to shoot [the passenger], [the officer] contends that [the passenger] did not suffer a Fourth Amendment seizure. We disagree.")

Prior to the April 20, 2017 shooting of S.L., "[i]t was clearly established that officers are not entitled to qualified immunity for shooting at an individual in a fleeing vehicle that does not pose a danger to them or to the public." *Stoddard-Nunez v. City of Hayward*, 817 Fed. Appx. 375, 379 (9th Cir. 2020) (citing *Acosta v. City & County of San Francisco*, 83 F.3d 1143, 1146 (9th Cir. 1996), *as amended* (June 18, 1996)). *Stoddard-Nunez* involved a Fourth Amendment claim brought on behalf of a passenger who was killed when an officer fired into the side and rear of a slowly moving vehicle. *See id.* at 377-78. In both *Stoddard-Nunez* and *Villanueva*, the Ninth Circuit found that the law had been clearly established on this issue since the 1996 *Acosta* decision. *Id.* at 378; *Villanueva*, 986 F.3d at 1171–72.

In *Acosta*, a police officer was chasing two men he believed had stolen a purse. *Acosta*, 83 F.3d at 1144. The men got into a waiting, stopped car. As the car began "moving or rolling very slowly from a standstill," the officer, who was standing more to the side of the car than the center, fired his gun into the car, shooting and killing the driver. *Id.* at 1147.

**ROBBINS & CURTIN, P.L.L.C.**
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

The Ninth Circuit held that the officer's deadly force was excessive and violated the Fourth Amendment because "it was not reasonable for him to believe that [the driver] posed a threat of great bodily injury or harm to him or to anyone else." *Id.* at 1148. *See also Orn v. City of Tacoma*, 949 F.3d 1167, 1178 (9th Cir. 2020) ("By the time of the shooting in October 2011, at least seven circuits had held that an officer lacks an objectively reasonable basis for believing that his own safety is at risk when firing into the side or rear of a vehicle moving away from him."); *Longoria v. Pinal County*, 873 F.3d 699, 709–10 (9th Cir. 2017) (quoting *Torres*, 648 F.3d at 1128) ("[F]ew things in our case law are as clearly established as the principle that an officer may not 'seize an unarmed, nondangerous suspect by shooting him dead' in the absence of 'probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others.'").

In *Villanueva*, after determining that the passenger had Fourth Amendment standing to assert a claim, the Ninth Circuit addressed whether the officers' use of deadly force was reasonable as a matter of law. *Villanueva*, 986 F.3d at 1169–70. The court noted that a moving vehicle can pose a threat of serious harm, "but only if someone is at risk of being struck by it." *Id.* at 1170 (quoting *Orn v. City of Tacoma*, 949 F.3d 1167, 1174 (9th Cir. 2020)). Thus, the use of deadly force to stop a recklessly speeding vehicle during a dangerous, high-speed car chase is generally reasonable under the Fourth Amendment. *Id.* (citing *Mullenix v. Luna*, 577 U.S. 7, 15 (2015)).

On the other hand, courts have consistently found the use of deadly force against a stopped or slow-moving vehicle unreasonable if "the officers could have easily stepped out of the vehicle's path to avoid danger" or the subject was not aggressively engaging in the "attempted or actual acceleration of the vehicle" in the officers' direction. *Id.* (citing *Orn*, 949 F.3d at 1175).

In *Villanueva*, the surviving passenger, Orozco, attested that the driver had come to a complete stop before making a controlled three-point turn, was driving very slowly, and that no officers were in the truck's path. *See id.* at 1171-72. Because the officers "could have simply moved away to avoid injury" and therefore lacked an objectively reasonable basis to

fear for their own safety, the court affirmed the district court's denial of the officers' motion for summary judgment. *Id.* at 1171.

The Mesa Defendants also err in analyzing Pezzelle's use of deadly force under the *Graham* factors, when in cases involving the use of deadly force, "the Supreme Court has crafted a more definitive rule, allowing an officer to use deadly force only if the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Villanueva*, 986 F.3d at 1169 (quoting *Orn v. City of Tacoma*, 949 F.3d 1167, 1174 (9th Cir. 2020)) (quotation marks omitted). "A police officer may not seize an unarmed, nondangerous suspect by shooting him dead." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985).

There is no question that Defendant Pezzelle was on notice that it was unlawful for him to use deadly force against S.L. or the occupants of the Corolla when neither the vehicle nor the occupants posed a threat of serious physical harm to himself or others.

### 2. Factual disputes about the shooting and the events before the shooting preclude qualified immunity or summary judgment for Pezzelle.

Defendant Pezzelle is not entitled to summary judgment or qualified immunity because there are disputed material facts from which a jury could conclude that Pezzelle violated S.L.'s Fourth Amendment right to be free from unreasonable deadly force.

A reasonable jury can conclude, based solely on the bullet holes in the rear passenger window that Pezzelle manifested an objective intent to seize and kill S.L. Pezzelle does not claim that his gun fired accidentally or that he attempted to fire at one target and accidentally fired at another. Pezzelle was an "expert marksman" shooting from 12 feet away. The bullet holes are the best evidence of his intent. A jury that reaches that conclusion will find that Pezzelle violated S.L.'s clearly established constitutional rights.

Based on Damien's testimony, a reasonable jury can also conclude that at the time of the shooting the car was not moving and Pequeño's hands were in the air. Pezzelle admitted the Corolla was not moving when he fired. PRSOF, ¶ 210. He admitted that he saw Pequeño

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

raise his hands and that he saw Pequeño was not holding a gun or anything else. *Id.*, ¶¶ 208-209. A reasonable jury can conclude that under these circumstances the use of deadly force against anyone in the Corolla without warning was unreasonable and excessive.

Defendants' motion claims that Pequeño was violently resisting arrest by "ramming" the Corolla back and forth, but Pezzelle himself admitted the Corolla was not moving when he fired. *Id.*, ¶ 210. Baker and Pollard agree that they did not see any "ramming." *Id.*, ¶ 193. There is no physical evidence to support the "ramming" theory. *Id.*, ¶ 194. And Damien Sandoval Rosa testified compellingly that Pequeño revved the engine a single time, place the car in park, and raised his hands. *Id.*, ¶¶ 192, 205-206.

