**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| Jennifer Lane, | No. CV-19-00852-PHX-SMB |
|---|---|
| Plaintiff, | **ORDER** |
| v. | |
| City of Mesa, et al., | |
| Defendants. | |

Pending before the Court are three separate motions for summary judgment. (1) Plaintiff Jennifer Lane's Motion for Partial Summary Judgment RE: State Law Affirmative Defenses, (Doc. 303); (2) Mesa Defendants' Motion for Summary Judgment, (Doc. 306); (3) the Chandler Defendants Motion for Summary Judgment, (Doc. 309). Oral argument was held on all three motions on October 4, 2021. Having considered the parties' briefs and authorities, the Court now issues the following order.

## I.   BACKGROUND

### A.  Factual Background

This case revolves around a law enforcement shooting that resulted in the death of a seventeen-year-old girl ("S.L") and Brandon Pequeno. Pequeno had a lengthy criminal history including felony arrests across Arizona and California. (Doc. 317 ¶ 1.) He was affiliated with several gangs, including the Surenos, a Latin-based gang, and La Victoria Locos, a Mesa street gang. (Doc. 310 ¶ 1; Doc. 317 ¶ 3.) Pequeno was on probation in Maricopa County since October 2016. (Doc. 317 ¶ 4.) During his probation, Pequeno's

probation officer became aware of his reported mistreatment of his then girlfriend, Frances Gomez. (Doc. 317 ¶ 7.) Due to Pequeno's probation violations through drug and alcohol use and his reported mistreatment of Gomez, Pequeno's probation officer petitioned to revoke his probation. (Doc. 317 ¶ 15.) Pequeno's probation officer was concerned about arresting Pequeno because he had attempted suicide on multiple occasions and had reportedly stolen Gomez's handgun. (Doc. 317 ¶ 18.) Accordingly, on April 10, 2017, the probation officer asked if Detective Michael Pezzelle of the Mesa Police Department would assist in Pequeno's apprehension. (Doc. 317 ¶ 23.) Pezzelle was assigned to Mesa Police Department's Violent Offenders Unit ("VOU") and also worked with the East Valley Violent Offenders Task Force ("Task Force"). (Doc. 304 ¶ 2.) The Task Force accepted the Pequeno case. (Doc. 310 ¶ 6.) Mesa police officers James Pollard, Hoapili Baker, Jalyn Bellows, William "Chip" Jones, Brandon Ekren, Andrew Walag, Donald Rudd, and Chandler Police Department Detective Garrett Dever were also assigned to the VOU. (Doc. 304 ¶ 2.) The probation officer sent Pezzelle an email with additional information about Pequeno, including a report Gomez that Pequeno had stolen her Glock .380 on March 27 or 28, 2017. (Doc. 304 ¶ 4.) Gomez later testified that Pequeno told her in April 2017—before the date of the incidence that gave rise to this lawsuit—that he had sold the pistol. (Doc. 310 ¶ 8.)

On April 20, 2017, Gomez was on the phone when Pequeno came down the stairs of Gomez's apartment and an altercation ensued during which Pequeno slapped Gomez in the face, grabbed Gomez's car keys and phone, and hurt Gomez's hand when she attempted to grab her belongings from him. (Doc. 310 ¶ 10.) Pequeno left Gomez's apartment and drove a short distance in Gomez's Toyota Corolla. (Doc. 310 ¶ 11.) Gomez approached another resident who was sitting in his vehicle to ask to use his cell phone. (Doc. 317 ¶ 32.) She told him that Pequeno was stealing her car. (Doc. 317 ¶ 33.) Pequeno returned to the apartment complex at that moment in the stolen Corolla and parked it to trap the resident's car in his parking space. (Doc. 317 ¶ 34.) Pequeno held a large knife against the man's car window and told him not to "talk to [his] girl." (Doc. 310 ¶ 13.) He then attempted to force

Gomez into her Corolla but was unsuccessful. (Doc. 310 ¶ 13.) After Gomez broke free from Pequeno, he fled the apartment complex in the stolen Corolla. (Doc. 317 ¶ 39.) A resident of the apartment complex witnessed the events and called 911. (Doc. 310 ¶ 12.)

Pezzelle responded to the Chandler apartment complex after Pequeno's altercation with Gomez. (Doc. 310 ¶ 14.) Detective Pezzelle learned that, just after Pequeno fled in the stolen Corolla, a Chandler police officer attempted to pull Pequeno over for a traffic violation but was unsuccessful because Pequeno failed to yield and blew red lights, leading the officer to terminate the pursuit. (Doc. 310 ¶ 14.) During his interview with Gomez, Pezzelle asked Gomez multiple times whether Pequeno still had the handgun he had stolen from her in March. (Doc. 304 ¶ 7.) The parties dispute Gomez's response to this question. (*See* Doc. 331 ¶ 15.) Although Detective Pezzelle testified that "Frances Gomez believed that he had a gun [*sic*] but she did not see it that day," (Doc. 304-1 at 49), Gomez testified that she told Pezzelle that Pequeno did not have the gun because that he had sold it. (Doc. 304 ¶ 7.) Specifically, Gomez testified that she told Pezzelle that Pequeno did not leave her house with a gun. (Doc. 304-1 at 62.)  In addition, she informed Pezzelle that Pequeno told her that he "felt like if he was to go [*sic*] it was going to be by the police." (Doc. 304-1 at 62.)

Meanwhile, Pequeno drove to the residence of 17-year-old S.L., where he picked up S.L. and a friend, Damien Sandoval Rosa. (Doc. 304 ¶ 9.) Although officers learned this fact later, Pequeno and Sandoval Rosa smoked heroin and meth multiple times after Pequeno picked up S.L. and Sandoval Rosa. (Doc. 310 ¶ 17.) After smoking meth and heroin in the stolen Corolla, Pequeno drove S.L. and Sandoval Rosa to an apartment complex located at 5220 West Northern Avenue in Glendale, where Sandoval Rosa lived with his brother. (Doc. 304 ¶ 10.) VOU members were called and advised to head toward the Glendale apartment complex where Pequeno was headed. (Doc. 317 ¶ 62.) Walag arrived at the complex in time to observe Pequeno, an "orange haired" female, and another Hispanic male get out of the Corolla. (Doc. 304 ¶ 12.) Pequeno, S.L., and Sandoval Rosa entered one of the apartment units. (Doc. 304 ¶ 14), but the officers did not see which one,

(Doc. 310 ¶ 24).

While Pequeno, S.L., and Sandoval Rosa were inside the apartment, the officers discussed arresting Pequeno. (Doc. 304 ¶ 15.) Bellows suggested a "vehicle containment" to seize Pequeno in the parking lot. (Doc. 304 ¶ 15.) A vehicle containment is a law enforcement tactic in which police position unmarked vehicles in front of and behind the subject vehicle. (Doc. 304 ¶ 17.) The procedure is initiated by having the "front block" vehicle drive in reverse and contact the front bumper of the subject vehicle. (Doc. 304 ¶ 17.) The "rear block" vehicle then drives forward and makes contact with the rear bumper of the subject vehicle. (Doc. 304 ¶ 17.) Once the "front block" and "rear block" vehicles are in place, the "right and left blocks" move in and pin the sides of the subject vehicle so its doors cannot be opened, and its occupants are trapped inside. (Doc. 304 ¶ 17.) Vehicle containments are typically reserved for apprehending felony suspects with a history of violence or flight from law enforcement. (Doc. 304 ¶ 19.)

Before executing the containment, Pezzelle informed the other officers of the content of his interview with Gomez over the radio, including the fact that Pequeno may have been in possession of a handgun. (Doc. 304 ¶ 20.) Jones agreed to be the "front block" if the Corolla used the exit onto 53rd Avenue, and Dever agreed to perform the front block if the Corolla used the much narrower exit onto Northern Avenue. (Doc. 304 ¶ 25.) The officers did not have a specific conversation about passenger safety because that was something that was "always on [their] minds, and it's always something that [they're] taking into consideration." (Doc. 317 ¶ 86 (alterations original); Doc. 334 ¶ 86.)

After spending time in the apartment, Pequeno, S.L., and Sandoval Rosa got back into the Corolla. (Doc. 304 ¶ 27.) Pequeno drove, Sandoval Rosa sat in the front passenger seat, and S.L sat in the back passenger seat. (Doc. 304 ¶ 27.) The officers knew the positioning of everyone in the Corolla. (Doc. 304 ¶ 29.) S.L. was not armed with any weapon, and the officers had no reason to believe that she was. (Doc. 304 ¶ 33.) In fact, after the incident, officers discovered that none of the Corolla's occupants had a gun. (Doc. 304 ¶ 35.)

Pequeno drove toward the Northern Avenue exit of the apartment complex, (Doc. 304 ¶ 37), leaving Dever responsible for initiating the vehicle containment. (Doc. 304 ¶¶ 38, 40.) When the Corolla was behind Dever's truck, he shifted the truck in reverse, gave the command for the other officers to move, and backed up until he felt contact with the Corolla. (Doc. 304 ¶ 40; Doc. 327 ¶ 40.) After his truck contacted the Corolla, Dever put his foot on the brake and crouched down in his seat to make himself as small as possible. (Doc. 310 ¶¶ 32-33.) Pollard used his unmarked SUV to contact the Corolla's rear bumper. (Doc. 304 ¶ 41.)

Sandoval-Rosa was surprised by the vehicle containment. (Doc. 304 ¶ 42.) He testified that he thought the Corolla had been rear ended. (Doc. 310 ¶ 34.) Therefore, he jumped out of the passenger door to see what was happening. (Doc. 304 ¶ 42.) He saw that the Corolla was being surrounded by unmarked police vehicles with their lights activated. (Doc. 304 ¶ 42.) The officers directed Sandoval Rosa to get back into the vehicle and put his hands up. (Doc. 304 ¶ 42.) He complied. (Doc. 304 ¶ 42.) Ekren and Walag pulled their unmarked vehicles into position along the left and right sides of the Corolla. (Doc. 304 ¶ 43.) Each vehicle made contact to the sides of the Corolla so that the doors could not open. (Doc. 304 ¶ 44.)