Pezzelle's assertion of his subjective intent to shoot only Pequeño is not a defense to liability. Because Pezzelle intentionally fired his gun into the Corolla. *Id.*, ¶ 211. Pezzelle's willful action "objectively manifested" a restraint on the movement of all the Corolla's occupants. *See Villanueva*, 986 F.3d at 1167.

This case is more egregious than *Villanueva.* Here, a reasonable jury could conclude from Pezzelle's own statements and the bullet holes in the Corolla that Pezzelle intentionally targeted S.L. He intentionally fired into the window where he knew she was sitting. His first shot, the furthest to the left, struck her and entered her skull. He could see her from his vantage point. He was only twelve feet away from her window. PRSOF, ¶¶ 201, 204. He was an expert marksman. *Id.*, ¶ 204.

A jury could also reject Pezzelle's claim that S.L. allegedly "ducked down" toward the floorboard before he fired his gun. Other Officers testified that they could see S.L. sitting in the backseat and that they never saw her duck. *Id.*, ¶ 202. Lucien Haag has testified that S.L. could not have been ducking when Pezzelle shot her, and bullet hole H in the Corolla indicates that she had to have been visible through the window at the time of the shooting. *Id.*, ¶ 203.

The physical evidence, including the small size of the backseat and the placement of the front passenger seat, show there was no room for S.L. to go down to the floorboard. *Id.*, ¶ 129. The jury could reasonably conclude that Pezzelle is lying about S.L. "ducking down"

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

or that S.L. collapsed in the back seat after Pezzelle's first shot struck her and entered her brain. *See id.*, ¶ 218.

In this case, there is ample testimony that proves the Corolla was completely stopped and that Pequeño had placed the car in park and raised his hands *before* Pezzelle fired into the window. *See id.*, ¶¶ 192-193, 207-210. Pezzelle's claim that Pequeño was violently resisting arrest and attempting to maneuver out of the containment is not supported by the physical evidence or the testimony of the other officers and the surviving passenger. The vehicle containment occurred so quickly and so thoroughly that the Corolla was immobilized. It was not capable of being used as a weapon. And Pezzelle did not have an objectively reasonable belief that it could be.

Pezzelle's claims that he believed Pequeño had a gun and was reaching into the center console are also intensely disputed. Frances Gomez testified that she repeatedly told Pezzelle that Pequeño no longer had the gun he had stolen from her, that he had sold it, and that he had not left the house with a gun that day. *Id.*, ¶¶ 160-161. Damien testified that, during the shooting, Pequeño had his hands raised in the air and only began to slump to the right, over the console and over Damien's lap, after he had been shot and was bleeding from his shoulder. *Id.*, ¶ 208. Pezzelle himself admitted that he saw Pequeño raise his hands and could see his hands were empty, but Pezzelle claims he incorrectly assumed that Pequeño was going to be holding a gun, so he fired. *Id.*, ¶ 209.

A jury could reasonably conclude that (a) Pezzelle lied about Pequeño having the gun or (b) that Pezzelle made an unreasonable mistake of fact in assuming Pequeño had the gun. *See Torres v. City of Madera*, 648 F.3d 1119, 1124 (9th Cir. 2011) (citing *Jensen v. City of Oxnard,* 145 F.3d 1078, 1086 (9th Cir. 1998) (emphasis in original). A jury could also conclude that no reasonable officer would have perceived that Pequeño was rummaging in the console for a weapon. Any of these findings would allow the jury to determine that no reasonable officer would have perceived that Pequeño posed a serious risk of physical harm or death to others and, therefore, Pezzelle's use of deadly force was excessive, unreasonable, and violated the Fourth Amendment.

**B.     Mesa Defendants Pollard, Bellows, Baker, Jones, Ekren, Walag, and Rudd were integral participants in the violation of S.L.'s right to be free from deadly force and they are not entitled to summary judgment or qualified immunity on that claim.**

In *Boyd v. Benton County*, 374 F.3d 773, 779 (9th Cir. 2004), the Ninth Circuit held that officers used excessive force and violated the Fourth Amendment when they deployed a flash-bang device by throwing it "blind" into a room occupied by innocent bystanders without careful consideration of alternatives and appropriate measures to reduce risk of injury. The court went on to conclude that each officer involved in the search operation where the flash-bang was used—including those who remained outside to provide backup—was an "integral participant" for the purposes of the plaintiff's civil rights lawsuit. The court explained:

> "[I]ntegral participation" does not require that each officer's actions themselves rise to the level of a constitutional violation. For example, in *James ex rel. James v. Sadler,* 909 F.2d 834 (5th Cir.1990), cited with approval by *Chuman,* the court held that officers who provided armed backup during an unconstitutional search were "integral" to that search, and were therefore participants rather than mere bystanders. *Id.* at 837. Additionally, in *Melear* itself, the Fifth Circuit held that an officer who does not enter an apartment, but stands at the door, armed with his gun, while other officers conduct the search, can nevertheless be a "full, active participant" in the search.

> The facts of this case clearly support a finding that each officer involved in the search operation was an "integral participant." First, as in *James* and *Melear*, the officers in this case stood armed behind Ellison while he reached into the doorway and deployed the flash-bang. Second, the use of the flash-bang was part of the search operation in which every officer participated in some meaningful way. Third, every officer was aware of the decision to use the flash-bang, did not object to it, and participated in the search operation knowing the flash-bang was to be deployed. Therefore, under the integral participation analysis adopted in *Chuman,* each defendant may be held liable for the Fourth Amendment violation outlined above.

*Id.* at 780.