In response to the vehicle containment, Pequeno revved the Corrolla's engine and attempted to break free but was unsuccessful because the Corolla was completely boxed in by the law enforcement vehicles. (Doc. 304 ¶ 45; Doc. 310 ¶ 36.) The officers then surrounded the Corolla with their weapons drawn and shouted commands such as "Police" and "Put your hands up" (Doc. 304 ¶ 47.) Jones, who was positioned on the driver's side of the Corolla, fired three less-than-lethal beanbag rounds into Pequeno's driver side window so that the vehicle occupants could better hear officers' commands. (Doc. 304 ¶ 49; Doc. 317 ¶ 109.) Officers testified that—rather than complying with officers' commands—Pequeno quickly leaned over the Corolla's center console, rummaged around for something in the center console area, and made a furtive movement back towards the driver's side of the vehicle. (Doc. 317 ¶¶ 110–13.) Thinking that Pequeno had grabbed a

handgun, Baker fired a single round at Pequeno. (Doc. 317 ¶¶ 113–18.) Pollard, who was in the rear block position, also purportedly saw Pequeno frantically reach towards the center console and then turn back at officers. (Doc. 317 ¶ 118.) Thus, Pollard fired three rounds at Pequeno through the upper left portion of the rear windshield. (Doc. 317 ¶¶ 119–20.)

Pezzelle was on the passenger side of Walag's vehicle, using the engine block as a cover, was facing the rear passenger door of the Corolla. (Doc. 304 ¶ 51.) Pezzelle testified that he saw Pequeno digging around in the center console which he interpreted as Pequeno reaching for a pistol that he suspected Pequeno possessed. (Doc. 317 ¶ 123.) Pezzelle testified that Pequeno made a series of abrupt turns. (Doc. 317 ¶ 124.) On the final turn, Pezzelle saw Pequeno's hands coming up as if he was pulling out a pistol. (Doc. 317 ¶ 125.) Thus, Pezzelle fired five shots through the back passenger window at Pequeno. (Doc. 304 ¶ 58.) Unfortunately, one of the bullets fired by Pezzelle struck S.L. in the head. (Doc. 304 ¶ 60.) Pezzelle testified that S.L. had ducked down towards the floorboard and was completely out of sight when he fired the five shots. (Doc. 317 ¶ 133.)

Pequeno was struck a total of three times from the officers' gunfire: once in the upper right side of his back, once on the left side of his chest, and once in the left lumbar area of his back. (Doc. 317 ¶ 134.) He died as a result of those gunshot wounds. (Doc. 304 ¶ 67.) Paramedics transported S.L. to the John C. Lincoln Medical Center. (Doc. 304 ¶ 68; Doc. 317 ¶ 138.) She died on April 21, 2017 from the gunshot wound to her head. (Doc. 304 ¶ 68.) A Maricopa County medical examiner performed the postmortem examination of S.L. and concluded that the cause of death to S.L. was a gunshot wound to the head. (Doc. 310 ¶ 47.) He also found that Pequeno had methamphetamine in his system at the time of his death. (Doc. 310 ¶ 47.)

### B. Material Facts in Dispute

The parties dispute what Gomez told Pezzelle during the interview at her Chandler apartment complex. Although Pezzelle testified that Gomez told him she believed Pequeno had a gun—but that she did not see it that day—Gomez testified that she told Pezzelle that

Pequeno did not have a gun, and that she had never seen Pequeno with a gun. (Doc. 331 ¶ 15.)

Additionally, the parties dispute the events moments before the shooting occurred. Officers testified that Pequeno tried aggressively to break out of the vehicle containment by accelerating forward and turning the steering wheel to the left. (Doc. 317 ¶ 97.) Pollard testified that Pequeno then put the Corolla in reverse and was able to create a few inches of clearance by pushing the Corolla against Pollard's vehicle. (Doc. 317 ¶¶ 98–99.) Conversely, Sandoval Rosa testified that Pequeno simply revved the engine of the car forward once and then placed it in park. (Doc. 334 ¶ 97.)

Though multiple officers, including Pezzelle, testified that they observed Pequeno make a furtive movement towards the center console of the vehicle after they issued commands to put his hands up, (Doc. 310 ¶¶ 38–43), Sandoval Rosa testified differently. Sandoval Rosa testified that after he revved the Corolla's engine, Pequeno put the car in park. (Doc. 331 ¶ 38.) At that point, Sandoval Rosa testified that shots came through the window. (Doc. 331-1 at 226.) During his deposition, Sandoval Rosa testified to the moments when the shooting occurred: "I saw [Pequeno] was kind of like freaking out. And he was like looking back towards the police. And he was like putting his hands up in the air. And he was like our fucking hands are up, our fucking hands are up." (Doc. 334 ¶ 107.) Sandoval Rosa testified that at that point, more shots came through the window and hit Pequeno, causing Pequeno to lean over the center console into Sandoval Rosa's lap. (Doc. 331-1 at 226-227.)

Lastly, the parties dispute S.L.'s positioning in the back seat. Pezzelle testified that he saw S.L. turn away from the passenger side of the vehicle and duck down towards the floorboard, and that he could not see S.L. at all when he fired shots at Pequeno. (Doc. 317 ¶¶ 131-133.) However, Plaintiff's expert, Dr. Knox, intends to testify that S.L.'s head had to have been within Pezzelle's line of sight when he fired. (Doc. 334 ¶ 129.) Further, Pollard reported being able to see S.L.'s silhouette when he fired through the back window. (Doc. 334 ¶ 129.) Walag also reported being able to see S.L.'s head after the vehicle

1   containment was executed. (Doc. 334 ¶ 129; Doc. 334-3 at 22.)

2   **II.   LEGAL STANDARD**

3         Summary judgment is appropriate when "there is no genuine dispute as to any

4   material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

5   56(a). A material fact is any factual issue that might affect the outcome of the case under

6   the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

7   A dispute about a fact is "genuine" if the evidence is such that a reasonable jury could

8   return a verdict for the nonmoving party. *Id.* "A party asserting that a fact cannot be or is

9   genuinely disputed must support the assertion by . . . citing to particular parts of materials

10  in the record" or by "showing that materials cited do not establish the absence or presence

11  of a genuine dispute, or that an adverse party cannot produce admissible evidence to

12  support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B). The court need only consider the cited

13  materials, but it may also consider any other materials in the record. *Id.* 56(c)(3). Summary

14  judgment may also be entered "against a party who fails to make a showing sufficient to

15  establish the existence of an element essential to that party's case, and on which that party

16  will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

17        Initially, the movant bears the burden of demonstrating to the Court the basis for the

18  motion and "identifying those portions of [the record] which it believes demonstrate the

19  absence of a genuine issue of material fact." *Id.* at 323. If the movant fails to carry its initial

20  burden, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co. v. Fritz*

21  *Cos.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000). If the movant meets its initial responsibility,

22  the burden then shifts to the nonmovant to establish the existence of a genuine issue of

23  material fact. *Id.* at 1103. The nonmovant need not establish a material issue of fact

24  conclusively in its favor, but it "must do more than simply show that there is some

25  metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*

26  *Corp.*, 475 U.S. 574, 586 (1986). The nonmovant's bare assertions, standing alone, are

27  insufficient to create a material issue of fact and defeat a motion for summary judgment.

28  *Liberty Lobby*, 477 U.S. at 247–48. "If the evidence is merely colorable, or is not

significantly probative, summary judgment may be granted." *Id.* at 249–50 (citations omitted). However, in the summary judgment context, the Court believes the nonmovant's evidence, *id.* at 255, and construes all disputed facts in the light most favorable to the nonmoving party, *Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004). If "the evidence yields conflicting inferences [regarding material facts], summary judgment is improper, and the action must proceed to trial." *O'Connor v. Boeing N. Am., Inc.*, 311 F.3d 1139, 1150 (9th Cir. 2002).

## III.     DISCUSSION

### A.  Plaintiff's Motion for Partial Summary Judgment[1]

Plaintiff's Partial Motion for Summary Judgment argues that the Defendants are not entitled to certain justification defenses under Arizona law.

#### 1.  Justification Defenses under A.R.S. §§ 13-404 – 413

Plaintiff first argues that the Defendants are not entitled to the justification defenses found in A.R.S. §§ 13-404 through 13-413 because it is undisputed that S.L. did nothing to justify any use of force against her and because the language of the statutes does not permit Defendants to justify using force against S.L. based on the conduct of Pequeno. (Doc. 303 at 9.)

The burden is on the defendant to establish the elements of a justification defense by a preponderance of the evidence. *Pfeil v. Smith*, 900 P.2d 12, 14 (Ariz. Ct. App. 1995). In Arizona, courts interpret statutes in view of the entire text, considering the context and related statutes on the same subject. *Arizona Chapter of Associated Gen. Contractors of Am. v. City of Phoenix*, 445 P.3d 2, 4 (Ariz. 2019). The goal is to effectuate legislative intent. *Id.*

A.R.S. § 13-409 states:[2]

---

[1] Based on the Court's decision below to grant the Chandler Defendants' Motion for Summary Judgment, the Court will only analyze Plaintiff's Partial Motion for Summary Judgment as to the Mesa Defendants.

[2] The Mesa Defendants have highlighted only A.R.S. §§ 13-409 – 13-411. Thus, the Court will examine those provisions.

A person is justified in threatening or using physical force against another if in making an arrest or detention or in preventing or assisting in preventing the escape after arrest or detention of that other person, such person uses or threatens to use physical force and all of the following exist:

1.  A reasonable person would believe that such force is immediately necessary to effect the arrest or detention of prevent the escape.

2.  Such person makes known the purpose of the arrest or detention or believes that it is otherwise known or cannot reasonably be made known to the person to be arrested or detained.

3.  A reasonable person would believe the arrest or detention to be lawful.

Section 13-410(A) states:

A.  The threatened use of deadly physical force by a person against another is justified pursuant to § 13-409 only if a reasonable person effecting the arrest or preventing the escape would believe the suspect or escapee is:

1.  Actually resisting the discharge of a legal duty with deadly physical force or with the apparent capacity to use deadly physical force; or

2.  A felon who has escaped from lawful confinement; or

3.  A felon who is fleeing from justice or resisting arrest with physical force.

Section 13-410(C) states:

C.  The use of deadly force by a peace officer against another is justified pursuant to § 13-409 only when the peace officer reasonably believes that it is necessary:

1.  To defend himself or a third person from what the peace officer reasonably believes to be the use or imminent use of deadly physical force.