Defendants Bellows, Rudd, Ekren, Walag, Pollard, Baker, and Jones' claim that they cannot be held liable for a Fourth Amendment violation because they did not personally shoot S.L. is contrary to the rule expressed in *Boyd*. They all decided and agreed to use the vehicle containment, knowing that S.L. would be trapped in the car for the anticipated

Page 23 of 42

"shootout" with Pequeño. PRSOF, ¶¶ 173-174. They had time to plan and consider alternatives that would have minimized the risk to S.L., and they had time to conduct the briefing that their training required, but they did neither. *See id.*, ¶¶ 175-176. None of them objected to it or even discussed ways to minimize the risk of harm to her. *See id.*, ¶ 176. All participated in the vehicle containment or the nearly simultaneous shooting in a meaningful and fundamental way. *See Boyd*, 374 F.3d at 780.

Bellows and Rudd were VOU supervisors. They "gave the okay" for the containment to be used and did not conduct a briefing beforehand. PRSOF, ¶¶ 165, 175. Ekren, Walag, and Pollard performed the side and rear blocks of the containment. They ensured the Corolla was pinned in, that its doors could not be opened, and that its occupants were trapped inside. *Id.*, ¶¶ 187, 189-190 Immediately after the containment was complete, Jones began firing beanbag rounds into the Corolla to "gain compliance" and open the window so the occupants could hear the commands, and Pollard and Baker joined Pezzelle in firing lethal rounds. *Id.*, ¶ 197-198. Under *Boyd*, each Officer was an integral participant and may be held liable to the same extent as Pezzelle.

C. **Plaintiff's unreasonable seizure claim is governed by the Fourth Amendment's reasonableness standard, regardless of whether there was probable cause to arrest Pequeño.**

The Officer Defendants are not entitled to an "absolute defense" for their seizure of S.L. based on probable cause to arrest Pequeño. *See* Dkt. 306, p. 11. Because the Estate of S.L.'s Fourth Amendment claim alleges that the Officer Defendants used excessive force to effect her seizure, the reasonableness of that seizure is governed by the Fourth Amendment's objective reasonableness standard. *See Plumhoff v. Rickard*, 572 U.S. 765, 774 (2014) (citing *Graham v. Connor,* 490 U.S. 386, 396 (1989)). The reasonableness of the seizure cannot be evaluated apart from the excessive force used to effect it. "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ◆ Fax: (602) 265-0267

Amendment interests' against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (quoting *Tennessee v. Garner*, 471 U.S. 1, 6 (1985)).

There were no exigent circumstances that required Pequeño's immediate arrest while two innocent passengers were in the car with him. The Defendant Officers did not witness him committing a crime, let alone a violent crime. Brandon, S.L., and Damien were at an apartment with no disruption, threat, or danger to anyone. There was certainly a government interest in apprehending him on his probation violation warrants and for his assault and attempted kidnapping of Frances Gomez earlier in the day; however, as further discussed below, the *Graham* factors do not support the Officers' use of the violent and forceful vehicle containment technique to seize the Corolla and all three of its occupants. S.L.'s right to be free from excessive force as a passenger in a vehicle that posed no risk to police was clearly established long before April 20, 2017. *See Acosta v. City & County of San Francisco*, 83 F.3d 1143, 1146 (9th Cir. 1996), *as amended* (June 18, 1996).

In this case, the Officer Defendants took intentional action to stop the Toyota Corolla when they executed and successfully completed the vehicle containment, and their action caused the seizure of all its occupants, including S.L. The Officer Defendants intentionally rammed the Toyota Corolla from all sides, pinned the doors so they could not be opened, and completely immobilized it. *See* PRSOF, ¶ 191. In fact, the vehicle containment was so successful and so secure that when Pequeño revved the Toyota Corolla's engine, the car did not move and did not break the containment. *See id.*

The Officer Defendants' claim that they only intended to seize Pequeño is irrelevant because their willful action to stop the Toyota Corolla from leaving the parking lot "objectively manifested" restraint on the movement of its passengers. *See Villanueva*, 986 F.3d at 1167. Any reasonable person in S.L.'s position would understand that the vehicle containment technique terminated her freedom of movement and that she was not free to leave. Accordingly, this Court should find, as a matter of law, that S.L. was "seized" for purposes of the Fourth Amendment when the Officer Defendants carried out the vehicle containment.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

**D.     Arizona's survival statute does not preclude the Estate of S.L.'s Fourth Amendment claim or the ability to recover damages for the violation of her constitutional rights.**

The Ninth Circuit has rejected Defendants' argument that a state survival statute bars the recovery of non-economic damages in a § 1983 case. *Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1105 (9th Cir. 2014). In *Chaudhry*, the court found that California's statutory prohibition against pre-death pain and suffering damages limited recovery too severely and was inconsistent with § 1983's dual goals of compensating the victims of constitutional violations and deterring future abuses by state actors. *See id.* at 1103-05.

The Estate of S.L. may recover non-economic compensatory damages for the violation of her Fourth Amendment rights, including "loss of life" damages occasioned by the Officer Defendants' unlawful conduct. "A remedy must obtain by reason of the actual deprivation—in this case the greatest of deprivations, loss of life. Absent such a remedy, the § 1983 action amounts to little more than a tort claim." *Guyton v. Phillips*, 532 F. Supp. 1154, 1167 (N.D. Cal. 1981), *disapproved of on other grounds by Peraza v. Delameter*, 722 F.2d 1455 (9th Cir. 1984).

**E.     Defendants may be held liable for violating the Fourth Amendment even if the vehicle containment itself did not cause a significant physical injury.**

Defendants' argument that the Fourth Amendment claim should fail because the vehicle containment did not directly cause S.L.'s physical injuries or death is unavailing for two reasons. First, in evaluating the reasonableness of an officer's use of force, courts "may consider the presence and severity of a plaintiff's injuries, *but injuries are not required*." *Cortesluna v. Leon*, 979 F.3d 645, 653–54 (9th Cir. 2020) (citing *Felarca v. Birgeneau*, 891 F.3d 809, 817 (9th Cir. 2018) (emphasis added). The Ninth Circuit "long ago recognized that a plaintiff asserting a claim of excessive force 'is not required to show a significant injury.'" *Id.* (quoting *Wilks v. Reyes*, 5 F.3d 412, 416 (9th Cir. 1993), *as amended on denial of reh'g* (Oct. 28, 1993).