2.  To effect an arrest or prevent the escape from custody of a person whom the peace officer reasonably believes:

(a) Has committed, attempted to commit, is committing or is attempting to commit a felony involving the use or a threatened use of a deadly weapon.

- 10 -

(b) Is attempting to escape by use of a deadly weapon.

(c) Through past or present conduct of the person which is known by the peace officer that the person is likely to endanger human life or inflict serious bodily injury to another unless apprehended without delay.

(d) Is necessary to lawfully suppress a riot if the person or another person participating in the riot is armed with a deadly weapon.

Section 13-411(A) states:

A. A person is justified in threatening or using both physical force and deadly physical force against another if and to the extent the person reasonably believes that physical force or deadly physical force is immediately necessary to prevent the other's commission of arson of an occupied structure under § 13-1704, burglary in the second or first degree under § 13-1507 or 13-1508, kidnapping under § 13-1304, manslaughter under § 13-1103, second or first degree murder under § 13-1104 or 13-1105, sexual conduct with a minor under § 13-1405, sexual assault under § 13-1406, child molestation under § 13-1410, armed robbery under § 13-1904 or aggravated assault under § 13-1204, subsection A, paragraphs 1 and 2.

Before determining whether the evidence supports the use of the affirmative defenses by the Mesa Defendants, the Court will determine whether the statutes apply when police have harmed a third party who is not their intended target. Examining the plain wording of the statutes, it is clear that the statutes cannot provide a justification for harm inflicted on a third party who is not the target of law enforcement. The statutes are silent as to whether physical force or deadly physical force would be justified against a third party, leading to the conclusion that it could not have been the intent of the legislature. *See MacKinney v. City of Tucson*, 299 P.3d 1282, 1285 (Ariz. Ct. App. 2013) ("Our primary goal in interpreting a statute is to give effect to the legislature's intent, and the language of a statute is the most reliable evidence of that intent."). Thus, the Court cannot interpret the statutes as justifying force against a third party who is not the object of law enforcement's use of force or deadly force. This interpretation is in accord the New Jersey Supreme Court, which examined a similarly worded self-defense statute and found that the statute did not

justify physical force accidentally inflicted on a third party. *See State v. Fowler*, 216 A.3d 152, 161 (N.J. 2019) ("The language of the statute is not drafted to address force used against third parties, but rather offers justification for force used against a party who uses force against the defendant."). Accordingly, the Court will grant Plaintiff's request for summary judgment on the defenses contained in sections 13-404 through 13-413 because it is undisputed that S.L. did not take any action to provoke the force used against her, and the statutes do not justify force used against an unprovoking third party.

### 2. Defenses under A.R.S. §§ 12-711, 12-712, and 12-716

The Mesa Defendants concede that the statutory defense in A.R.S. § 12-711 is inapplicable in this action. (Doc. 326 at 15.) However, they contend that summary judgment is not appropriate on the defenses in A.R.S. §§ 12-712 and 12-716. Section 12-712 provides an affirmative defense if the defendants proves that the claimant or decedent "was attempting to commit, committing, or having immediately fleeing from a felony criminal act and as a result of that act, the decedent was at least fifty percent responsible for the event that caused the claimant or decedent harm. Section 12-716(A) provides that if a court finds by a preponderance of the evidence that a plaintiff is harmed while the plaintiff is attempting to commit, committing, or fleeing after having committed or attempting to commit a felony criminal act, a peace officer is presumed to be acting reasonably if the peace officers using deadly physical force to protect himself or another person or to effect an arrest or prevent or assist in preventing a plaintiff's escape.

The Court will grant Plaintiff's request for summary judgment on A.R.S. § 12-712. Although there is a dispute about whether S.L. committed a felony (by potentially helping Pequeno evade police officers or by consuming methamphetamine), under no interpretation of the evidence could she be found to be at least fifty percent responsible for the event that caused her death. The officers' execution of the vehicle containment and shooting was not due, even in part, to her conduct. Further, the evidence shows that S.L. was not committing, attempting to commit, or fleeing after having committed a criminal act. Instead, she was simply sitting in the back of the Corolla, which was boxed in and

going nowhere, when she was shot. Accordingly, the Court will grant summary judgment on the defense found in A.R.S. § 12-712.

Summary judgment is also appropriate on the defense found in A.R.S. § 12-716. Like the defense found in section 12-712, the defense found in section 12-716 requires the court to find by a preponderance of the evidence that a plaintiff was harmed while the plaintiff was "attempting to commit, committing or fleeing after having committed a felony criminal act…" There is simply no evidence here that S.L. was doing any of those things. The Mesa Defendants point to a dispute of fact that S.L. may have committed a felony earlier in the day—either by helping Pequeno to avoid police or, potentially, by consuming meth. However, this does not bolster their argument in the slightest. Accordingly, the Court will grant Plaintiff's request for summary judgment on the defense found in A.R.S. § 12-716 as well.

**3. Qualified Immunities under A.R.S. § 12-820.02**

Plaintiff argues that the eleven circumstances outlined by A.R.S. § 12-820.02 are inapplicable to the current evidence and, thus, do not provide a defense to liability for Defendants. The Mesa Defendants oppose summary judgment on this point, arguing that A.R.S. § 12-820.02(A)(1) applies. The Court disagrees with the Mesa Defendants. Section 12-820.02(A)(1) states that a public entity or employee is not liable for "[t]he failure to make an arrest or the failure to retain an arrested person in custody." However, Plaintiff is not seeking liability for the failure to arrest Pequeno or S.L. Thus, this defense is inapplicable. The Court will grant summary judgment in favor of Plaintiff's on the defense.

**4. Statutory Defenses in A.R.S. § 12-820**

Plaintiff next contends that the Defendants waived the remainder of their defenses under A.R.S. § 12-820 by failing to raise them in their answers.[3] The Mesa Defendants respond that they did in fact raise the defense in their answer, in their initial disclosure statement, and in their responses to Mandatory Initial Discovery Pilot Program Requests

---

[3] Plaintiff does not argue that the justifications found in A.R.S. § 12-820 do not apply, only that Defendants have waived them.

1    ("MIDP Responses"). (Doc. 326 at 11-12.)

2         The Mesa Defendants' Answer states, "As and for a separate affirmative defense,

3    and in the alternative, the Mesa Defendants assert the privileges and immunities set forth

4    in A.R.S. § 12-820 *et. seq*., including absolute and qualified immunities arising out of this

5    incident." (Doc. 12 at 36 ¶ 20.) In the Mesa Defendants' MIDP Responses, they do not

6    specifically mention A.R.S. § 12-820 *et. seq.* Instead, they claim that they are entitled to

7    "all privileges and immunities extended to governmental employees under federal law,

8    including qualified immunity." (Doc. 327-2 at 54.) In their initial disclosure statement, the

9    Mesa Defendants asserted "the privileges and immunities set forth in A.R.S. § 12-820 et

10   seq. [*sic*], including absolute and qualified immunity arising out of this incident." (Doc.

11   327 at 205.) Plaintiff does not cite any binding authority requiring the Court to rule that the

12   Mesa Defendants have waived the defenses under these circumstances. Further, although

13   Plaintiff points out that the Court's General Order 17-08 requires the parties to identify the

14   relevant facts and legal theories for each claim or defense asserted, Plaintiff has never filed

15   a motion with this Court to compel compliance with that order, and the order never states

16   that a party waives a defense by its failure to comply. (Doc. 3 at 7 ¶ 4.) Accordingly, the

17   Mesa Defendants have not waived the defenses under A.R.S. § 12-820 *et seq*.

18        **5.  Assumption of the Risk**

19        Lastly, Plaintiff argues that she is entitled to summary judgment on Defendants'

20   affirmative defense of assumption of the risk. The Mesa Defendants respond that it is

21   impermissible the grant summary judgment on assumption of the risk under the Arizona

22   Constitution. In Arizona, the elements of assumption of the risk are as follows:

23

24        (1) There must be a risk or harm to plaintiff caused by defendant's conduct
             or by the condition of the defendant's land or chattels;

25

26        (2) Plaintiff must have actual knowledge of the particular risk and appreciate
             its magnitude.

27

28        (3) The plaintiff must voluntarily choose to enter or remain within the area
             of the risk under circumstances that manifest his willingness to accept

- 14 -

1  that particular risk.

2  *Garcia v. City of South Tucson*, 640 P.2d 1117, 1121 (Ariz. Ct. App. 1981) (quoting

3  *Hildebrand v. Minyard*, 494 P.2d 1328 (Ariz. Ct. App. 1972). Article 18 section 5 of the

4  Arizona Constitution states, "The defense of contributory negligence or assumption of the

5  risk shall, in all cases whatsoever, be a question of fact and shall, at all times, be left to the

6  jury." Thus, "[i]t is constitutionally forbidden for Arizona courts to enter summary

7  judgment for a defendant on the ground of assumption of the risk." *Estes v. Tripson*, 932

8  P.2d 1364, 1366 (Ariz. Ct. App. 1997). However, as Plaintiff points out, Arizona courts

9  have decided that despite the broad language of the Arizona Constitution, "this provision

10  does not guarantee a defendant an unqualified right to raise assumption of the risk as a

11  defense." *A Tumbling-T Ranches v. Flood Control Dist. of Maricopa Cty.*, 217 P.3d 1220,

12  1244 (Ariz. Ct. App. 2009) (finding that the trial court did not err in refusing to grant a jury

13  instruction on assumption of the risk where the defendant presented no evidence as to the

14  defense). Due to the broad language in the Arizona Constitution, the Court will deny

15  summary judgment on the assumption of the risk defense, but that does not necessarily

16  mean that the Mesa Defendants will be entitled to the jury instruction at trial.

17  **B. Mesa Defendants' Motion for Summary Judgment**

18  The Mesa Defendants claim that summary judgment is appropriate for the seizure

19  the Corolla and the excessive force claim.