Second, as already explained above, each Officer Defendant was an integral participant in the sequence of events that culminated in S.L.'s death. The Officer Defendants

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

had a conscious agreement to trap S.L. in a car for a shootout with Pequeño. Each Officer played a fundamental role in the operation, and even those who never fired their weapons may be held liable for the Fourth Amendment violation to the same extent as Michael Pezzelle, who fired the fatal shot. *See Boyd v. Benton County*, 374 F.3d 773, 779 (9th Cir. 2004).

    **F.**    **The Officer Defendants are not entitled to qualified immunity for their use of the vehicle containment technique.**

        **1.**    **A reasonable jury could find that the use of the vehicle containment was objectively unreasonable and violated S.L.'s Fourth Amendment rights.**

Resolving a claim of qualified immunity generally involves two questions: whether officers violated a plaintiff's constitutional rights, and, if so, whether the right in question was clearly established. *Clement v. Gomez*, 298 F.3d 898, 903 (9th Cir. 2002). Under *Graham*, the Fourth Amendment's objective reasonableness standard "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). Other relevant factors include the availability of less intrusive alternatives to the force employed and whether the officers gave warnings prior to the use of force. *Glenn v. Washington County*, 673 F.3d 864, 872 (9th Cir. 2011).

In *Cunningham v. Gates*, 229 F.3d 1271, 1278 (9th Cir. 2000), *as amended* (Oct. 31, 2000), the Ninth Circuit heard the consolidated appeals of cases alleging in part that Los Angeles Police Department detectives' use of a vehicle "jamming" technique was an excessive use of force under the Fourth Amendment. The detectives typically followed a pattern of conduct where they would surveil armed robbers, lie in wait as the robberies were committed, execute the "jamming technique" to pin the robbers' car into a confined space to prevent it from leaving, and then open fire into the vehicle. *Id.* at 1278-80. The Ninth Circuit reluctantly held that the non-shooting officers who participated in the "jamming" technique were entitled to qualified immunity. The court noted its concern that the technique

**ROBBINS & CURTIN, P.L.L.C.**
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

"needlessly or unreasonably create[d] a dangerous situation necessitating an escalation in the use of force." *Id.* at 1291, n. 23. However, because the officers were with "armed individuals in the midst of committing a dangerous felony" and the jamming technique was widely used within the LAPD, it was not "clearly established at the time of the shootings that the 'jamming' technique was an unreasonable use of force." *Id.* at 1291.

In this case, unlike *Cunningham*, the occupants of the Corolla were not armed and were not "in the midst" of committed a dangerous crime. In applying the *Graham* factors, a jury could conclude that the Mesa Defendants violated the Fourth Amendment when they seized S.L. during vehicle containment.

While Pequeño's assault and attempted kidnapping of his girlfriend two hours before were undoubtedly serious, the other *Graham* factors weigh against the reasonableness of the containment. Taking the facts in the light most favorable to Plaintiff, Pequeño, S.L., and Damien had done nothing that posed an "immediate threat" to the officers or others. *See Graham*, 490 U.S. at 396. They were not "actively resisting arrest or attempting to evade arrest by flight." *See id.* The Officer Defendants did not give any warnings prior to executing the containment, and Pequeño, S.L., and Damien did not even know the Officers had tracked them to the apartment complex in their unmarked police vehicles. *See* PRSOF, ¶ 178, 188.

The availability of less intrusive alternatives is also highly relevant. The Mesa Defendants had been tracking Pequeño's cell phone, could have continued to surveil him, and could have apprehended him at a time when he was alone. *See id.*, ¶ 165. This alternative was available and likely would have resulted in Pequeño's apprehension in a fairly short amount of time without endangering two innocent passengers. Although the government interest in taking Pequeño into custody may have been significant, it could have been accomplished without the obvious risk of trapping S.L. in the car for a "shootout."

There are also significant questions of fact regarding the reasonableness of the Officer Defendants' mistaken belief that Pequeño had a gun. Where an officer's use of force results from his mistaken belief that a suspect was armed, the relevant inquiry is "whether a reasonable officer would have or *should* have accurately perceived that fact." *Torres v. City*

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

*of Madera*, 648 F.3d 1119, 1124 (9th Cir. 2011) (citing *Jensen v. City of Oxnard,* 145 F.3d 1078, 1086 (9th Cir. 1998) (emphasis in original). "Plainly, not all mistakes—even honest ones—are objectively reasonable." *Floyd v. City of Detroit*, 518 F.3d 398, 408 (6th Cir. 2008) (citing *Dawkins v. Graham,* 50 F.3d 532, 534 (8th Cir.1995) ("[T]he Fourth Amendment's allowance for officers' honest mistakes is limited to mistakes that are objectively reasonable.")). An officer's "honest but mistaken belief thus does little to resolve the key issue of whether his belief and subsequent actions were nonetheless objectively unreasonable." *Id.*; *see also Duenez v. City of Manteca*, 2013 WL 6816375, at *2 (E.D. Cal. Dec. 23, 2013) (noting that a jury could find the defendant officer "violated the decedent's clearly established Fourth Amendment rights by seizing an unarmed, non-dangerous civilian" when the officer shot and killed a man whom the officer mistakenly believed was carrying a knife).

In this case, a jury can conclude that Pezzelle lied about Pequeño having a gun and that he lied to about the potential for a "shootout," making the vehicle containment all the more excessive and unreasonable. *See* PRSOF, ¶¶ 63, 160-162.