20  **1. § 1983 Fourth Amendment Claim**

21  **i.   Qualified Immunity Rule of Law**

22  "The doctrine of qualified immunity protects government officials 'from liability

23  for civil damages insofar as their conduct does not violate clearly established statutory or

24  constitutional rights of which a reasonable person would have known." *Pearson v.*

25  *Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818

26  (1982)). "[Q]ualified immunity is 'an immunity from suit rather than a mere defense to

27  liability. *Id.* The doctrine "shields federal and state officials from money damages unless a

28  plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right,

and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citing *Harlow*, 457 U.S. at 818). "Courts have discretion to decide the order in which to engage these two prongs." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (citing *Pearson*, 555 U.S. at 236). "When this test is properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Hernandez v. City of San Jose*, 897 F.3d 1125, 1132-33 (9th Cir. 2018) (quoting *al-Kidd*, 563 U.S. at 743).

A government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of the right are sufficiently clear such that "every 'reasonable official would [understand] that what he is doing violates that right.'" *al-Kidd*, 563 U.S. at 741 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). While a case directly on point is not required, "existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741. Where excessive force is at issue, police officers "are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Kisela v. Hughes*, 138 S.Ct. 1148, 1153 (2018) (citing *Mullenix v. Luna*, 136 S.Ct. 305, 308 (2015)). To be clearly established, the court must identify a case "where an officer acting under similar circumstances" was held to have violated the constitutional right at issue. *S.B. v. Cty. of San Diego*, 864 F.3d 1010, 1015 (9th Cir. 2017) (cleaned up). Thus, liability will not attach unless there is "'a case where an officer acting under similar circumstances … was held to have violated the Fourth Amendment.'" *Emmons v. City of Escondido*, 921 F.3d 1172, 1174 (9th Cir. 2019) (quoting *White v. Pauly*, 137 S.Ct. 548, 552 (2017)). To achieve this kind of notice, "the prior precedent must be 'controlling'—from the Ninth Circuit or Supreme Court—or otherwise be embraced by a 'consensus' of courts outside the relevant jurisdiction." *Sharp v. Cty. of Orange*, 871 F.3d 901, 911 (9th Cir. 2017) (citing *Wilson v. Layne*, 526 U.S. 603, 617 (1999)). The plaintiff bears the burden of showing that the rights allegedly violated were clearly established. *Shafer v. Cty. of Santa Barbara*, 868 F.3d 1110, 1118 (9th Cir. 2017) (citation omitted).

The Supreme Court has repeatedly "stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991). The trend of the Supreme Court's qualified immunity jurisprudence is "toward resolving qualified immunity as a legal issue before trial whenever possible." *Morales v. Fry*, 873 F.3d 817, 823 (9th Cir. 2017). Where disputed facts exist, courts can determine whether the denial of qualified immunity was appropriate by assuming that the version of the material facts asserted by the non-moving party is correct. *Bingue v. Prunchak*, 512 F.3d 1169, 1172-73 (9th Cir. 2008) (citing *Jeffers v. Gomez*, 267 F.3d 895, 903 (9th Cir. 2001)).

### ii.    Excessive Force Rule of Law

Claims of excessive force are analyzed under the reasonableness standard of the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 395 (1989). Objective reasonableness turns on the facts and circumstances of each case. *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015) ("A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight."). Reasonableness is assessed by weighing the type and amount of force used with: (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the officers or others; and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Miller v. Clark Cty.*, 340 F.3d 959, 964 (9th Cir. 2003) (citing *Graham*, 490 U.S. at 396). "Of all these factors, the 'most important' one is 'whether the suspect posed an immediate threat to safety of the officers or others.'" *S.B. v. Cty. of San Diego*, 864 F.3d 1010, 1013 (9th Cir. 2017). "'Other relevant factors include the availability of less intrusive alternatives to the force employed, whether proper warnings were given and whether it should have been apparent to officers that the person they used force against was emotionally disturbed.'" *S.B. v. Cty. of San Diego*, 864 F.3d at 1013 (quoting *Glenn v. Washington Cty.*, 673 F.3d 864, 870 (9th Cir. 2011)). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense,

1   uncertain, and rapidly evolving—about the amount of force that is necessary in a particular

2   situation." *Graham*, 490 U.S. at 396–97.

3               iii.    **Fourth Amendment Analysis**

4               a.  **Vehicle Containment**

5          The Mesa Defendants argue that the use of the vehicle containment constitutes a

6   reasonable seizure because they had probable cause to arrest Pequeno for the crimes he

7   committed. (Doc. 306 at 11.) Conversely, Plaintiff argues that, applying the *Graham*

8   factors, a jury could find that the Mesa Defendants unreasonably seized S.L. during the

9   vehicle containment. (Doc. 337 at 36.) Analyzing the seizure effected by the vehicle

10  containment under the *Graham* factors, it is clear that the vehicle containment was justified.

11         Officers are justified in seizing a vehicle and its occupants if they have probable

12  cause that a crime has been committed. *See Whren v. United States*, 517 U.S. 806, 817

13  (1996). And plainly, "a police officer has immunity if he arrests with probable cause."

14  *Hutchinson v. Grant*, 796 F.2d 288 (9th Cir. 1986). Where probable cause exists, it is

15  unnecessary to perform the balancing analysis for required searches and seizures unless it

16  involved a seizure conduced in an "extraordinary manner." *Whren*, 517 U.S. at 818.

17         Here, even though there was clearly probable cause to seize and arrest Pequeno and

18  the stolen Corolla, Plaintiff encourages the Court to analyze the seizure effected by the

19  vehicle containment using the *Graham* factors. Although the balancing is unnecessary

20  because probable cause existed, the Court will nonetheless indulge this request. The Court

21  begins its balancing of interests by noting that there is no evidence that the vehicle

22  containment caused any harm or injury to the occupants of the vehicle. As to the first factor,

23  the crimes committed by Pequeno were violent and severe. Not only did he assault Gomez,

24  steal her car, and threaten a bystander with a knife, but he also attempted to kidnap her.

25  Additionally, he then fled from police in the stolen car by running red lights and failing to

26  yield. Second, based on Pequeno's violent crime spree, it was reasonable for officers to

27  assume that he posed a threat to themselves and other members of the community. If

28  Pequeno were allowed to continue to roam free, the officers had a reasonable belief that he

1   may have committed other violent crimes. Third, Pequeno had indeed actively evaded

2   arrest by flight. Weighing the important government interests at stake, clearly the use of

3   the vehicle containment did not constitute excessive force or an unreasonable seizure.[4]

4   Thus, the third factor is also met. The officers are, therefore, entitled to qualified immunity

5   for the vehicle containment. Accordingly, summary judgment in favor of the Mesa

6   Defendants is granted for the seizure claim for the vehicle containment.[5]

### b.  Shooting of S.L.

8          Analyzing the seizure and excessive force claims for the shooting of S.L. as a result

9   of the shooting, it is clear that there is a dispute of fact about whether Pezzelle ran afoul of

10  the Fourth Amendment. Sandoval Rosa's testimony provides evidence that could allow a

11  reasonable jury to conclude that the officers shot unarmed vehicle occupants who were in

12  their car, with their hands in the air, complying with officers' commands.

13         Although the Mesa Defendants argue that S.L. does not have standing to bring an

14  unlawful seizure or excessive force claim against the officers because the officers solely

15  intended to target Pequeno, they are wrong. Ninth Circuit jurisprudence has held that it is

16  clearly established that the passenger of a vehicle has standing to bring an unlawful seizure

17  and excessive force claim even when officers intended to shoot the driver of the vehicle to

18  stop the vehicle. *See Villanueva v. California*, 986 F.3d 1158, 1165–66 (9th Cir. 2021)

19  (holding that the passenger of a truck had standing to bring Fourth Amendment claims

20  when he was unintentionally shot by officers who were targeting the driver of the vehicle).

21  Additionally, there is evidence by which a reasonable jury could conclude that Pezzelle

22  intentionally fired at S.L. The bullet hole labeled H in the back window of the Corolla

23  clearly shows that one shot was errant and fired in the direction of S.L. It would be a

24  question for the jury if this shot was just a bad shot or one intentionally fired at S.L. Thus,

---

[4] At least one other court in this circuit has found that the use of a vehicle containment maneuver did not constitute excessive force. *See Nelson v. City of Los Angeles*, No. CV 11-5407-PSG JPR, 2014 WL 6066053, at *7 (C.D. Cal. Nov. 13, 2014).

[5] The Court need not analyze the second prong of the qualified immunity test—whether the violation was clearly established—based on this conclusion. *See Tolan*, 572 U.S. at 656.

1

S.L. clearly has standing to bring a Fourth Amendment claim.

2

3

4

5

6

7

8

9

10

11

12

13

14

15



16

(Doc. 334 ¶ 127.)

17

      Having established that S.L. has standing to bring a Fourth Amendment claim, the Court must turn to whether the officers' actions can constitute a Fourth Amendment violation. S.L. was seized when she was struck by a bullet from Pezzelle's gun. *See Villanueva*, 986 F.3d at 1169 (holding that the passenger of the vehicle was seized when he was shot even though officers were targeting the driver of the vehicle). The Court must next determine whether S.L. was *unreasonably* seized—that is, whether the officers engaged in the use of excessive force. *See id*. Analyzing the evidence under the *Graham* factors in the light most favorable to Plaintiff, there is a question of fact as to whether Pezzelle engaged in excessive force by shooting S.L.[6]

18

19

20

21

22

23

24

25

26

_____

27

[6] Because the Court concludes that Ninth Circuit caselaw confers S.L. standing for her Fourth Amendment claim as the passenger of the Corolla even if officers intended solely to shoot Pequeno and because a reasonable jury could conclude that Pezzelle intended to shoot S.L., the Court will analyze the *Graham* factors both as to Pequeno and S.L.

28

First, the crimes committed by Pequeno were severe. Pequeno assaulted Gomez, stole her car, threatened a bystander with a knife, and attempted to kidnap Gomez before fleeing in the stolen Corolla. Second, Pequeno did not pose much of a threat to officers or others viewing the evidence in the light most favorable to Plaintiff. According to Sandoval Rosa, Pequeno put the Corolla in park and put his hands in the air moments before being shot dead. Although there is evidence that Pequeno tried to break the Corolla free from the vehicle containment, the Corolla was apparently not going anywhere; it was completely boxed in, and the doors could not be opened. Thus, there is a question of fact as to whether Pequeno posed a threat to officers or others when he was shot. Third, Pequeno was trying to evade arrest by revving the engine of the Corolla. However, the Corolla was not capable of breaking out of the containment. Weighing the factors, there is clearly a dispute of fact as to whether officers' use of force in shooting Pequeno was excessive.