### 2. S.L.'s right to be free from an unlawful vehicle containment was clearly established before April 20, 2017.

Defendants were on notice that the vehicle containment was likely to needlessly escalate their use of force and was unreasonable when deployed against individuals who were not armed and actively committing a crime. *See Cunningham*, 229 F.3d at 1291, n. 23. It is not a defense that the Mesa Defendants' violent and dangerous conduct—trapping an innocent girl in a car for a shootout—was novel. The Supreme Court has made clear that "egregious" or "extreme" factual circumstances put government officials on notice that their conduct is unlawful. *Taylor v. Riojas*, 141 S. Ct. 52, 208 L. Ed. 2d 164 (2020) (holding that Fifth Circuit erred when it granted qualified immunity to prison officials where facts of case were sufficiently "egregious" to put them on notice that their conduct was unconstitutional); *see also McCoy v. Alamu*, 141 S. Ct. 1364, 209 L. Ed. 2d 114 (2021) (vacating qualified immunity and remanding in light of *Taylor*). The "requirement that the plaintiff's asserted

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

right be clearly established 'does not mean that the very action at issue must have been held unlawful before qualified immunity is shed.'" *Blankenhorn v. City of Orange*, 485 F.3d 463, 480 (9th Cir. 2007) (quoting *Wall v. County of Orange*, 364 F.3d 1107, 1111 (9th Cir. 2004)). Police officers "can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002); *see also Cunningham*, 229 F.3d at 1288 (9th Cir. 2000) (providing that courts "must not allow an overly generalized or excessively specific construction of the right" to guide this analysis).

The Mesa Defendants knowingly and intentionally trapped a seventeen-year-old girl in a car for an anticipated shootout. When that shootout occurred, even though nobody in the car had a gun, they cannot claim they were unaware they were violating the girl's Fourth Amendment Rights. To paraphrase the Supreme Court in *Taylor,* "[N]o reasonable [police] officer could have concluded that, under the extreme circumstances of this case, it was constitutionally permissible" to trap a seventeen-year-old girl in a car for a shootout. *Taylor v. Riojas*, 141 S. Ct. 52, 208 L. Ed. 2d 164 (2020)

> **G.    The Mesa Defendants are not entitled to summary judgment on Plaintiff's Fourteenth Amendment familial association claim because they acted with deliberate indifference when they executed the vehicle containment knowing that S.L. would be trapped in the Corolla for the anticipated "shootout."**

The Ninth Circuit has recognized that parents have a Fourteenth Amendment substantive due process interest in the companionship and society of their children. *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010). To prevail on a Fourteenth Amendment familial association claim, the plaintiff must prove that the officers' use of force "shocked the conscience." *Gonzalez v. City of Anaheim*, 747 F.3d 789, 797 (9th Cir. 2014) (quoting *Porter v. Osborn,* 546 F.3d 1131, 1137 (9th Cir. 2008)). In determining whether excessive force shocks the conscience, the court must first ask "whether the circumstances are such that actual deliberation [by the officer] is practical." *Wilkinson*, 610 F.3d at 554 (quoting *Porter*, 546 F.3d at 1137).

> Where actual deliberation is practical, then an officer's "deliberate indifference" may suffice to shock the conscience.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

> On the other hand, where a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives. For example, a purpose to harm might be found where an officer uses force to bully a suspect or "get even."

*Id.* (finding that the "purpose to harm" standard was appropriate where officers shot at a suspect who, within seconds, accelerated his vehicle at a high rate of speed toward officers who were on foot).

Whether the Officer Defendants' conduct shocked the conscience is governed by the "deliberate indifference" standard, not the "purpose to harm" standard. Their "actual deliberation" was not only practical, but they did in fact deliberate about apprehending Pequeño while he, S.L., and Damien were inside the apartment for a considerable period of time. PRSOF, ¶ 165. The Officer Defendants collectively discussed arresting Pequeño. They were already tracking his cell phone and knew they could follow him to another location. *Id.* There were no exigent circumstances that required his immediate apprehension while S.L. and Damien were in the car with him. *See id.*, ¶ 175.

But most importantly, the Officer Defendants knew that by executing the vehicle containment, S.L. would be trapped inside the Corolla with a person whom they allegedly believed had a gun and would engage in a "shootout" with police. *Id.*, ¶ 173. They never discussed ways to minimize the risk to her, even though their policies required them to. *Id.*, ¶ 176. They decided to utilize the vehicle containment with knowledge of the risks to S.L. *See id.*, ¶ 174. Because the Officer Defendants had actual knowledge of a substantial risk of harm to S.L. and disregarded that risk when he initiated the containment, a jury could easily find that they were deliberately indifferent to S.L.'s and Plaintiff's rights and that their conduct shocked the conscience. *See Farmer v. Brennan*, 511 U.S. 825, 842 (1994) (noting that to establish deliberate indifference, "it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm.").

### H.   The City of Mesa is not entitled to summary judgment on Plaintiff's *Monell* claim.

Summary judgment is not appropriate on Plaintiff's *Monell* claim against the City of Mesa because, as set forth above, there are many significant questions of fact surrounding the Officer Defendants' violations of the Fourth and Fourteenth Amendments. There are also significant questions for the jury regarding Mesa's policies, supervision, and training of the Officer Defendants and whether those policies and customs were deliberately indifferent and were a moving force behind the constitutional deprivations.

A municipality is liable under 42 U.S.C. § 1983 when the municipality's longstanding or widespread policies or customs amount to deliberate indifference and are the moving force behind a municipal employee's constitutional violation. *Long v. County of Los Angeles*, 442 F.3d 1178, 1186 (9th Cir. 2006) (citing *Gibson v. County of Washoe,* 290 F.3d 1175, 1193–94 (9th Cir. 2002), *cert. denied,* 537 U.S. 1106 (2003)); *see also Monell v. Dep't of Soc. Services of City of New York*, 436 U.S. 658, 694 (1978). For a policy or custom to be the moving force behind the deprivation of a constitutional right, there must be a direct causal link between the municipal action and the deprivation of federal rights. *Castro v. County of Los Angeles*, 833 F.3d 1060, 1078–79 (9th Cir. 2016) (quoting *Board of County Commissioners of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 404–05 (1997)).