Analyzing the Graham factors for S.L., she was not suspected of committing any crime. S.L., undisputedly, did not pose a threat to officers or others when she was shot. Officers did not have any information that she was dangerous, possessed a weapon, or would be uncooperative. Further, there is no evidence that S.L. was evading arrest. Thus, the evidence clearly reveals that Pezzelle's shooting of S.L. would constitute excessive force under the Fourth Amendment if the jury concludes that Pezzelle intentionally shot her. Both the Court's conclusions regarding excessive force used against S.L. and Pequeno comport with the Supreme Court's definitive rule: "An officer may use deadly force to apprehend a fleeing suspect only if 'the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others.'" *Orn v. City of Tacoma*, 949 F.3d 1167, 1174 (9th Cir. 2020) (quoting *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)). Accordingly, there is a factual dispute about whether Pezzelle's shooting of S.L. constituted excessive force under the Fourth Amendment.

Because the use of excessive force is a highly fact-specific inquiry, even when a court determines excessive force was used, "police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Kisela*,

138 S.Ct. at 1153. After considering Ninth Circuit and Supreme Court caselaw, the Court also finds that the alleged Fourth Amendment violations against Pequeno and S.L. were clearly established on April 20, 2017 when the evidence is viewed in the light most favorable to the Plaintiff. Simply put, "A police officer may not seize an unarmed, nondangerous suspect by shooting him [or her] dead." *Garner*, 471 U.S. at 11. This principle has been reiterated by the Ninth Circuit. *See Torres v. City of Madera*, 648 F.3d 1119, 1128 (9th Cir. 2011) ("[F]ew things in our caselaw are as clearly established as the principle that an officer may not seize an unarmed, nondangerous suspect by shooting him dead in the absence of probable cause to believe that the fleeing suspect poses a threat of serious physical harm, either to the officer or to others." (cleaned up)).

Further, there is ample Ninth Circuit caselaw affirming that it is clearly established that shooting unarmed vehicle occupants violates the Fourth Amendment when the vehicle and occupants are not posing a threat of bodily harm to officers or others. *Villanuava*, 986 F.3d at 1165-66; *Stoddard v. City of Hayward*, 817 Fed. App'x 375, 379 (9th Cir. 2020) ("At the time of the incident, it was clearly established that officers are not entitled to qualified immunity for shooting at an individual in a fleeing vehicle that does not pose a danger to them or to the public.").

In *Villanuava*, the Ninth Circuit found that it was clearly established by 1996 that shooting at the driver of a slow-moving vehicle—from which the officers could easily have stepped out of the way—violated the Fourth Amendment's prohibition on excessive force. *Villanueva*, 986 F.3d at 1171 (citing *Acosta v, City & County of San Francisco*, 83 F.3d 1143, 1145–47 (9th Cir. 1996)), *as amended* (June 18, 1996). Indeed, in *Acosta*, the court found that a reasonable jury could have concluded that a police officer used excessive force when he shot the driver of a vehicle that was slowing moving, and which the officer could not have perceived to pose a harm of seriously bodily injury to himself. *Acosta*, 83 F.3d at 1146–47. In that case, evidence showed that the car just barely moved before the officer shot into the car, killing the driver. *Id.* at 1146 n. 8. The court noted that the officer could have avoided the car by merely stepping to the side. *Id.* at 1146. Thus, the car did not pose

- 22 -

a danger of serious bodily harm to the officer. *Id.* at 1147. While the facts of the cases are not identical to those here, the Court finds that they are close enough that an officer in Pezzelle's situation should have known that shooting an unarmed occupant in a trapped vehicle constituted excessive force. Accordingly, the Court finds that, interpreting the evidence in the light most favorable to Plaintiff, it was clearly established before April 20, 2017 that shooting unarmed vehicle occupants in a stationary vehicle, who were complying with officer commands and posing no risk or harm to officers or others, violated the Fourth Amendment prohibition on unreasonable seizures and excessive force.

### c.  Qualified Immunity for Individual Officers

The Court will next determine whether any of the officers are entitled to qualified immunity. Each defendant is entitled to an "individualized analysis" of qualified immunity. *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000). Plaintiff only argues that Pezzelle is not entitled to qualified immunity, (Doc. 337 at 28), and seeks to hold the rest of the officers accountable under the integral participation theory.

As analyzed above, Pezzelle is not entitled to qualified immunity. The factual disputes about how S.L. was positioned when she was shot, Pequeno's actions, and Pezzelle's intent preclude a grant of qualified immunity.

### d.  Integral Participation Theory

Plaintiff argues that the remainder of the Mesa officers in this matter were integral participants to Pezzelle's constitutional violations. (Doc. 337 at 31.) "'[I]ntegral participation does not require that each officer's actions themselves rise to the level of a constitutional violation." *Boyd v. Benton Cty.*, 374 F.3d 773, 780 (9th Cir. 2004). "But it does require some fundamental involvement in the conduct that allegedly caused the violation." *Blankenhorn v. City of Orange*, 485 F.3d 463, 481 n. 12 (9th Cir. 2007). In *Boyd*, the Ninth Circuit determined that officers who helped in the deployment of a flash-bang and the subsequent search operation were integral participants in constitutional violations for three reasons: (1) the officers at issue stood behind the officer as he reached into the doorway and deployed the flash-bang; (2) the use of the flash-bang was part of the

1    search operation in which every officer participated in some meaningful way; and (3) every

2    officer was aware of the decision to use the flash-bang, did not object to it, and participated

3    in the search in some meaningful way. *Boyd*, 374 F.3d at 780.

4           Here, as the Court discussed above, the vehicle containment itself was lawful and

5    justified. The conduct that caused the potential constitutional violation was the shooting

6    itself of S.L. Thus, mere participation in the vehicle containment in this scenario would not

7    make an officer in integral participant in the conduct that resulted in the constitutional

8    violation. Instead, only the officers who fired shots at the vehicle occupants could

9    potentially have been said to engage in constitutional violations. Unlike in *Boyd* where

10    every officer involved in the search knew of the decision to use the flash bang and did not

11    object to it, *id*. at 780, here, there is no evidence that the plan was to trap the vehicle

12    occupants in the car in order to shoot them, even if they acquiesced to officer commands.

13    The officers knew only that a shootout was a possibility, as it always is when officers

14    attempt to arrest the most violent suspects. Therefore, only those officers who fired shots

15    into the Corolla can be considered integral participants.

16           Besides Pezzelle, only Pollard and Baker fired rounds at the Corolla's occupants.

17    However, their rounds never struck S.L., and thus, they never caused any harm to her.

18    Thus, they had no part in the actions that actually caused the constitutional violation

19    because only Pezzelle actually shot S.L. While Jones fired beanbag rounds into the Corolla

20    to "gain compliance" and open the windows—so that the Corolla occupants could hear

21    officer commands—that action alone did not constitute the unlawful seizure and excessive

22    force alleged by Plaintiff, and Jones was not an integral participant in the constitutional

23    violation. Accordingly, apart from Pezzelle, none of the officers were integral participants

24    in the constitutional violation that caused S.L.'s death.

25           **2.  Fourteenth Amendment Familial Association Claim**

26           The Ninth Circuit has recognized that "parents have a Fourteenth Amendment

27    liberty interest in the companionship and society of their children. *Wilkinson v. Torres*, 610

28    F.3d 546, 554 (9th Cir. 2010). A Fourteenth Amendment familial association claim

requires a plaintiff to prove that officers' use of force "shocked the conscious." *Gonzalez v. City of Anaheim*, 747 F.3d 789, 797 (9th Cir. 2014) (quoting *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008)) (alterations omitted). "In determining whether excessive force shocks the conscience, the court must first ask 'whether the circumstances are such that actual deliberation [by the officer] is practical.'" *Wilkinson*, 610 F.3d at 554 (quoting *Porter*, 546 F.3d at 1137). Where actual deliberation is practical, an officer's "deliberate indifference" may suffice to shock the conscious. *Id.* Actual deliberation is not practical "when an officer encounters fast paced circumstances presenting competing public safety obligations." *Porter*, 546 F.3d at 1139. Thus, the purpose-to-harm standard must apply when situations escalate so quickly that the officer must make a "snap judgment." *Id.* at 1137. Where officers did not have time to deliberate, "a use of force shocks the conscience only if the officers had a 'purpose to harm' the decedent for reasons unrelated to legitimate law enforcement objectives." *Gonzalez*, 747 F.3d at 797. "For example, a purpose to harm might be found where an officer uses force to bully a suspect or 'get even.'" *Wilkinson*, 610 F.3d at 554 (quoting *Porter*, 546 F.3d at 1137). Speculation as to improper motive does not rise to the level of evidence sufficient to survive summary judgment. *Id.* (citing *Karam v. City of Burbank*, 352 F.3d 1188, 1194 (9th Cir. 2003)).

While the Mesa Defendants argue that the purpose-to-harm standard should apply because the officers were faced with a rapidly evolving situation that required snap judgments, Plaintiff argues that the deliberate indifference standard applies because the officers had time to deliberate regarding the vehicle containment while the trio was inside the apartment.

Here, the Court finds that actual deliberation was not practical, requiring the Court to use the purpose-to-harm standard. Undisputedly, the time between when the officers executed the vehicle containment until the time that they started firing was a matter of seconds. (Doc. 331 ¶ 102.) While the officers did deliberate about the vehicle containment itself and note that a shooting was possible, after the vehicle containment the officers found themselves in an escalating situation requiring snap judgments. Accordingly, the purpose-

1    to-harm standard is appropriate.