#### 1.   The City of Mesa was deliberately indifferent in its training of Officers on the Task Force.

A municipality is liable under § 1983 for the failure to train its police officers if (1) "the existing training program" is inadequate "in relation to the tasks the particular officers must perform"; (2) the officials have been deliberately indifferent "to the rights of persons with whom the police come into contact"; and (3) the inadequacy of the training "actually caused the deprivation of the alleged constitutional right." *Johnson v. Shasta County*, 83 F. Supp. 3d 918, 932 (E.D. Cal. 2015) (quoting *Merritt v. Cnty. of L.A.,* 875 F.2d 765, 770 (9th Cir. 1989)). Deliberate indifference exists where "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

to the need." *Castro*, 833 F.3d at 1076 (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989)). "Where a § 1983 plaintiff can establish that the facts available to city policymakers put them on actual *or constructive notice* that the particular omission is substantially certain to result in the violation of the constitutional rights of their citizens, the dictates of *Monell* are satisfied." *Id.* (quoting *City of Canton*, 489 U.S. at 396) (emphasis in original).

A pattern of similar constitutional violations by untrained, or improperly trained, employees is ordinarily necessary to demonstrate deliberate indifference for purposes of a municipality's failure to train. *Connick v. Thompson*, 563 U.S. 51, 62 (2011). The Supreme Court, however, has provided that a pattern of violations may not be required under circumstances where the need for training is "so obvious" that the failure to provide it could properly be characterized as deliberate indifference. *City of Canton*, 489 U.S. at 390, n. 10.

> [In *Canton*,] [t]he Court posed the hypothetical example of a city that arms its police force with firearms and deploys the armed officers into the public to capture fleeing felons without training the officers on the constitutional limitation on the use of deadly force. Given the known frequency with which police attempt to arrest fleeing felons and the "predictability that an officer lacking specific tools to handle that situation will violate citizens' rights," the Court theorized that a city's decision not to train the officers about constitutional limits on the use of deadly force could reflect the city's deliberate indifference to the "highly predictable consequence," namely, violations of constitutional rights.
>
> * * * *
>
> There is no reason to assume that police academy applicants are familiar with the constitutional constraints on the use of deadly force. And, in the absence of training, there is no way for novice officers to obtain the legal knowledge they require. Under those circumstances there is an obvious need for some form of training.

*Connick*, 563 U.S. at 63–64.

MPD's training was deliberately indifferent to the rights of individuals with whom its officers came into contact because there was a pattern of similar constitutional violations

in which its officers used force above and beyond what was reasonably necessary to gain compliance over subjects. This was at issue in other cases—including *Tai v. City of Mesa, et al.*, USDC Case No. 2:14-cv-01170-DGC; *Krstic v. Gransee, et al.*, USDC Case No. 2:16-cv-02830-MHB; and *Sweet v. City of Mesa, et al.*, USDC Case No. 2:17-cv-00152-GMS—which all predated the subject incident. In *Tai*, for example, MPD officers beat and tased a mentally ill man who did not comply with their orders to sit down. *See Tai v. City of Mesa, et al.*, USDC Case No. 2:14-cv-01170-DGC, *Dkt. 1* at p. 3. The *Krstic* and *Sweet* cases involved the use of deadly force by MPD officers against individuals who were not armed and had not displayed any physical resistance or aggression. Similarly, Pezzelle was involved in a prior use-of-force incident in 2011, the *Espinoza* case, where he fired his gun at the unarmed occupants of a vehicle. PRSOF, ¶ 246.

Deliberate indifference is also established because the City of Mesa (a) trained officers to intensify their force in a way that was disproportionate under the circumstances and (b) failed to provide scenario-based training to Task Force Officers to prepare them for their inevitable encounters with non-suspects during vehicle containments. *Id.*, ¶ 234. The Officers assigned to the Task Force were responsible for surveilling and apprehending violent felony offenders. The Officers would perform these tasks in plainclothes and unmarked police vehicles. They routinely used the vehicle containment technique to seize the felony suspects through "speed, surprise, and violence of action." *Id.*, ¶ 166. It was entirely predictable—and virtually certain—that the Officers would encounter situations that posed a risk to non-suspects, particularly vehicle containments involving non-suspects who were passengers in the vehicle with a felony suspect. The City's training was patently inadequate in relation to the tasks that the Officers were expected to perform. *See Johnson*, 83 F. Supp. 3d at 932.

It was "so obvious" and apparent that training officers to intensify and escalate their use of force without equipping them with any guidance for minimizing the risk to non-suspect passengers would result in the "highly predictable consequence" of constitutional violations. *See Connick*, 563 U.S. at 63–64 (citing *City of Canton*, 489 U.S. at 395). Like the

Supreme Court's hypothetical situation in *Canton* where a city failed to train its officers on the use of deadly force, the City of Mesa's training failed to provide officers with the tools necessary to apprehend felony suspects in a way that did not interfere with the lives and safety of non-suspect passengers. Because of the predictability with which the Task Force Officers were sure to encounter such situations, MPD's training is properly characterized as deliberately indifferent. *See id.* A jury could find that MPD's constitutionally deficient training was an actual cause of S.L.'s and Plaintiff's harm and was the moving force behind the Officer Defendants' constitutional violations.

### 2.  The City of Mesa was deliberately indifferent in its supervision of Officers on the Task Force.

The evidence in this case establishes that the City of Mesa maintained several widespread, systemic customs and practices from which they jury could conclude that the City was deliberately indifferent in its supervision of the Officers on the Task Force. To establish *Monell* liability based on a failure to supervise, a plaintiff must show the municipality's "failure to supervise its employees amounted to deliberate indifference to the need for adequate supervision." *Martin for C.M. v. Hermiston Sch. Dist. 8R*, 2020 WL 6547638, at *24 (D. Or. Nov. 4, 2020) (citing *City of Canton*, 489 U.S. at 388); *see also Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) ("[A] failure to supervise that is 'sufficiently inadequate' may amount to 'deliberate indifference.'").