2        Applying this standard, it is clear that Plaintiff's familial association claim under

3    the Fourteenth Amendment must fail. Plaintiff has produced no evidence—besides bullet

4    hole "H" in the rear passenger window of the Corolla—that officers had the purpose to

5    harm S.L. or any other occupant of the Corolla unrelated to legitimate law enforcement

6    objectives. Speculation would be required to come up with an improper motive. Therefore,

7    the Court will grant summary judgment in favor of the Mesa Defendants on Plaintiff's

8    Fourteenth Amendment familial association claim.

9        **3.  *Monell* Claim**

10        The Mesa Defendants argue that Plaintiff's *Monell* claim fails because there is no

11    constitutional violation, and they also claim that the failure to train and failure to supervise

12    claims fail on the merits. A government entity may not be held liable under 42 U.S.C. §

13    1983, unless a policy, practice, or custom of the entity can be shown to be a moving force

14    behind a violation of constitutional rights. *Monell v. Dep't of Soc. Servs. of the City of New

15    York*, 436 U.S. 658, 694 (1978). In order to establish *Monell* liability against a government

16    entity, a plaintiff must prove (1) that the plaintiff possessed a constitutional right of which

17    she was deprived; (2) that the municipality had a policy; (3) that the policy amounts to

18    deliberate indifference to plaintiff's constitutional right; and (4) that the policy is the

19    moving force behind the constitutional violation. *Dougherty v. City of Covina*, 654 F.3d

20    892, 900 (9th Cir. 2011).

21        The Court has decided that there is a dispute of fact as to whether Pezzelle engaged

22    in an unlawful seizure and excessive force under the Fourth Amendment. Thus, the Mesa

23    Defendants' first argument—that there was not constitutional violation—fails. The Court

24    will analyze the Mesa Defendants arguments regarding the evidence related to the failure

25    to train and the failure to supervise claims.

26        **i.    Failure to Train**

27        A municipality's failure to train an employee who has caused a constitutional

28    violation can be the basis for § 1983 liability where the failure to train "amounts to

deliberate indifference to the rights of persons with whom the employee comes into contact." *Long v. Cty. of Los Angeles*, 442 F.3d 1178, 1186 (9th Cir. 2006). Further, the failure to train must have been the moving force behind the employee's violation of a constitutional right. *Id.* To show that the failure to train was the moving force behind a constitutional violation, a plaintiff must "demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Castro v. City of Los Angeles*, 833 F.3d 1060, 1078–79 (9th Cir. 2016) (Callahan, J. dissenting) (quoting *Board of Commissioners of Bryan Cty., Oklahoma v. Brown*, 520 U.S. 397, 404–05 (1997)). "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick v. Thompson*, 563 U.S. 51, 62 (2011). However, in some circumstances, the Supreme Court has recognized that there may be situations where "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton v. Harris*, 489 U.S. 378, 390 (1989).

In support of their failure to train claim, Plaintiff produces scant evidence. First, Plaintiff points to three other federal cases since 2014 in which Mesa Police Department officers were alleged to have used excessive force. However, the facts of those cases are distinguishable from this one, and none resulted in a finding of a constitutional violation. These cases do not put the Mesa Police Department on notice of a training problem. Next, Plaintiff points out that Pezzelle was involved in a use of force incident in 2011 when he was alleged to have fired his gun at unarmed occupants of a vehicle. (Doc. 334 ¶ 246.) The outcome of this incident is unclear. Finally, Plaintiff next points to their expert, Scott DeFoe's, report, which opines that the Defendants failed to conduct scenario-based training for vehicle containments that involved contingencies and tactics for when the subject vehicle contained individual who were not suspected of having committed a crime. (Doc. 334 ¶ 234.) However, this assertion is not correct. During Pollard's deposition, he testified that VOU members would train using a dummy, a mannequin head, or paper targets.  (Doc.

346-5 at 3.) He also testified that they would put dummies in different positions in the vehicle during training to practice avoiding shooting the dummy. (*Id.* at 2.) Plaintiff has fallen short of what is required to show deliberate indifference of constitutional rights by the City of Mesa. There is no pattern of similar constitutional violations and this is hardly a situation where training is so obviously deficient as to trigger *Monell* liability. Accordingly, the Court will grant the Mesa Defendants' request for summary judgment on this portion of the *Monell* claim.

### ii.    Failure to Supervise

The Mesa Defendants contend that Plaintiff's failure to supervise claim under *Monell* fails because the VOU was adequately supervised by the U.S. Marshall's service and because it had on-sight supervision from Sergeant Bellows and Lieutenant Rudd. (Doc. 306 at 29.) Plaintiff contends that the City of Mesa maintained widespread, systematic practices from which a reasonable jury could conclude that the city was deliberately indifferent to the supervision of the officers. (Doc. 337 at 43.) A failure to supervise that is "sufficiently inadequate" may amount to "deliberate indifference." *Dougherty*, 654 F.3d at 900.

Here, Plaintiff has failed to provide enough evidence to show that the Mesa Police Department's supervision was sufficiently inadequate to constitute a policy or custom, or that it was sufficiently inadequate to constitute deliberate indifference to constitutional rights. Plaintiff alleges that Mesa Police Department violated its own policies by failing to complete a Containment Report Form and Use of Force Report for each vehicle containment, that the department failed to convene a Use of Force Board for serious use of force incidents involving the Task Force, that the department failed to take any action in response to Pezzelle's high number of IAPro alerts, and that Bellows and Rudd failed to implement an alternative plan in lieu of the containment and failed to implement a tactical plan before the containment. (Doc. 337 at 43-44.) However, as the Mesa Defendants point out, the failure to convene the Use of Force Board is somewhat misleading evidence. Commander Beaton testified that OIS, detectives from another agency, or detectives from

1   the Mesa Police Department review the case and then brief the executive staff of the Mesa
2   Police Department. (Doc. 354 at 26.) The case is then presented to the Maricopa County
3   Attorney's Office. (*Id.*) Thus, this case was in fact reviewed on multiple occasions,
4   including by the executive staff of the Mesa Police Department. Plaintiff does not explain
5   how numerous IAPro alerts reveal a lack of supervision or that the Mesa Police Department
6   had a policy or custom of failing to supervise other officers who had a high number IAPro
7   alerts. Furthermore, any alleged failures by Bellows and Rudd as to this incident do not
8   establish a department wide policy or custom of failing to supervise officers. Thus, Plaintiff
9   has presented insufficient evidence for the *Monell* claim of failure to supervise.

### iii.   Ratification

11  The Mesa Defendants also argue that the City of Mesa did not ratify the conduct at
12  issue in this action. "If the authorized policymakers approve a subordinate's decision and
13  the basis for it, their ratification would be chargeable to the municipality because their
14  decision is final." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). While a single
15  decision by a municipal policymaker may be sufficient to trigger *Monell* liability, "the
16  plaintiff must show that the triggering decision was the product of a 'conscious affirmative
17  choice' to ratify the conduct in question." *Haugen v. Brosseau*, 351 F.3d 372, 393 (9th Cir.
18  2003) (quoting *Gillette v. Delmore*, 979 F.2d 1342, 1347 (9th Cir. 1992)), *cert. granted,*
19  *judgment vacated*, 543 U.S. 194 (2004). A single instance of a failure to discipline does
20  not rise to the level of ratification. *Haugen*, 351 F.3d at 393.

21  Plaintiff points to the testimony of Commander Michael Beaton of the Mesa Police
22  Department in her attempt to argue ratification. Beaton testified that in 2017, Acting Chief
23  Dvorak instructed the Mesa Police Department to disregard the Use of Force Board policy,
24  DPM 1.11.60, and stop reviewing officer-involved shootings. (Doc. 334 ¶ 241.) Instead,
25  Chief Dvorak directed the Use of Force Board to look at only "tasers and beanbags and
26  strikes to the face" rather than shootings. (*Id.*) Thus, the Use of Force Board never reviewed
27  the shooting of S.L. and Pequeno. (*Id.*) However, as mentioned above, Plaintiff somewhat
28  misrepresent Beaton's testimony. Beaton also testified that OIS, detectives from another

agency, or detectives from the Mesa Police Department review the case and then brief the executive staff of the Mesa Police Department. (Doc. 354 at 26.) The case is then presented to the Maricopa County Attorney's Office. (*Id.*) Plaintiff's evidence falls short of what is required for ratification. There is simply no evidence to exhibit a conscious affirmative choice by the Mesa Police Department to ratify the conduct that took place in this case. The Court will grant summary judgment in favor of the Mesa Defendants on Plaintiff's *Monell* claims.

### 4. Arizona Wrongful Death Claim

A prerequisite for recovery under Arizona's wrongful death statute is that S.L. would have been able to maintain the action if her death had not occurred. *See Summerfield v. Superior Ct. In & For Maricopa Cty.*, 698 P.2d 712, 720 (Ariz. 1985). Plaintiff argues that the City of Mesa is liable for the negligence and gross negligence of its employees who trapped S.L. in the car and for the shooting; that a reasonable jury could find the City of Mesa liable for the assault and battery that its officers committed when they trapped S.L. in the car and shot her; and that a reasonable jury can find that the city was negligent in its training supervision and adoption of policies. (Doc. 337 at 46–47.)

The Mesa Defendants argue that Plaintiff's wrongful death claim under Arizona law fails because Defendants' use of force was objectively reasonable, because Arizona's justification statute precludes civil liability, A.R.S. § 13-413, because officers are statutorily protected in using deadly force against another to protect themselves or a third person, A.R.S. § 13-406; A.R.S. § 13-410(C)(1), and because there is insufficient evidence for Plaintiff's negligent supervision and training claim against the City of Mesa. (Doc. 306 at 30–31.) Based on the Court's Fourth Amendment analysis above, the Mesa Defendants' first argument must fail. The remaining arguments will be discussed below.

### i. Negligence and Gross Negligence for Trapping S.L. in the Car

In her Second Amended Complaint, Plaintiff alleged that the City of Mesa is liable for the wrongful death of S.L. due to their failure to use reasonable care and their reckless disregard for the risk of harm to S.L. (Doc. 10 ¶¶ 219–20.) To establish a claim for

negligence, a plaintiff must prove: (1) a duty requiring the defendant to conform to a certain standard of care; (2) a breach of that standard of care; (3) a causal connection between the defendant's conduct and the resulting injury; and (4) actual damages. *Gipson v. Kasey*, 150 P.3d 228, 230 (Ariz. 2007). Under Arizona caselaw, a plaintiff may plead negligence for conduct that is "independent for the intentional use of force" or as an alternate theory of liability if the evidence supports both theories. *Ryan v. Napier*, 425 P.3d 230, 238 (Ariz. 2018). "A gross-negligence claim additionally requires a showing of gross, willful, or wanton conduct." *Noriega v. Town of Miami*, 407 P.3d 92, 98 (Ariz. Ct. App. 2017) (cleaned up). "A party is grossly or wantonly negligent if he acts or fails to act when he knows or has reason to know facts which would lead a reasonable person to realize that his conduct not only creates an unreasonable risk of bodily harm to others but also involves a high probability that substantial harm will result." *Walls v. Arizona Dep't of Pub. Safety*, 826 P.2d 1217, 1221 (Ariz. Ct. App. 1991).