The jury could find that the City of Mesa was deliberately indifferent in its supervision of the Task Force and turned a blind eye to the high likelihood that Task Force Officers would commit constitutional violations because (1) MPD violated its own policies by failing to complete a Containment Report Form and Use of Force Report for each vehicle containment executed by the Task Force; (2) MPD violated its own policies by failing to convene a Vehicle Operations Board to evaluate the Task Force's vehicle containments; (3) MPD violated its own policies by failing to convene a Use of Force Board for serious use of force incidents involving the Task Force; (4) MPD failed to take any action in response to Michael Pezzelle's disproportionately high number of IAPro alerts and prior use of force

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

incidents; and (5) the two Mesa Officers assigned to directly supervise the Task Force, Sergeant Bellows and Lieutenant Rudd, failed to failed to implement an alternative plan in lieu of the containment and failed to implement a tactical plan before the containment occurred. PRSOF, ¶¶ 232-233, 236, 241-248.

### 3. The City of Mesa ratified the Officer Defendants' use of excessive force when it failed to complete a Use of Force Board Review of this incident in violation of its own policies.

The City of Mesa's Rule 30(b)(6) representative, Commander Michael Beaton, testified that in 2017, Acting Chief Dvorak instructed the MPD to disregard the Use of Force Board policy, DPM 1.11.60, and stop reviewing officer-involved shootings. PRSOF, ¶ 241. Acting Chief Dvorak directed Commander Beaton to disregard the Use of Force Board policy and to look at only "tasers and beanbags and strikes to the face" rather than shootings. *Id.* Commander Beaton testified that the City of Mesa's Use of Force Review Board never reviewed the shooting of S.L. and Brandon Pequeño. *Id.*

A jury could conclude that the City's policymaker, Acting Chief Dvorak, made a conscious, affirmative choice to support the Officer Defendants' unconstitutional conduct when he deliberately prevented a Use of Force Board review of the shooting of an unarmed 17-year-old girl in violation of the City's policies. "[R]atification requires the authorized policymaker to make a 'conscious, affirmative choice,'" and therefore, ratification "and thus the existence of a *de facto* policy or custom, can be shown by a municipality's post-event conduct, including its conduct in an investigation of the incident." *Johnson v. Shasta County*, 83 F. Supp. 3d 918, 933 (E.D. Cal. 2015) (quoting *Dorger v. City of Napa,* 2012 WL 3791447, at *5 (N.D.Cal. Aug. 31, 2012)). "Ordinarily, ratification is a question for the jury." *Id.*

### I. The Officer Defendants are not entitled to summary judgment on Plaintiff's claim for punitive damages.

A jury may assess punitive damages against a defendant on a § 1983 excessive force claim when the defendant's conduct involved reckless or callous indifference to the constitutional rights of others, was driven by evil motive or intent, or was malicious, wanton,

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

or oppressive. *Dang v. Cross*, 422 F.3d 800, 808 (9th Cir. 2005) (citing *McKinley v. Trattles*, 732 F.2d 1320 (7th Cir. 1984)). There is more than sufficient evidence in this case for a jury to conclude that the Officer Defendants acted with reckless or callous disregard of S.L.'s Fourth Amendment rights or even that they acted maliciously, oppressively, or with an evil mind.

The Officer Defendants knew that by executing the vehicle containment, S.L. would be trapped in the Corolla for the anticipated "shootout" with Pequeño. PRSOF, ¶¶ 173-174. They also knew that S.L. was innocent, had not committed any crime, and was not a threat to anyone. *Id.*, ¶¶ 180-185. A reasonable jury could find that trapping an innocent, unarmed girl in a car for a "shootout" with police—and then shooting directly into the window where she is sitting without ever seeing anyone in the car with a gun—is strong evidence of a reckless and callous disregard for that individual's right to be free of unreasonable seizures and excessive force.

In addition, a reasonable jury will likely assess significant punitive damages against Michael Pezzelle. Pezzelle runs company called Five Eight Group, which, according to its website, Five Eight Group provides "reality based training to law enforcement professionals with the intended purpose of providing modern, proven tactics to mitigate your risk during the apprehension of violent criminals." Five Eight Group's Instagram, however, mostly shows Pezzelle posting pictures of bloodied victims and documenting the enjoyment he gets from "hunting" them. In one post, for example, Pezzelle, using the handle @fiveeightgroup, compared the adrenaline rush he gets from hunting men to the rush some people get from using intravenous drugs. His caption is accompanied by an Ernest Hemingway quote: "There is no hunting like the hunting of man. And, those who have hunted armed men long enough and liked it, never care for anything else, thereafter." PRSOF, ¶ 249.

After he shot S.L., Pezzelle continued to post images and quotes about firearms, bloodied suspects, and the virtues of violence on the Five Eight Group account. In another post, Pezzelle features a Sig Sauer .45 caliber pistol like the one he used to kill S.L. After another user made a comment about firearm safety, Defendant Pollard commented: "don't

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

worry, brother, we can't kill anyone right now on lockdown." "Lockdown" refers to the fact that after the shooting of S.L., Pezzelle and Pollard were assigned to a different unit where police discipline and policies were actually followed. PRSOF, ¶ 250. Shortly afterward, both Pezzelle and Pollard took early retirements.

Pezzelle's callous disregard for S.L.'s constitutional rights is apparent not only from the shooting itself but also from his many prior use of force incidents, including the 2011 *Espinoza* shooting, and the general disdain and lack of respect for others' lives that he displayed to the world in his Instagram account.

## IV. The City of Mesa is not entitled to summary judgment on Plaintiff's wrongful death claim.

Plaintiff's wrongful death claim against the City of Mesa is premised on three separate legal theories: (a) the City is vicariously liable for the negligence or gross negligence of its officers; (b) the City is vicariously liable for the assault and battery committed by its officers; and (c) the City was negligent in failing to train, supervise and adopt reasonable policies for the officers. The City is not entitled to summary judgment on any of those claims.

### A. The City of Mesa is liable for the negligence and gross negligence of its employees who trapped S.L. in the car for a shootout and for Pezzelle's claim that he unintentionally shot S.L.

In her wrongful death claim, Plaintiff alleges that the City of Mesa is liable for the wrongful death of S.L. because the individual officers "failed to use reasonable care and recklessly disregarded obvious risks of harm to S.L." and caused her death. (Dkt. 10, ¶¶ 219-20). The City of Mesa did not address this claim in its summary judgment motion.