"Common law qualified immunity generally provides public officials, including police officers, limited protection from liability when performing an act that inherently requires judgment or discretion." *Spooner v. City of Phoenix*, 435 P.3d 462, 466 (Ariz. Ct. App. 2018) (cleaned up). Therefore, "an officer performing a discretionary act within the scope of his public duties may be liable only if grossly negligent." *Merritt v. Arizona*, 425 F. Supp. 3d 1201, 1231 (D. Ariz. 2019). Thus, the Court must only determine if the officers' decision to perform the vehicle containment could have amounted to gross negligence.

Here, there is a dispute of fact about officers' knowledge of whether Pequeno had a weapon when the shooting occurred. There is evidence that Pezzelle informed other officers that Pequeno may have a firearm before the vehicle containment occurred. There is also evidence that Gomez had told Pezzelle—and that Pezzelle had relayed to the other officers—that if Pequeno was going out, it would be at the hands of the police. Plaintiffs must show that these facts would have led a reasonable person to realize that his conduct not only created an unreasonable risk of bodily harm to S.L., but also that it involved a high probability that substantial harm would result. As stated above, the decision to

1   perform the vehicle containment was constitutionally justified because the officers had

2   probable cause to arrest Pequeno and seize the stolen Corolla. The officers had performed

3   scenario-based training during which they practiced performing a vehicle containment and

4   shooting into the vehicle with passengers. (Doc. 346-5 at 2-3.) Further, the decision to

5   conduct the vehicle containment necessarily required a balancing of interests by VOU

6   members. They could either perform the vehicle containment—which was constitutionally

7   justified—or risk that Pequeno would continue his crime spree or escape if they did not.

8   The Court finds that under these facts, a reasonable jury could not find that the officers'

9   decision to conduct the vehicle containment was grossly negligent. Especially considering

10   the fact that the officers conducted scenario-based training, there is no evidence that

11   officers knew that there was a high probability that substantial harm to S.L. would result

12   from the containment. Further, since Plaintiff has not shown any alternatives to the VOU's

13   containment plan or that those alternatives would have been successful, a jury cannot

14   speculate that alternative plans would have been successful or would have resulted in no

15   harm to officers or others. *See McCleaf v. State*, 945 P.2d 1298, 1303 (Ariz. Ct. App. 1997).

16   Thus, summary judgment on the gross negligence claim is granted.

17               **ii.**    **Assault and Battery**

18       Plaintiffs contend that the Mesa Defendants are liable for assault and battery. The

19   Mesa Defendants' respond that they are entitled to justifications pursuant to Arizona

20   statutes. (Doc. 345 at 32) (citing A.R.S. §§ 13-404 – 406, 13-409 – 411.) "To establish a

21   battery claim, a plaintiff must prove that the defendants intentionally caused a harmful or

22   offensive contact with the plaintiff to occur." *Johnson v. Pankratz*, 2 P.3d 1266, 1268 (Ariz.

23   Ct. App. 2000). "Similarly, a claim for common-law assault requires an allegation that the

24   defendant acted intentionally to cause a harmful or offensive or offensive contact and

25   another person is placed in imminent apprehension of the contact." *Gallegos v. Flores*, No.

26   1 CA-CV 10-0178, 2012 WL 208858, at *3 (Ariz. Ct. App. Jan. 24, 2012) (citing

27   Restatement (Second) of Torts §§ 13, 18 (1965)).

28       The evidence shows that S.L. has a valid battery claim against Pezzelle, but not an

1    assault claim. The evidence, when viewed in a light most favorable to the Plaintiff, shows

2    that Pezzelle may have intentionally fired at S.L. Thus, if this were the case, Pezzelle would

3    have intended for a harmful or offensive contact to occur. However, Plaintiff can provide

4    no evidence that S.L. was in imminent apprehension of the harmful or offensive contact.

5    As decided above, the justification defenses under Arizona law fail because they do not

6    justify force inflicted on a third party who did not provoke such force. Accordingly, the

7    Court will allow Plaintiff's battery claims to proceed to trial but will grant the Mesa

8    Defendants' request for summary judgment on the assault claim.

9                      **iii.    Negligent Training and Supervision**

10        The Mesa Defendants contend that Plaintiff's negligent training and supervision

11   claim fails because there is no evidence that the City of Mesa failed to adequately supervise

12   or train its officers and because Plaintiff cannot prove that negligent training or supervision

13   caused S.L.'s death. Plaintiff argues that the Mesa Defendants are not entitled to summary

14   judgment on this claim for the same reason that the Court discussed with respect to

15   Plaintiffs' negligent supervision and training *Monell* claims. (Doc. 337 at 47.)

16        For negligent training, Plaintiff must provide evidence specifying in what way a

17   defendant's training or lack of training was negligent. *Inmon v. Crane Rental Servs., Inc.*,

18   67 P.3d 726, 733 (Ariz. Ct. App. 2003), *disapproved of on other grounds by Tarron v.*

19   *Bowen Mach. & Fabricating, Inc.*, 235 P.3d 1030 (2010). Negligent training must be the

20   proximate cause of Plaintiff's injuries. *Id.* For an employee to be liable for negligent

21   supervision, an employee must have committed a tort. *Kuehn v. Stanley*, 91 P.3d 346, 353

22   (Ariz. Ct. App. 2004).

23        As the Court stated above in the section on Plaintiff's *Monell* claims against the City

24   of Mesa, Plaintiff produces little evidence that the Mesa Police Department was negligent

25   in training their officers. However, the standard or proof for a negligent training claim

26   under Arizona law appears to be less than what is required for *Monell* liability under federal

27   law since Arizona law does not require Plaintiff to show that the municipality had a policy

28   or custom of negligent training. Nonetheless, Plaintiff's negligent training claim still fails

under Arizona law. Scott DeFoe's report opines that the Defendants failed to conduct scenario-based training for vehicle containments that involved contingencies and tactics for when the subject vehicle contained individuals who were not suspected of having committed a crime. (Doc. 334 ¶ 234; Doc. 334-5 at 88.) However, as mentioned above, this claim appears to be false because Pollard testified that the officers did conduct scenario-based training using a dummy, mannequin, or paper targets. *See supra* § III(B)(3)(i). Further, Pezzelle's use of force incident from 2011 does not necessarily indicate negligent training. Thus, summary judgment is denied on this claim.

Analyzing Plaintiff's negligent supervision claim, there is insufficient evidence by which a jury could find that the Mesa Defendants engaged in negligent supervision in this instance. As decided above, Officer Pezzelle may have committed the tort of battery. However, there is no further evidence that supervision of the members of the VOU was negligent. Sergeant Bellows and Lieutenant Rudd were on the scene and made the constitutionally permissible decision to perform the vehicle containment. Additionally, Plaintiff has not shown that a different outcome would have resulted with different supervisors. *See McCleaf*, 945 P.2d at 1303 ("A directed verdict is properly granted when the plaintiff's evidence would require the jury to speculate on causation."). The same could be said of Plaintiff's other evidence. Plaintiff never explains why the result of the incident would have been different had the Mesa Police Department convened a use of force board for this incident, required the VOU members to fill out a vehicle containment report form, or paid better attention to Pezzelle's IAPro alerts. Viewing this evidence in the light most favorable to Plaintiff, Plaintiff's negligent supervision claim under Arizona law fails due both to the insufficiency of the evidence and due to the lack of evidence of causation.

### 5.  Punitive Damages

Lastly, the Mesa Defendants argue that Plaintiff is not permitted to recover punitive damages from the individual Defendants under federal law because Plaintiff's § 1983 claims fail and because Plaintiff has not established punitive damages are warranted given the facts of the case. Based on the Courts analysis above, the Court has determined that

Plaintiff's § 1983 claims against Pezzelle may go forward. Thus, the Mesa Defendants' first argument fails. A jury may assess punitive damages in a § 1983 action when "the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). Here, viewing the facts in the light most favorable to Plaintiff, the Court finds that a reasonable jury could find that Pezzelle acted with a reckless or callous indifference to the rights of Pequeno and S.L. by potentially intentionally shooting S.L. or by shooting at Pequeno who was simply complying with police commands with his hands in the air. Accordingly, summary judgment must be denied on Plaintiff's punitive damages at this time.

**C. Chandler Defendants' Motion for Summary Judgment**

**1.  § 1983 Fourth Amendment Claim**

The Chandler Defendants argue that the claims for unlawful seizure and excessive force against them must be dismissed because the vehicle containment was lawful, and Officer Dever did not engage in the use of excessive force. As stated above, because the officers had probable cause to arrest Pequeno and recover the stolen Corolla, the vehicle containment was reasonable for Fourth Amendment purposes. Thus, the Court will grant summary judgment on this claim for the Chandler Defendants.

In the Mesa Defendants' section of this order above, the Court determined that there is a question of fact as to whether Mesa officers engaged in the use of excessive force when Pezzelle shot S.L. in the head. The Chandler Defendants are correct that Dever did not engage in any of the acts that constituted excessive force. That evidence shows that he simply initiated the vehicle containment by backing into the Corolla's front bumper and then made himself as small as possible in the front seat with his foot on the brake. (Doc. 310 ¶¶ 32-33.)