Given the disputed facts detailed herein, a reasonable jury can conclude that Mesa officers "failed to use reasonable care and recklessly disregarded obvious risks of harm to S.L. when they came up with a plan to trap her in a car during an anticipated shootout. A reasonable jury can conclude that this conduct was negligent, grossly negligent and reckless. Additionally, given the disputed facts regarding Pezzelle's intent, a reasonable jury could

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

conclude that, if he did not intend to shoot S.L., he was negligent or grossly negligent for doing so.

In *Ryan v. Napier,* Arizona's Supreme Court expressly determined that such claims can be brought in tandem with battery claims:

> plaintiffs may plead a negligence claim for conduct that is independent of the intentional use of force or plead negligence and battery as alternate theories if the evidence supports each theory. For example, if the evidence here also supported a finding that Klein unintentionally dropped Barry's leash, resulting in the attack against McDonald, a negligence claim would have been appropriate…It is the jury's role (or the judge's in a bench trial) to establish what occurred and then apply the correct legal theory to arrive at a verdict.

*Ryan v. Napier*, 245 Ariz. 54, 62, 425 P.3d 230, 238 (2018).

**B.    A reasonable jury could find that the City of Mesa is vicariously liable for the assault and battery that its Officers committed when they trapped S.L. in the car and shot and killed her.**

A jury can reasonably conclude that Mesa's officers committed an assault and battery on S.L. when they trapped her in the car for a shootout and when Pezzelle shot her. The Officer Defendants are not entitled to defenses or presumptions under Arizona state law criminal act, intoxication, or justification statutes. *See* A.R.S. §§ 12-711, 12-712, 12-716, 13-404, 13-405, 13-406, 13-409, 13-411, or 13-413. Plaintiff fully incorporates her Motion for Partial Summary Judgment (Dkt. 303) and all arguments asserted therein with respect to these issues. Specifically, Defendants cannot meet their burden under any of the justification statutes, A.R.S. §§ 13-404 through 13-413, because (a) it is undisputed that S.L. did nothing to justify any use of force against her and (b) because the language of the statutes does not permit Defendants to justify using force against S.L. based on the conduct of Pequeño.

**C.    A reasonable jury can find that the City was negligent in its training, supervision and adoption of policies.**

The City of Mesa is not entitled to summary judgment on Plaintiff's wrongful death claim for the same reasons discussed with respect to Plaintiff's *Monell* claim, above. Plaintiff's negligence claim alleges that the City breached its duty of care by failing to adequately supervise and train its officers. A reasonable jury could easily find that the City

breached the duty of reasonable care that it owed to individuals who were seized or taken into custody by its officers.

The City knew that its officers on the Task Force would routinely apprehend potentially violent felony offenders and that the officers would frequently use vehicle containments to do so. Yet the City adopted training and policies that placed non-suspect passengers directly in harm's way. The City never trained its officers on ways to minimize the risk of harm to non-suspects. It did not require Task Force officers to complete use of force or vehicle containment reports, and it failed to convene the Vehicle Operation Review Board (VORB) and Use of Force Board regarding Task Force incidents. PRSOF, ¶¶ 233, 236. Most significantly, the City turned a blind eye to Pezzelle's disproportionate number of IAPro alerts, use of force incidents, and prior shootings. *See id.*, ¶¶ 237, 243-248.

A jury could reasonably find that the City's policies, training, and lack of adequate supervision created a risk of harm to individuals who came into contact with the Task Force officers, led to the Officer Defendants' assault and battery against S.L., and proximately caused her injuries. *Guerra v. State*, 234 Ariz. 482, 489–90, ¶ 30, 323 P.3d 765, 772–73 (App. 2014), *vacated on other grounds,* 237 Ariz. 183, ¶ 30, 348 P.3d 423 (2015) ("To prevail on a negligent training claim, a plaintiff must show a defendant's training or lack thereof was negligent and that such negligent training was the proximate cause of a plaintiff's injuries."); *Kuehn v. Stanley,* 208 Ariz. 124, 130, ¶ 21, 91 P.3d 346, 352 (App. 2004) (providing that a claim for negligent supervision requires the plaintiff to demonstrate that an employee of the defendant committed a tort and that the defendant had a reason and opportunity to act, failed to adequately discharge its duty to supervise, and thereby contributed to the cause of the injury).

**ROBBINS & CURTIN, P.L.L.C.**
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

1    **V.     Conclusion.**

2          Based on the foregoing, Plaintiff requests that the Court deny the Mesa Defendants'

3    Motion for Summary Judgment.

4          RESPECTFULLY SUBMITTED: May 21, 2021

5                                              **ROBBINS & CURTIN, p.l.l.c.**

6                                    By:    /s/ Jesse M. Showalter
                                            _____
7                                           Joel B. Robbins
                                            Jesse M. Showalter
8                                           301 E. Bethany Home Road, Ste. B-100
                                            Phoenix, Arizona 85012
9                                           *Attorneys for Plaintiff*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

     I hereby certify that on May 21, 2021, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

John P. Torgenson, Esq.
Torgenson Law
333 W. Roosevelt Street
Phoenix, Arizona 85003
jtorgenson@torgensonlaw.com
*Co-Counsel for Plaintiff*

John T. Masterson, Esq.
Joseph J. Popolizio, Esq.
Justin M. Ackerman, Esq.
Ian C. Beck, Esq.
Jones, Skelton & Hochuli, P.L.C.
40 N. Central Avenue, Suite 2700
Phoenix, Arizona 85004
jmasterson@jshfirm.com
jpopolizio@jshfirm.com
jackerman@jshfirm.com
ibeck@jshfirm.com
*Attorneys for Mesa Defendants*

J. Randall Jue, Esq.
Chandler City Attorney's Office
P.O. Box 4008, MS602
Chandler, Arizona 85244-4008
randy.jue@chandleraz.gov
*Attorneys for Chandler Defendants*

/s/ Julie W. Molera

**ROBBINS & CURTIN, P.L.L.C.**
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267