Plaintiff counters that Dever was an integral participant in the excessive force used against S.L. (Doc. 330 at 29) (citing *Boyd*, 374 F.3d at 779.) "'[I]ntegral participation does not require that each officer's actions themselves rise to the level of a constitutional

violation," *Boyd*, 374 F.3d at 780, "[b]ut it does require some fundamental involvement in the conduct that allegedly caused the violation," *Blankenhorn*, 485 F.3d at 481 n. 12.[7]

Here, Dever was not an integral participant in the excessive force used against S.L. because this case is distinguishable from *Boyd* in several respects. In *Boyd*, using the flash-bang was a part of the plan of the search operation. Here, there is no evidence to support that shooting Pequeno or the occupants of the vehicle was a part of the plan after executing the vehicle containment, which the Court has ruled was justified. Next, although Dever was an integral participant in the vehicle containment, he was not at all involved in the use of force used immediately afterward. In fact, even if he had time to object to the shooting, there was likely nothing he could have done to stop it. It is undisputed that the shooting occurred very quickly after the vehicle containment—taking place less than thirty seconds after the execution of the maneuver. Dever was crouched down in the front seat of his truck and could only hear what was happening during the rapidly unfolding situation. Thus, the Court finds that he was not an integral participant in the excessive force. Accordingly, Dever is entitled to qualified immunity for the seizure and excessive force of S.L., and the Court will grant the Chandler Defendants' request for summary judgment on this claim.

## 2. Fourteenth Amendment Familial Association Claim[8]

In its analysis of the Mesa Defendants' Motion for Summary Judgment above, the Court determined above that the purpose-to-harm standard would guide its analysis because the officers did not have time to deliberate and were forced to make snap judgments. As with the Mesa Defendants above, the Fourteenth Amendment claim against the Chandler Defendants must fail. Devers undisputedly initiated the vehicle containment by backing his truck into the bumper of the Corolla and then made himself as small as possible in the front seat. Plaintiffs can produce no evidence that Devers had a purpose to harm any of the vehicle occupants of the Corolla through the initiation of the vehicle

---

[7] The events of the *Boyd* case are described above.

[8] The Court included its rule statement for a Fourteenth Amendment familial association claim in the Mesa Defendants' section above, and the Court need not reiterate it here.

containment. Accordingly, the Court must grant summary judgment in favor of the Chandler Defendants on Plaintiff's Fourteenth Amendment familial association claim.

### 3. Arizona Wrongful Death Claim

In Count I of her Second Amended Complaint, Plaintiff alleges a wrongful death claim under Arizona law against the City of Chandler, (Doc. 10 ¶¶ 201–35), in which she alleges that Dever assaulted and battered S.L. and that the City of Chandler acted negligently and grossly negligently by failing to supervise Dever.

#### i.    Assault and Battery

Plaintiffs first allege assault and battery claims against the Chandler Defendants for Devers act of "ramming his vehicle into the Toyota Corolla" occupied by S.L. (Doc. 10 ¶¶ 208-210.) "To establish a battery claim, a plaintiff must prove that the defendants intentionally caused a harmful or offensive contact with the plaintiff to occur." *Johnson v. Pankratz*, 2 P.3d 1266, 1268 (Ariz. Ct. App. 2000). "Similarly, a claim for common-law assault requires an allegation that the defendant acted intentionally to cause a harmful or offensive or offensive contact and another person is placed in imminent apprehension of the contact." *Gallegos v. Flores*, No. 1 CA-CV 10-0178, 2012 WL 208858, at *3 (Ariz. Ct. App. Jan. 24, 2012) (citing Restatement (Second) of Torts §§ 13, 18 (1965)).

Plaintiff's claim for assault and battery against the Chandler Defendants fails for several reasons. First, there is no evidence that Devers intended to cause a harmful or offensive contact to S.L. through the initiation of the vehicle containment. *See Ryan v. Napier*, 425 P.3d 230, 235 (Ariz. 2018) ("Acting with 'intent' does not refer to the act itself."). He simply performed a law enforcement maneuver to apprehend a suspect. Further, even if there were evidence that Devers intended to cause a harmful or offensive contact to the vehicle occupants, Plaintiff's has provided no proof of harm that S.L. suffered from the battery, and she has also failed to provide proof that S.L. was in imminent apprehension of a harmful or offensive contact for her assault claim. Even if Plaintiff had provided such proof, damages for pre-death pain and suffering are not allowed in Arizona. A.R.S. § 14-3110 ("provided that upon the death of the person injured, damages for pain

and suffering of such injured person shall not be allowed.").

Plaintiff contends that Sandoval Rosa's testimony—that he, S.L., and Pequeno were "shocked, alarmed, and frightened" when the vehicle containment began—will allow a reasonable jury to conclude that S.L. was in imminent apprehension of offensive contact and that the contact in fact occurred. (Doc. 330 at 19.) Plaintiffs are incorrect. Such evidence includes no evidence of a harmful or offensive contact initiated by Dever.

Additionally, Plaintiffs argue that a reasonable jury could conclude that, if Dever did not make offensive contact with S.L., Dever was negligent or grossly negligent for doing so. (*Id*.) However, that argument fails because there is evidence that Dever intentionally initiated the vehicle containment. Thus, summary judgment is appropriate for the Chandler Defendants on Plaintiff's state law wrongful death claim premised on assault and battery.

### ii.     Negligent Training and Supervision of Dever

Plaintiff's First Amended Complaint alleges that the City of Chandler breached its duty of care by failing to adequately supervise and train Dever. To establish a claim for negligence, a plaintiff must prove: (1) duty, (2) breach of that duty; (3) causation; and (4) damages. *Gipson*, 150 P.3d at 230. Negligent training must be the proximate cause of Plaintiff's injuries. *Inmon*, 67 P.3d at 733.

Plaintiff argues that "a reasonable juror could conclude that the City of Chandler's negligent training and supervision of Dever was one link in the causal chain that resulted in S.L.'s death." (Doc. 330 at 23.) More specifically, she argues that the jury could conclude that the containment and shooting would not have occurred if Dever had been properly trained to consider the risk of harm to passengers during a vehicle containment. (Doc. 330 at 24.) However, Plaintiff's claim for negligent training fails. Significantly, Plaintiff fails to provide evidence that Dever was not properly trained in vehicle containments. Although Plaintiff claims that Dever testified that he was not trained in how to minimize the risk of harm to passengers during a vehicle containment, Defendants do not cite testimony from Dever backing this assertion. (Doc. 331 ¶ 127.) Further, Plaintiff's

expert, Scott DeFoe, opined that the Task Force failed to conduct scenario-based training that involved contingency tactics when the involved vehicle contained individuals who were not suspected of committing a crime. (Doc. 331-1 at 341.) However, as twice stated above, that claim appears to be false. *See supra* § III(B)(3)(i).

Even if negligent training had occurred, Dever's actions were not the proximate cause of S.L.'s death. The Mesa officers' shooting of Pequeno and S.L. was not part of any scripted plan, and it occurred quickly during a rapidly unfolding situation. Therefore, the Court has determined that the shooting of the Mesa officers was an intervening cause of S.L.'s death. *See Patterson v. Thunder Pass, Inc.*, 153 P.3d 1064, 1067-68 (Ariz. Ct. App. 2007) (a defendant may be relieved of liability for negligence due to a later, intervening event of independent origin). Accordingly, summary judgment in favor of the Chandler Defendants must be granted on Plaintiff's negligent training claim.

Moreover, an employer to be liable for negligent supervision of an employee, a court must first find that the employee committed a tort. *Kuehn*, 91 P.3d at 352. Here, the Court has decided that Dever, the underlying employee, did not commit a tort against S.L. Therefore, Plaintiff's claim for negligent supervision against the City of Chandler must fail.

### iii.   Gross Negligence[9]

The Court discussed the legal standard for gross negligence in the analysis of the Mesa Defendants' Motion for Summary Judgment. *See supra* § III(B)(4)(i). Plaintiff's gross negligence claim necessarily must fail for the same reasons that their negligence claim for failure to train and supervised failed. Namely, Plaintiff has not shown that the training of Dever was negligent, nor that the negligent training and supervision were the proximate cause of S.L.'s death. Accordingly, the Court will grant summary judgment in favor the Chandler Defendants on this claim.

---

[9] Plaintiff also alleged gross negligence in the Second Amended Complaint, but now states that it pled that claim in the alternative and concedes that mere negligence is the appropriate standard. (Doc. 330 at 22.) Nonetheless, Plaintiff goes on to argue that summary judgment on the gross negligence claim is not appropriate. Thus, the Court will address the claim.

#### iv.    Joint and Several Liability

Based on the Court's ruling, the Chandler Defendants cannot be held jointly and severally liable with the Mesa Defendants. In Arizona, parties may be held jointly and severally liable if they were "acting in concert." A.R.S. § 12-2506(D)(1). The statute defines "acting in concert" as "entering into a conscious agreement to pursue a common plan or design to commit an intentional tort and actively taking part in that intentional tort. Acting in concert does not apply to any person whose conduct was negligent in any of its degrees rather than intentional." A.R.S. § 12-2506(F)(1). Here, there is insufficient evidence for a jury to conclude that Dever's initiation of the vehicle containment constituted an intentional tort. Furthermore, there is no evidence that there was a common agreement to commit an intentional tort by shooting S.L. Accordingly, the Chandler Defendants may not be held jointly and severally liable with the Mesa Defendants.

#### 4.  *Monell* Claim

The Chandler Defendants contend that there can be no *Monell* liability because Dever did not violate S.L.'s rights under the Fourth or Fourteenth Amendments. Indeed, having decided that Dever is entitled to qualified immunity as to each of Plaintiff's alleged constitutional violations, *Monell* liability cannot be imposed against the City of Chandler. Accordingly, the Court will grant summary judgment in favor of the City of Chandler for Plaintiff's *Monell* claim.

#### 5.  Summary

In summary, the Court grants summary judgment in favor of the Chandler Defendants on all claims against them. Consequently, the Chandler Defendants are excused as Defendants in this matter.

## IV.    CONCLUSION

Accordingly,

**IT IS ORDERED** granting in part and denying in part Plaintiff's Partial Motion for Summary Judgment, (Doc. 303), as outlined above.

**IT IS FURTHER ORDERED** granting in part and denying in part the Mesa

1   Defendants' Motion for Summary Judgment, (Doc. 306), as outlined above.

2          **IT IS FURTHER ORDERED** granting the Chandler Defendants' Motion for

3   Summary Judgment, (Doc. 309) as outlined above.

4          **IT IS FURTHER ORDERED** directing the Clerk of the Court to file this order

5   under seal.

6          Dated this 8th day of November, 2021.

Honorable Susan M. Brnovich
United States District Judge

cc: Counsel for all parties

- 41 -